1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  MARK R. BECKINGTON, State Bar No. 126009
   Supervising Deputy Attorney General
3  R. MATTHEW WISE, State Bar No. 238485
   Deputy Attorney General
4   1300 I Street, Suite 125
    P.O. Box 944255
5   Sacramento, CA 94244-2550
    Telephone:  (916) 323-8549
6   Fax:  (916) 324-3385
    E-mail: Matthew.Wise@doj.ca.gov
7  *Attorneys for William B. Gould IV, Genevieve*
   *Shiroma, Cathryn Rivera-Hernandez, and J. Antonio*
8  *Barbosa*

9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12

13

14

15 | **CEDAR POINT NURSERY and FOWLER PACKING CO.,** | 1:16-cv-00185-LJO-BAM |
|---|---|
| 16            Plaintiffs, | |
| 17        v. | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| 18 **WILLIAM B. GOULD IV, GENEVIEVE SHIROMA, CATHRYN RIVERA-HERNANDEZ, AND J. ANTONIO BARBOSA, members of the Agricultural Labor Relations Board in their official capacities,** | |
| 22            Defendants. | Date:         March 23, 2016<br>Time:         9:00 a.m.<br>Dept:         Courtroom 4, 7th Floor<br>Judge:        Lawrence O'Neill |
| 23 | Action Filed:  February 16, 2016 |

24        In support of their opposition to Plaintiffs' motion for preliminary injunction, Defendants

25 respectfully request that the Court take judicial notice of the following documents:

26        •    Agricultural Labor Relations Board (ALRB) memorandum, dated November 23,

27             2015, and titled "Staff Proposal for an Education Access Regulation for Concerted

28             Activity, attached as Exhibit A (also available at http://www.alrb.ca.gov/content/

                                            1

1    pdfs/statutesregulations/regulatory/StaffRecommendationWorksiteAccess.pdf)

2    • California's Indigenous Farmworkers—Final Report of the Indigenous Farmworker

3    Study (IFS) to the California Endowment, dated January 2010, attached as Exhibit B

4    (also available at http://www.alrb.ca.gov/content/pdfs/meetings/2015publicmeetings/

5    IFS_Mines_Final_2010.pdf)

6    These exhibits can be found on the Agricultural Labor Relations Board website.  Exhibit A

7    is an ALRB staff memorandum on workplace access under the Agricultural Labor Relations Act.

8    The records and reports of administrative bodies are proper subjects of judicial notice.  *See Mack*

9    *v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279, 1282 (9th Cir. 1986), *abrogated on other*

10   *grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991).

11   Exhibit B is a final report to the California Endowment documenting the findings of a

12   research study of indigenous farmworkers.  The Court is entitled to take judicial notice of this

13   source to inform its views on the necessity of the access regulation.  *Brown v. Bd. of Educ. of*

14   *Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483, 494 (1954) (judicially noticing studies documenting

15   the effects of segregation on minority children to decide whether segregation was constitutional);

16   *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 58 (1973) (considering published report on the

17   relationship between obscene material and crime to inform whether state's obscenity laws were

18   constitutional).

19   Dated:  March 9, 2016                              Respectfully submitted,

20                                                      KAMALA D. HARRIS
                                                        Attorney General of California
21                                                      MARK R. BECKINGTON
                                                        Supervising Deputy Attorney General
22

23

24                                                      */s/ R. Matthew Wise*
                                                        R. MATTHEW WISE
25                                                      Deputy Attorney General
                                                        *Attorneys for William B. Gould IV,*
26                                                      *Genevieve Shiroma, Cathryn Rivera-*
                                                        *Hernandez, and J. Antonio Barbosa*

27

28   SA2016100631
     RJN.doc

                                        2

# Exhibit A

**Agricultural Labor
Relations Board**

# Memo

| | |
|---|---|
| **To:** | The Board |
| **From:** | Thomas Sobel, Administrative Law Judge, Eduardo Blanco, Special Legal Advisor |
| **cc:** | J. Antonio Barbosa, Executive Secretary; Paul M. Starkey, Acting Executive Secretary |
| **Date:** | November 23, 2015 |
| **Re:** | Staff Proposal for an Education Access Regulation for Concerted Activity |

### I.  Introduction

During the month of September 2015, the Board held a series of hearings for the purpose of gathering information on whether the ALRB needed to take additional steps to ensure that farmworkers were aware of their rights and protections under the Act with respect to protected concerted activity and what regulatory steps, if any, could or should be taken by the Board to increase that awareness. These hearings were held in Fresno, California on September 9, 2015, in Salinas, California on September 14, 2015 and in Santa Maria, California on September 15, 2015.[1]

After the hearings were concluded, the Board requested staff to consider the Board's authority to enter employer premises to conduct onsite worker education and to prepare a draft regulation in accordance with the extent of such authority.

---

[1] The initial hearing in Fresno commenced with comments from ALRB Chairman William B. Gould IV, who stated that, "These hearings focus upon the worker – worker education and access to promote such exclusively."  (RT 9/9/15: P. 6 L 10-11.)

II.  History of the Board's Worker Education Program

Because exercising the rights guaranteed by the Act depends upon knowledge of its provisions and processes, from the inception of the Act, this Board has devoted considerable attention and resources to educating employees. It has produced and distributed a wide variety of informational materials about the purposes and procedures of the Act.

Historically, the Board has not left it to the parties to educate employees about their rights; it embarked on a direct-to-employee program of worker education under which Board agents took access to employees to educate them about their rights. Although these efforts were controversial, they were endorsed in the Initial Report to the Legislature by the Joint Committee to Oversee the Agricultural Labor Relations Act.

The Committee concluded that the fact that "[v]ery few of the individuals directly affected [sic] by . . . the ALRA have had prior experience" with the law, combined with the fact that "there was a serious lack of information concerning the fundamental concepts and procedures of the" Act, "compound[ed] the problems confronting the ALRB in its efforts to achieve the objectives of the [Act.]" However, taking account of complaints about the content of the procedures involved in taking access for this purpose, the Committee recommended that the Board develop more "precise guidelines for its Board agents in the conduct of worker education programs. These guidelines should be strictly adhered to and should include, except in extraordinary circumstances, advance notification of visits to [an employer's] fields. Further, Board agents should receive specific training . . . in the techniques for making an objective presentation of workers' rights under the ALRA."

In 1978, the Board did hold hearings on adopting a worker education regulation, but it did not adopt one; instead, it maintained its ad hoc approach until 1979, when the court of appeal in *San Diego Nursery v Agricultural Labor Relations Board* (1979) 100 Cal 3d 128, held that in the absence of a valid regulation the Board could not continue the program. Just as significantly the court also held that 1) that Labor Code Section 1151(a) did authorize such access for the purpose of investigations authorized by the Act; 2) that the Board could properly conclude that its investigative authority begins before the filing of a petition for certification; and 3) that such investigative authority could include advising, notifying, or educating employees about their rights and obligations under the Act.  Despite the court's indication that a duly promulgated regulation was within the scope of the Board's authority, the Board did not enact one.

In the ensuing decades, election related activity subsided and the ALRB's personnel resources went from over 200 positions to less than 40.  Even during the years of limited resources, the Board sought out farmworker and supervisor outreach events and updated its printed outreach material.  More recently, the Governor and Legislature approved significant additional resources for the ALRB, including resources for education and outreach, which provide a means for a renewed regulatory effort.

The 2015 public hearings confirm the emergence of a new population of immigrant workers less familiar with the American legal system, and more difficult to reach because of various language and cultural barriers.  They also confirm that despite the Board's ongoing efforts at outreach, farmworkers, regardless of heritage or ancestry, remain largely unaware of their concerted activity rights and protections.  Thus, it is as true of farmworkers today as it was in 1978 that, as the Joint Committee observed, "very few of the individuals directly [affected] by . . . the ALRA have had [any] experience of the law."

### III. Summary of Evidence and Conclusions from the Hearings

These hearings provided the various constituent groups (Employers, Employer counsel, Farm Labor Contractors, Employee unions and the employees themselves) and experts from Academia and Non-profit Groups (NGOs) such as CRLA and CAUSE an opportunity to express their thoughts on the state of worker education and to suggest approaches, counter-approaches and constituent support for or opposition to suggested approaches or alternative methods of addressing any deficiencies in the Board's approach to farmworker education.  At least on the part of unions and employer counsel, the expressed views, at the hearings, centered around comments made by Chairman Gould, enunciated at the August 3, 2015 Labor-Management Advisory Committee meeting, which posited the potential for creating a new regulation that would allow ALRB staff to enter the field work sites in order to educate farmworkers and supervisors regarding the concerted protected activity rights and protections provided to farmworkers under the Act.

Staff believes that the hearings revealed one point upon which all sides agreed and that, in the abstract, no side opposed educating farmworkers about their concerted activity rights and protections.  Otherwise, there was considerable disagreement as to the appropriate means or methods by which the Board could achieve such education.[2]

---

[2] There were a few voices raised against the need for any education.  In Salinas, Mr. Steve Scaroni whose opinion appears to be formulated from and entirely based on his relationship (as employer) to an employee pool made solely up of H2A visa program employees, none of

Footnote continued----

In the staff's view, the real import and impact of these hearings are evidenced by what they either revealed or confirmed: In general, despite 40 years of outreach efforts by the Board, by unions and by Hispanic community legal, religious, social and cultural groups, today's farmworkers have little to no knowledge about the ALRA/ALRB and the rights and protections this law affords them.  According to the most recent NAWS (National Agricultural Workers Survey) data (2012), in 2012, 95 percent of California farmworkers are foreign-born and their average age is 37.  The NAWS also estimated that, in 2012, 63 percent of California farmworkers were undocumented and that 64 percent of the California farmworkers had, at minimum, a 6th grade education. The NAWS also established that the average number of years doing farm work in the United States was 14 years.  72 percent of farmworkers had one employer in 2012 and worked 46 hours per week for 40 weeks.  Further, the NAWS states that 20 percent of California's farmworkers are indigenous.

Fair conclusions that can be derived from a review of the NAWS data are that health & safety conditions have been improving. However, the NAWS data also revealed that wages have not increased and that, in real terms, have actually decreased. In 1990, wages were $9.80 (per hour) and in 2012 were $9.06 (per hour). This NAWS data was, in many ways, confirmed by most of the farmworkers testifying at each hearing location and came from mestizo and indigenous workers alike. Mr. Rick Mines, a University of California, Berkeley researcher, former NAWS director and co-author of the seminal Indigenous Farmworker Study, in his testimony indicated that indigenous farmworkers are poorer than mestizo farmworkers.

A key factor taken from the farmworker witnesses and spoken of eloquently by some was their reluctance to confront employers (managers, supervisors and foremen) about working conditions because of a heightened fear of retaliation and/or deportation.  Farmworker

---

Footnote continued----

whom testified. Against all the other testimony presented, throughout the hearings, his view and situation must be seen as an atypical employment situation.  There was also the testimony of Ms. Carmen Garza, a former farmworker, who testified in Fresno, whose views on farmworker use of modern communications technology must also be seen as atypical.  There were workers in Salinas that wanted to be assured that information would be given regarding their rights to oppose their collective bargaining representative or to oppose a union seeking to organize.  In Fresno, there was an expression of distrust leveled toward the Visalia Regional Office staff and Regional Director as being biased against workers opposed to a union and questioning the veracity of any information that would be given.

witnesses, particularly the indigenous farmworkers, consistently testified that their fears of retaliation are directly tied to their undocumented status and resulting in vulnerability to unlawful practices engaged in by foremen or other management, which was, essentially, expressed, by them, as a feeling of being powerless.

A key demographic change to the farmworker population in California is the growing percentage of farmworkers who are mono-lingual and can only speak (but not read or write) their indigenous language. The hearings revealed that the lack of an ability to speak Spanish and in particular to read Spanish is a growing obstacle to their ability to access agency written materials regarding their rights under the Act. This language barrier definitely contributes to their lack of knowledge about their labor rights and protections[3] which would also correlate to this sense of being powerless.

Various alternative methods to work site education were advanced by employer representatives. As discussed below, these methods have either already been tried (agency outreach) or are unworkable (computers, cell phones, social media, radio/television, billboards and video training)[4].

Finally, depending on the approach to regulatory language accepted by the Board, it is very unlikely that the suggested potential negative consequences to employers from education at the work sites will occur. Employers counsel/representatives voiced concern that a random selection approach or an approach to employer selection for education based on ulp filings will have employees believing that the employer was chosen because it is a bad actor that has been violating its employees' rights. Mr. Bedwell and Mr. Cloud also

---

[3] This was attested to by various witnesses, including but not limited to Mr. Mines, Ms. Keffer, Mr. Leoncio Vasquez, Mr. Fausto Sanchez and Mr. Estrada to name the non-farmworker witnesses along with many farmworker witnesses who will not be named herein.

[4] Also suggested, apparently as a corollary to these other methods, was a suggestion that we model our efforts on those of the Cal-OSHA Consultation Unit. Following the hearings, the Consultation Unit was contacted. A key point that was confirmed is that the Unit is "walled-off" from the OSHA enforcement personnel. Thus no citations are issued nor are violations seen ever reported to the enforcement personnel. Most of the training is done at events sponsored by the various employer organizations or by the workers compensation insurance industry. Events that occur at the work sites are voluntary. The Unit does not have a record of work site instruction but it can be said that they are infrequent when compared to industry or insurance company sponsored events. It was also learned that the number of employees at these events cannot be determined by the Unit. The impression was that it was not many if at all but there was no way to know for sure.

expressed another shared employer concern and that was the bias or appearance of bias on the part of ALRB regional or General Counsel staff. Mr. McClarty, a grower, felt that farmers would believe that ALRB staff had ulterior motives for educating workers.  Mr. Barsamian felt that ALRB staff could not be expected to be neutral if they were also expected to investigate and prosecute. Mr. Resnick referred to that possibility as a conflict of interest. These concerns are alleviated by the proposed regulation (see proposed regulation) by using Board personnel specifically tasked with outreach duties and "firewalled" from both the General Counsel's investigative obligations and the Board's judicial functions.

Mr. Barsamian also expressed a concern about an impact on productivity if work time was used because work would not get done therefore negatively impacting perishable crops.  He also believed that before and after work would also not be effective. Yet he also felt that lunchtime education would not work because workers were eating in the half hour lunch period which he felt would be ineffective as he believed education would take longer than that. We believe that the concerns regarding work time and before and after work are well taken.  We also believe that for our purposes and educational design the half hour lunch will be sufficient.  Mr. Maturino saw lunch time Board educational access as no different from the ability of a union to use the half-hour lunch to accomplish their (different) purposes.  He reminded us that the half-hour lunch is the employees time and therefore their choice to listen or not, regardless of how they are being paid for their work time (hourly or piece-rate).  A number of farmworkers also agreed that the lunch period would be the best time for education at the work site and that their own particular needs pre-work and post-work did not allow for any time in which to explain and more importantly to discuss ALRB information.

It is recommended that based upon the consideration of all of the information received from all of the constituent groups (employers, unions, academics, community representatives and, especially, farmworkers) and in light of the conclusions mentioned above, this Board should conclude that worksite education of farmworkers is essential so that the purposes of this Act may be effectuated and proposed regulatory activity, see proposed regulatory language, will ensure a fair, impartial and orderly processing of farmworker initiated requests for education.

## The Hearings

Below, is a general discussion of those statements received which we believe the Board should find, enlightening, revelatory, important and ultimately persuasive.  This is then followed by a closer look at the alternative counter-approaches or methods proposed for achieving the goal of an educated workforce mentioned above.

Numerous witnesses testified throughout the three days of hearing.  The majority of the witnesses were, in fact, farmworkers[5].  These farmworker witnesses spoke from their hearts and painfully revealed their fears, their anguish and a conviction that their plights were hopeless and that they were powerless to alter their "lot".

It is to be deeply appreciated that the farmworkers took the time to attend these hearings either as participants or as observers.  It is recognized that to follow a long work day filled with tremendous physical exertion and to stay at a hearing until late in the evening when they would have to rise the next day at the crack of dawn was a great sacrifice. Their interest in these proceedings does, in its own way, underscore the importance they place on the issues of education and protection from retaliation.

However, it must also be recognized that not all farmworkers who were present at the hearings or who testified were supportive of the potential desire of the Board to create a regulation allowing access for educational purposes.[6]

Lack of Knowledge

It is safe to say that there were several themes echoed through the testimony of the various workers who spoke in support of a regulation providing for work site education.  They stated that[7]:  Many farmworkers don't know their rights.[8] Many farmworkers did not know anything or very little about the ALRB and its protections.

Workers arrive from Mexico without any existing knowledge of labor laws or governmental protection against labor law violations from employers (Mr. Mines).  Mr.

---

[5] In total, 60 farmworkers testified. In Fresno 14 farmworkers testified; In Salinas, 29 farmworkers testified and; In Santa Maria, 17 farmworkers testified.

[6] The views of this group also received the consideration given to all of the other participants and see footnote 2.

[7] It was clear that the witnesses, for the most part, were including themselves in the group that had little or no knowledge.

[8] Ms. Keffer, Director of CRLA's Indigenous Project articulated that even if there were ten CRLAs there are far more farmworkers without knowledge of their labor rights than could ever be reached by them. However, Mr. Anthony Raimondo, an attorney who represents agricultural employers, expressed with confidence that workers know their rights and Ms. Sylvia Lopez, farmworker, agreed with that viewpoint.

Vasquez[9] specifically related this to indigenous farmworkers saying that labor rights was a concept that didn't exist in their culture. Worker witnesses also echoed the belief that many workers don't know their labor rights or the ALRB.  From her experience, Ms. Irma Luna, who is currently a Field Examiner for the ALRB in the Visalia Regional office and who is of Mixteco descent and speaks both Mixteco Alto and Bajo, indicated that indigenous farmworkers don't know that concerted activity is protected under the Act. Workers also don't know where to go if there is retaliation for protected concerted activity.  Mr. Alvarez[10] indicated that indigenous workers do not understand the concept of protected concerted activity. Ms. Anjelica Isidro who is a Mixteco interpreter who works with the Mixteco community and who, herself, was a farmworker for over 20 years and had never heard of the ALRB in the years she was a farmworker.  She believes, that like her, most Mixteco farmworkers in the Salinas area do not know of the ALRB.

Workers complained that supervisors were able to do whatever they wanted because indigenous workers don't know how to read, or write or speak Spanish.  This in turn leads to further additional discrimination against indigenous farmworkers. For a further discussion of maltreatment under these types of circumstances see the book by Dr. Seth Holmes, Fresh Fruit, Broken Bodies: Migrant Farmworkers in the United States (2013) University of California Press pp 65-68.

<u>Fear of Retaliation</u>

Many workers spoke of fear of reprisals and that in fact retaliation did occur when farmworkers did speak up and protest a working condition.  A number of witnesses, such as Mr. Vasquez, said that workers who do protest are fired on the spot. This showed other workers what would happen to them if they protested[11].  They spoke of this fear as an impediment to protesting working conditions.  In fact, as reported by one farmworker witness in Santa Maria, a fellow female worker had been observed suffering from apparent

---

[9] Mr. Leoncio Vasquez is the Executive Director of the National Center for the Development of Indigenous Communities which assists over 5,000 indigenous families in the San Joaquin valley.

[10] Mr. Mariano Alvarez, is a community worker in the CRLA Indigenous Project.  He is of Triqui descent and speaks Triqui. He was also an interviewer for the Indigenous Farmworker Study.

[11] This is a classic example of an oft-used phrase, in labor law, referring to an employer using the "iron fist".

heat stress and no one protested when the foreman refused to take any helpful medical action.

Ms. Keffer believes that regardless of whether the farmworkers were indigenous or not, the "[C]oncept of retaliation is one that has to be explained in some detail, in my experience. It's not something that's automatically, you know, understood that, well, they're not allowed to discriminate against me. But if I complain about discrimination I didn't know that that, you know, taking actions against me would be illegal. And so I think that maps really well onto what the protections of the ALRA are and the fact that workers don't intuitively understand that if they complain in a group they are protected against retaliation for that kind of complaint, etcetera."[12]

Ms. Davalos[13] also spoke of the culture of fear that that exists among farmworkers.  She sees them as a highly vulnerable population which is largely afraid of filing claims and reporting abuses.  One reason, among several others, for this fear is quite obvious and was mentioned by at least one worker which was that the workers depend on their salaries to support their families. A worker at the Santa Maria hearing stated that fear is so great that it stopped some workers from attending our hearing because of concerns over employer retaliation or, as put by another worker, a fear that ICE (Immigration Control and Enforcement) would appear at the hearing.

Staff recommends that the Board should determine that indeed workers do not come forward because of multiple fears which act in combination: fears of retaliation (of being fired), fears of deportation, language barriers of Spanish, that are now being increasingly complicated by an additional language barrier of indigenous languages which amplifies all of the other elements many times over.  These elements when coupled to feelings of powerlessness and hopelessness can be seen to be nothing less than overwhelming to employees that have little to no knowledge about the ALRA and the protections it provides.

---

[12] RT 9/9/15: P. 90-91 L 19-4.

[13] Ms. Hazel Davalos is the Organizing Director for CAUSE, the Central Coast Alliance United for a Sustainable Economy. CAUSE works in both Oxnard and Santa Barbara Counties(Santa Maria is located in  Santa Barbara County).  It should be noted that the court reporter misspelled Ms. Davalos' last name as being Avalos.

The Cellphone Alternative [14]

As for technology being available to indigenous farmworkers, a witness testified that they don't have access to technology. They can't afford to buy a computer and they don't have internet access where they live. They see it as a luxury they can't afford.

The Board should also determine that all or almost all farm workers have a cell phone[15]. This was not disputed by any of the constituent groups and the near ubiquitous presence of cell phones in the fields received confirmation from many of the witnesses (supporters and opponents, alike) at the hearings.  However, when it comes to the latest versions of the cell phone, there are certain barriers that are faced by all farmworkers regardless of origin (mestizo or indigenous) such as low literacy rates, computer illiteracy and yearly incomes that are below the established U.S. poverty level.  When combined and even separately, it is our belief that, for the farmworker, the purchase of a "smart" phone and the requisite (internet) data plan is a true luxury and prohibitively expensive.

Staff recommends that the Board should also accept, as fact, that, while among farmworkers cell phone ownership is very high, there was certainly no data or surveys provided to establish the contrary and counter-intuitive position that the majority of farmworkers can afford "smart phones" and the data plans. With what is commonly known about the average annual income of a farmworker in California, it is quite unlikely that the majority of them have the financial resources available to them to make such purchases. As Mr. Vasquez stated and as one farmworker witness in Santa Maria essentially put it, workers use their wages to pay rent, to pay for food, to send money back to Mexico or for the doctor, after that they don't have any money for the internet (and, presumably, this would extend to smart phones and data plans). The prohibitive cost to farmworkers of such products was also echoed by Mr. Alvarez.[16]

---

[14] We have received information that the  USEPA has also looked at the use of cellphones to contact farmworkers and making presentations to farmworkers via computer. They have concluded that texting to and between cellphones and downloading material to cellphones are significantly impacted by the type of phone service and data plans purchased by each worker.

[15] Farmworkers do use their phones, regardless of type, to send each other text messages.

[16] This applies equally to home computers. Ms. Isidro does a lot of home visits to farmworker families and said that they do not have access to the internet or to computers. This was also confirmed by Ms. Luna.

Ms. Isidro agreed that all farmworkers have cell phones and believed that some of them had smart phones but that they were limited with what they could do with them because they don't know how to read or write.  They (cellphones), in her view, are mainly used to stay in contact with their children.

Finally, use of computers and cell phones is based upon having internet access. Worker testimony was clear and has not been contradicted; Internet access and/or data plans require income that is not available to farmworkers who mainly devote their incomes to their living situations and to providing for their families both here and in Mexico. Cellphones (and computers) are not an economically feasible or reasonable means for educating farmworkers.

Illiteracy and Communications Technology

A number of the alternatives to work site education proposed by employer representatives require the "consumer" to have a certain degree of literacy[17].  Not surprisingly, a similar degree of literacy is needed in order to maneuver communication technology: computers, the internet, social media and smartphones.[18]

With the data uncovered by staff, after the conclusion of the hearings, we establish that farmworkers (mestizo and indigenous) are insufficiently computer literate to maneuver smart phones to access any internet-based education and; farmworkers are insufficiently literate in Spanish to be able to understand the written explanations of the ALRA.[19]

_____

[17]  A 2009 study analyzing the 2003 National Assessment of Adult Literacy arguably shows that there is a correlation between a low level literacy rate and not having a computer and also not being computer literate (See Overcoming the Language Barrier: The Literacy of Non-Native-English-Speaking Adults, 2009, Jin and Kling).

[18] Mr. Pete Maturino, UFCW vice-president and who has extensive experience in organizing farmworkers, noted that the problem with using the internet to provide information was that the workers could not ask questions besides the fact that he believed that the workers did not have internet access.  (Presumably this inability to ask instant questions is a problem that extends to all technology based forms of communication and to billboards as well.)

[19] Studies in Mexico have shown that there is a wide gap in proficiency in the ability to use technology/computers based on socio-economic strata.  This digital inequality points to the "…differences in material, cultural, and cognitive resources required to make good use of information and communication technology" and limited access prevents students from developing key skills that allow them to filter through information on the internet, find important information and develop skills.

Footnote continued----

11

Mr. Mines indicated that there should be no expectation that brochures written in the workers native language could be read except by scholars.  Nor should it be expected that indigenous workers that speak Spanish can read Spanish.  Mr. Santos[20] stated that not one of the many farmworkers he interacted with through his work had access to a computer and they didn't know how to use one. Mr. Vasquez said that indigenous workers are not able to access information online and even though many do have cell phones they don't have the knowledge to search for information.  Ms. Isidro expressed skepticism about the reading and writing abilities of the Mixteco farm worker community in their own language because most had not gone to school.  She believed that a verbal approach to education was necessary.

Research indicates that a certain level of literacy is needed in order to use computers (and therefore smart phones).  The NAWS data indicates that most farmworkers only have, at maximum, a 6th grade education.  CAUSE results were fairly similar. (See CAUSE NOW report of September 2015 which reported that more than 13,000 farmworkers in Santa Barbara County are immigrants from Mexico with an average age of 36.8 years old and that over 10,000 of them completed elementary school.)

Standards have been developed by the U.S. Department of Labor to identify the different levels of literacy: marginally literate (a person who can read between the eighth and twelfth grade levels, but lacks the twelfth grade equivalence needed in complex technological society), functionally illiterate (a person who can read between the fourth and seventh grade levels) and totally illiterate (a person who has skills below the fourth grade level and cannot acquire information through print).  Extrapolating from all of the data sources mentioned in our instant memorandum, we believe that, currently, the "functionally illiterate" category is where most mestizo farmworkers, whose first or only language is Spanish, can be placed.  We believe that most indigenous farmworkers, and

---

Footnote continued----

See "The Diffusion of the Internet in Mexico" by Thomasson, Foster And Press: www.lanic.utexas.edu/project/etext/mexico/thomasson/thomasson.pdf.

[20] Mr. Fausto Santos is a community worker for CRLA in the Indigenous Project.  He is of Mixteco descent and speaks both Mixteco Alto and Bajo. He was also an interviewer for the Indigenous Farmworker Study.

especially female indigenous farmworkers, can be placed in the category of "totally illiterate".[21]

For both the majority of mestizo and indigenous farmworkers, it is plainly apparent that neither group is sufficiently literate to use technology to acquire or then to understand or interpret written materials.  Neither group has attained the reading level needed in a "complex technological society" such as ours to use computers to (a) obtain information (knowledge) from the computer and then (b) have the ability to read and interpret that information.

Research also indicates that in the USA smartphone ownership and usage is highest among younger Americans with relatively high income and education levels (See April 2015 Report from PEW Research, U.S. Smartphone Use in 2015).  "64 % of American adults now own a smart phone of some kind" (U.S. Smartphone Use, supra).  "19% of Americans rely to some extent on a smart phone for internet access, but the connections to digital resources that they offer are tenuous for many of these users" (U.S. Smartphone Use, supra). The study found that "7% of Americans own a smartphone but have neither traditional broadband service at home, nor easily available alternatives for going online other than their cell phone"  (U.S. Smartphone Use, supra). The study also confirmed our conclusion that farmworkers would use the texting feature on their phones, "Fully 97% of smartphone owners used text messaging…" (U.S. Smartphone Use, supra).

Farmworkers are likely to be in the group that does not have broadband access and has relatively few options in getting on the internet unless they have a "smart" phone.  This group, in the PEW report, is referred to as "smartphone-dependent".  Although the data collected applies to the broad category of Hispanics in the USA it is highly likely that

---

[21] Dr. Seth Holmes, a medical anthropologist who has extensively studied the plight of migrant farmworkers, also commented on farmworker literacy.  Dr. Holmes observed a lack of proficiency in Spanish among the Triqui farmworkers he "studied".  He also noted an educational disparity between male and female Triqui farmworkers with the female Triqui farmworkers having less education which he attributed to the cultural gender-based roles in fulfilling domestic responsibilities. "Thus many of the women do not speak fluent Spanish. Neither male nor female Triqui had proficiency in English either written or spoken." (See p. 3, Statement of Seth M. Holmes).  Importantly, in the context of suggested alternatives to worksite education, Dr. Holmes noted that "… [N]one had access to a home computer." (See p. 3, Statement of Seth M. Holmes).

13

farmworkers fall squarely within that part of the demographic (relatively low income) which have limited access to the internet and are more likely to terminate their cellphone service due to financial constraints.  In this dependent group, "48% of smart-phone dependent Americans have had to cancel or shut off their cell phone service for a period of time because the cost of maintaining that service was a financial hardship" (U.S. Smartphone Use, supra). Because of this they are more likely to have fragmented access to their smartphone and the internet.  They also gravitate towards relatively low-cost plans. "…those with relatively low-cost plans are actually more likely to have canceled or suspended service" (U.S. Smartphone Use, supra). This dependent group also reported more functionality problems (48 percent) with their phones such as poor or dropped signal quality and content not displaying properly (47 percent).  (As to why this would be occurring in this low-income non-white demographic, PEW did not offer any explanation.) Other noteworthy statistics from the PEW report shows that only 9 percent of Americans with high school graduation or less have a smartphone; only 7 percent of Americans who live in rural America have a smartphone and; only 13 percent of Hispanics have a smartphone.[22]

Data taken in Mexico that assessed internet access during the "nineties" (when NAWS data and Mr. Mines indicate our current farmworker population would still have been in Mexico) indicates that the percentage of the Mexican population, in 1994, using the internet was 0.044 percent which equates to 39,000 users, which in 1995 jumped to 94,000 users or 0.103 percent and by 2001, 3.672 percent of Mexico's population was using the internet.  This however would exclude the (Mexico) economic and educational strata from which our current population of farmworkers come as the internet use and its expansion were Mexican university and business driven.[23]

---

[22] Ms. Keffer indicated that although she has seen farmworkers with cellphones she has not seen many indigenous farmworkers with smartphones. Although she has seen the children of farmworkers having experience with computers and social media she has not seen that experience extended to their farmworker parents.

[23] The Diffusion of the Internet in Mexico, supra.

14

Cell phone signal[24]

The problem of cell phone signal coverage, which is significant in the wide open spaces, away from most population centers, where most cell phone signals cannot be received (or sent), does deserve special mention in that it poses a very significant practical obstacle to a cellphone based educational approach.  At the hearings, workers spoke of poor reception or signal for their cell phone while out in the fields. The Board, itself, has experienced this problem numerous times when it has journeyed to observe farming operations. Previous General Counsels and their Regional Directors and regional staffs have over the years also complained of this issue and continue to do so to this very day.

In summary, even if the Board were to consider cell phones as an educational alternative, it would not be a reasonable alternative because of the lack of literacy, in written Spanish, among adult mestizo and indigenous farmworkers coupled to the inherent problem of the inability to take all-versions of spoken Mixteco or Triqui and possibly other indigenous languages and to put them into writing for the mono-lingual indigenous farmworker.  But, even if we assume that there were not any impediments to placing our educational materials into these languages and their multiple variations, the significant problem of a lack of literacy, amongst indigenous farmworkers, in their native languages remains[25]. As was commented upon during the hearing in Fresno by Field Examiner Luna[26], it is only academics that read and write indigenous languages.

When farmworker illiteracy is combined with low technological skills, low income and poor or no cellphone signal/area coverage, the conclusion is inescapable that for the variety of reasons stated above cell phones should not receive any consideration as an appropriate or reasonable alternative means for educating farmworkers.[27]

_____

[24] We have received information that USEPA also found that the remoteness of most farm field locations impedes internet access as well as actual telephone service because of weak signal or no signal.

[25] The Board accepts that a majority of indigenous farmworkers do not read or write their own languages.

[26] Ms. Luna was also an interviewer for the Indigenous Farmworker Study and was previously employed by CRLA as a community worker.

[27] However, it should be noted that Mr. Bryan Little, a representative of the California Farm Bureau Federation, said that he has seen farmworkers use their cell phones to find out

Footnote continued----

Other practical factors to be considered with the consideration of cell phones as a means of worker education is how would we acquire the workers cell phone numbers and; there is no guarantee that workers would have the opportunity at work to listen to an ALRB call; it must be believed that there would be little desire before or after work to take such an educational call given their before and after work schedules as discussed.  As was said by a worker in Santa Maria, the opportunity to receive the information is limited because of the long physically taxing hours that they work.  It was indicated by another Santa Maria worker that many people work 7 days a week and 10 to 12 hours per day.

The Other Avenues of Outreach Proposals

A. Community Outreach

As mentioned above, another alternative means of education being suggested by the employer community is through the use of community based educational events[28].  An implication from their suggestion is that until now the ALRB has not been so engaged.  Notwithstanding this implication, and as discussed above, the ALRB has, in fact, been engaging in efforts to educate farmworkers, at community based events, since agency inception, according to the institutional memory of agency staff.  It is unfortunate that for the initial three decades of our existence detailed charts of these efforts were not maintained.  However, detailed charts have clearly been in existence since 2011.  Since 2011 to date, the aggregate totals of outreach events are: 126 farmworker events, 72 supervisor/manager events, 5 events where data was not input and 2 joint participation events for a grand total of 204 events; 11,403 farmworkers were reached and 3,790 supervisor/managers were reached over the time period and 552.25 personnel hours were used in total.  The current approximate total of farmworkers in the state ranges from 650,000 to 1 million, extrapolating out over the next 24 years if we averaged the same

_____

Footnote continued----

what other employers are paying and regardless of phone types, he stated, the phones are used to communicate knowledge of all kinds.

[28] There exist well known exclusively farmworker oriented community events such as health fairs, the so-called "Day of the Farmworker" events that happen throughout the various rural counties in the Salinas, Central and San Joaquin Valleys as well as in the Ventura County and Imperial Valleys, churches, schools and some "stand-alone" events put on by the various federal and state labor agencies such as DOL or by DLSE.

number of events, of which we believe we attend most, we would have reached only another 66,000 plus workers.

Mr. Lozano[29] noted that most community events only occur annually and for such education to be effective the frequency of the education would have to be more frequent. It would have to be seasonal for each crop.  A farmworker in Santa Maria also related that she didn't think a lot of people went to community outreach meetings and to her it was because of a lack of documents or an inability to speak English.

Mr. Little and Ms. Wineman[30] felt that the ALRB could rely, either totally or in part, upon the community organizations to undertake the education the ALRB wanted to provide. The organizations, in his view, exist to impart information. However, the idea of relying on non-profit groups to educate workers on behalf of the ALRB does not, in the long run, overcome the fear of government which is preventing workers from filing charges or even from protesting conditions at work. Many workers said the only way to overcome that kind of fear is for direct face-to-face education by the government representatives themselves at the work site. (See below discussion of fear.)

B. Video Training

A number of employer witnesses recommended that video trainings, that they indicate have been successfully used to educate farmworkers in connection to Cal-OSHA and the DFEH sexual harassment prevention requirements, were an alternative method for worker education. Witnesses commented on the existence of trainings for heat stress prevention. Mr. Bedwell[31] expressed with confidence that employers have been successful in educating farm workers on heat illness issues through this method.

––––––––––––––––––––––

[29] Mr. Francisco Lozano is of Mixteco descent. He works with a Mixteco community group, the FIOB (Binational Front of Indigenous Organizations), in the Santa Maria area.  He was a farmworker for 15 years.

[30] Ms. Claire Wineman, is the president of the Grower-Shipper Association of Santa Barbara and San Luis Obispo Counties. It represents over 160 farmers, shippers, and labor contractors among others.

[31] Mr. Barry Bedwell represents the California Fresh Fruit Association.  It should be noted that Mr. Bedwell was misidentified by the court reporter for a portion of his testimony as being Mr. Barbosa.

However, Ms. Keffer noted that video trainings do not take into account language variations.  There are many variations within each of the indigenous languages *of Mixteco and Triqui*.  The Board heard from a number of witnesses that spoke to the existence of variations, referred to by some as dialects, in Mixteco and in Triqui. The Board heard a number of workers speak to the issue of there not being a commonly read written Mixteco language and there was also indication from a worker that this was also an issue with Triqui.[32] Mr. Estrada[33] believes that there are 16 different languages spoken in the State of Oaxaca.  He also said that there are different dialects of the same language depending on which region a person came from.  Mr. Carroll[34] stated that there are nearly 100 different dialects of Mixteco.  The NAWS placed the number of indigenous languages at 60.

These variations no doubt create a special logistics problem but with appropriate ALRB pre-education visit planning it would not appear to be insurmountable. But the fact that there are so many different or potentially different dialects within an indigenous language, such as in Mixteco, the alternative approach of video training urged upon the Board by a number of witnesses would not appear to be feasible cost-wise as we would have to create potentially hundreds of different versions of the same text without any expectation we might be called upon to do education in those languages and, more importantly, we would not, ourselves, know that anyone would listen.  Given worker fears expressed in their testimony, it is doubtful that any employer run training events could overcome those fears. It is not reasonable to expect the farmworkers to ask questions about how to protest working conditions when they fear that those questions will lead to retaliation.

Finally, Mr. Guadalupe Sandoval, the Director of the California Farm Labor Contractors Association, who has broad trainer experience stated that "video trainings are ineffective because they are not interactive and people do not pay attention."

---

[32] As Mr. Vasquez indicated, in the Salinas Valley, aside from Mixteco and Triqui, workers speak other indigenous languages such as Zapotec, Purepecho, Chatino and Nahuatl. There was no specific testimony as to whether or to what extent dialects existed within these other languages.

[33] Mr. Jesus Estrada has been a farmworker.  He is of Mixteco descent.  He now works with FIOB in the Santa Maria area.  He was also an interviewer for the Indigenous Farmworker Study.

[34] Mr. Rob Carroll is an attorney who represents agricultural employers.

C. Miscellaneous alternatives

Mr. Sagaser[35] and other employer representatives expressed the belief that workers could be reached through social media[36], television, billboards and radio. As a number of witnesses testified there are not many radio programs conducted in indigenous languages and the programs are of limited length and the station signals don't reach all enclaves.  It was noted that the signal did not reach Santa Maria. Another Santa Maria worker thought that because of the number of Mixteco dialects radio based education would not be effective because not all Mixtecos would understand. There was even less in the way of television access for indigenous languages and any media requiring reading such as billboards would not work with the various indigenous languages and dialects.  Billboards would not be able to afford workers with an opportunity to ask on-the-spot questions and the desire should be to make sure that there is immediate follow-up to what is being said. This can only be assured through the immediacy of a face-to-face oral presentation for both mestizo and indigenous workers.

The Need for Education

Section 1152 provides the right under the ALRA for farmworkers to act in concert for "…their mutual aid or protection".  ALRB and NLRB decisions establishing the requirements to gain this protection are legion.  However, in essence, the issue being brought to the employer, or its representative, must be raised by two or more employees and it must be concerning a working condition.  The employer is prohibited from engaging in retaliation against employees based on the employees engaging in this "protest".  An employer who does retaliate stands in violation of section 1153(a) of the Act.

As stated by Ms. Keffer and echoed by other witnesses, she does not believe that workers would intuitively know that they should protest working conditions as a group thereby giving themselves protection under the law. "[It] is not something that I find is intuitively understood by the farm workers that I have come into contact with, the people who I interview because of problems in the workplace, or the people who I have worked with in

---

[35] Mr. Howard Sagaser is an attorney who represents agricultural employers.

[36] Social media also relies on written language and is dependent on internet access and a computer or smart phone is needed for the use of it.

just conducting general community education and outreach. There isn't a presumed understanding that you're more protected if you complain in a group"[37]

Dr. Holmes' statement provides to the Board evidence that as to working conditions, such as health, pesticides exposure, including not being provided the opportunity to wash their hands, being given faulty training regarding protection from pesticide exposures, repeated failures by employers (or contractors) to pay the requisite minimum wage and being required to pay for rides to and from the work site (See p. 4, Statement to ALRB of Seth M. Holmes) workers are not coming together in mutual aid and for protection.  In the Board's experience, these types of working conditions often form the bases upon which workers, regardless of whether the setting is agricultural or industrial, join together concertedly and protest.

<u>The Argument for Work Site Education</u>

As noted, above, previous Board efforts, over the past 40 years, to educate farmworkers through our participation at community farmworker oriented events, working with the Mexican consulates, participating in radio programs and other media has met with little success[38].  These hearings also determined that the use of computer and other communication technologies that rely on a proficiency in computer or smart phone use would do little to educate a population that doesn't have such technology. The use of communication technology also is impeded by and doesn't overcome the literacy issues of both mestizo and indigenous workers.  In fact, even if the smartphone/cell phone technology could be used by farmworkers with the degree of proficiency needed, there still remain practical problems, which, in our view, shut the door completely on this proposed alternative,  *one of* which is that in a wide swath of rural California farmland cell phone signals are either severely limited or non-existent.  Video trainings[39], billboards and/or focusing on radio based shows have also been shown to be unworkable.

---

[37] RT 9/9/15: P. 89-90 L20-2

[38] If success means the number of 1153(a) protected concerted activity charges filed by or received from a farmworker population numbering between 650, 000 to 1 million farmworkers.

[39] Mr. Resnick, who is vice-president and general counsel for the Western Growers Association, noted that trainings are required by other statutes such as by DFEH and Cal-OSHA. These trainings are to be done by the employer and apparently are done on company time and the employers pay their employees for it. Notably, the employer chooses the date of

Footnote continued----

However, with these alternatives being eliminated, before the Board remains the problem of a workforce that remains largely unaware or only faintly aware of the ALRA and the rights and protections it provides coupled to the problem of finding a reasonable method to eradicate that lack of knowledge.  It is submitted that the elimination of the employer proposed alternatives places the Board squarely on the path to work site education.  This is a path that will have a number of hurdles and obstacles to be overcome. Hurdles arising from the choices made in model/methodology and obstacles arising from litigation that work site education will surely engender.

An obvious and existing method for modeling work site education procedures is in the existing section 20900 et seq. access procedures established for "Solicitation by non-employee organizers".  This allows for access before and after work and during lunch periods, in other words, during the "free" non-paid time of the employees.[40]  However, experience has, perhaps, shown that even union organizers do not see before and after work (access) as viable/useful times for organizing.  It is well known, from ALRB hearings and investigations, that before work, the workers are too busy placing themselves into position to start that day's assignment and after work are either too tired or too in a hurry to stop and listen. This is supported by testimony at our instant hearings, as well. Ms. Isidro confirmed that in the Salinas area, workers get up before 5 a.m. and work until 5 or 6 p.m. and that after work they go pick up their children from the babysitters and then go home and cook for the family.  "And they're not able to do anything else." Another farmworker explained that they have to get up before 5 in the morning to go to work and

_____

Footnote continued----

training and who does the training.  However at the base of our trainings is overcoming worker fears of retaliation from their employers who they believe will fire them if they come to the ALRB.  There is no indication that their fears exclude protesting sexual harassment or exclude health and safety violations and to the contrary, we heard from a number of worker witnesses that said they feared protesting health and safety violations including heat stress, job injuries and pesticide exposure.

[40] For the purposes of this discussion, it is assumed that the Board would not choose to provide for education sessions during work time.  The Board is sensitive to the needs of the employer for productivity and the prompt handling of highly perishable commodities on the one hand and on the other the employees' rights to choose not to participate in what would then essentially be a mandatory captive audience speech.  (This does not even reach the underlying issues of employer payment for the education time, which appears mandated by DLSE rules and case law or *what* the rate of pay should be for that time).

then don't go home from work until 5 or 6 p.m.  The only opportunity in such circumstances is to provide education at the worksite during the lunch break. The lunch period has always been and will always be the focal point of *any* access-taking.

As previously described by Ms. Davalos and many workers there exists among farmworkers a "culture of fear".[41]  Staff believes that any method of education adopted by the Board must, as part of its design, be directed at eliminating that culture.  Ms. Davalos felt that work site education would set a different tone for the workers and would imbue them with the knowledge needed about how to exercise their labor rights without fearing retaliation.[42]  Mr. Mines expressed his belief that the workplace was the only place so as to be sure to get access to the "full universe of those people, and especially those that are in most need of it."

Dr. Holmes states that, "Part of the reason the workers were underpaid is that they had reason to be afraid to stand up to their employers for fear of losing their jobs and/or being deported." Dr. Holmes quoted a farmworker so as to provide an example of this widespread fear, "They are afraid of speaking because the farm will fire them.  We want to say things to them but we can't because we don't have papers." (See p.4, Statement of Seth M. Holmes).

Workers brought our attention to their belief that, at least, among indigenous workers, they considered themselves when at work a part of a community or family as they all come from the same place (in Mexico).  A number of other farmworkers talked about their belief that making the ALRB presentations at the work site would also go a long way to combatting worker fear and for the same reason that, at work, the workers have a close connection to each other.  It is a connection beyond their particular employer and the belief was that information imparted there would be spread beyond their particular workplace.

---

[41] The CAUSE NOW report also stated that only 3.7 percent of farmworkers have filed a complaint against their employer, compared to the many more that had experienced violations of the labor laws.

[42] One example of a basis for concerted activity that is not raised because of fear, in Santa Maria, is the use of pesticides and the exposure of farmworkers to pesticides. Mr. Lozano explained that workers felt they could not raise that issue with their employers for fear of retaliation.

Mr. Barsamian[43] and Mr. Bogart[44] were among the many employer voices against work site education that wondered about how an employer would be selected for education[45]. They believed that a random selection of an employer for education would leave a negative perception with the employees, a perception that the company was in some kind of trouble.  Mr. Bedwell used the stronger term stigmatized to describe worker reaction to their employer being randomly selected. It is believed that the wording of the regulation (see proposed regulation) alleviates the concern regarding random selection as selection will be based on employee requests for education.  Requests for education will reflect employees themselves pro-actively seeking to be educated about their rights and protections.

Recent case law, involving the so-called "non-productive" work time (discussed elsewhere) also argues heavily in favor of lunch time access to avoid drop-offs in company productivity and to avoid employer payment for company time being used for training. However it also raises the issue of what is to occur if our agents run over into work time or do not leave the work site prior to the end of the lunch period and that disrupts the return to work.  Payment for the loss of work time may be required.  It is believed that our access plan design (discussed elsewhere) eliminates this possibility.

Before the Board has even taken any steps to determine a methodology for such access, criticisms and accusations have already been leveled. Among these are that: the specific content (language) of the board agent presentation must be worked out as part of the regulation (to eliminate the criticism of bias or that this is union organizing in disguise); the regulation must make known to all constituents that these agents are "walled off" from ulp enforcement (to eliminate the criticism that we are merely looking for ulp violations) and; the manner by which an employer is selected for education must take into account the criticism that an employer will be tainted by the Board's very selection of that employer for education.

---

[43] Mr. Barsamian is an attorney who represents agricultural employers.

[44] Mr. Bogart is president and general counsel of the Grower Shipper Association of Central California with a membership of over 400 growers, etc.

[45] A contrary union view to a trigger event for educational access was provided by Mr. Maturino who suggested an education approach initially triggered by ULPs.  He also stated that later they could be triggered by random selection and that a focus should be placed on educating indigenous farmworkers.

As obstacles, it must be fully expected that, as discussed by some employer counsel such as Mr. Raimondo, Mr. Sagaser and Mr. Borden[46] among others, legal attacks will be made in the courts based upon arguments that there is no statutory basis for education and that there are constitutional infirmities (see below legal discussion).

Earlier, we spoke of a consensus that, in the abstract, no one opposed the idea of worker education.  There was also another consensus and that was of the farmworkers, themselves, almost all of whom asked that the Board engage in education and that the education occur at the worksite.  Ultimately given all the facts presented and after careful consideration of those facts, the staff believes that this Board is obligated to give that viewpoint greater weight, as under section 1152, farmworkers are the principal focus of our statute with the protection of their rights having to be of our paramount concern.  Finally, it must be remembered that the need for education will always be continuous as a continuing stream of new workers coming to California's fields is a constant so that the educational efforts undertaken by the Board must themselves be continuous and permanent.

### III. Legal Framework

A program of worker education may be considered directly related to several sections of the Labor Code. Labor Code Section 1140.2 provides that agricultural employees shall have the right to full freedom of association, the right to self-organization, and the right to engage in concerted activities for mutual aid or protection. Labor Code Section 1151(a) provides that the Board shall have access to all places of labor in order to conduct investigations required by the Act. Labor Code Section 1152 provides that employees shall have the right of self-organization, to engage in concerted activities, and the right to designate representatives of their own choosing. Labor Code Section 1156.3(c) provides that an agricultural employee or a group of agricultural employees may file a petition for certification and that the Board shall investigate such petitions.

The regulation can also be considered directly related to title 8, California Code of Regulations, sections 20900 [Access Rule,] 20910 [Prepetition List Rule,] and 20915 [Prepetition Investigation of Employer,] a series of linked regulations that both provide the means for employees to learn the advantages and disadvantages of self-organization and a mechanism to facilitate the Board's conduct of elections.

---

[46] Mr. Carl Borden is an attorney with the California Farm Bureau Federation.

Worker education could enable the Board to educate employees and employers about their rights, choices, and responsibilities under the Act and, by allowing the Board to anticipate and plan for possible election activity, the regulation can facilitate the conduct of elections within the brief seven-day election period.

A.  The Applicability of NLRA Precedent

On December 20, 2010, the National Labor Relations Board proposed a regulation "requiring employers . . . to post notices informing employees of their rights as employees under the NLRA." The proposed regulation included several provisions to ensure compliance with the posting requirement: the first provided that failure to post the notice would be considered an unfair labor practice; the second provided that failure to post the notice would toll the statute of limitations for filing unfair labor practice charges; and the third provided that willful failure to post the notice could be considered evidence of unlawful motive in other unfair labor practice cases.

The purpose of the proposed regulation was that

> [e]nforcement of the NLRA and effectuation of Congress's national labor policy . . . depends on the existence of outside actors who are not only aware of their rights but also know where they may seek to vindicate them within appropriate timeframes.  *   *   * Given the direct relationship between employees' timely awareness of their rights under the NLRA and the Board's ability to protect and enforce those rights, [posting of such rights] is "necessary" for purposes of Section 6. *   *   * The effective workings of the NLRA's administrative machinery . . . presuppose that workers and employers have knowledge of the rights afforded by the statute and the means for their timely enforcement. The statute, however, has no provision with respect to making that knowledge available, a subject about which the statute is totally silent.

In addition to arguments that the Board lacked authority to promulgate such a rule, some commenters also argued that the posting requirement would violate either the First Amendment or Section 8(c) because it was either a form of compelled speech or it regulated the content of what employers were required to "tell" their employees.

The regulation was challenged in two cases. The lead opinion of the court of appeals in *National Association of Manufacturers v National Labor Relations Board* [*NAM*] (USCA DC 2013) 717 F3d 947 ignored the parties' arguments concerning the Board's rule-making authority in favor of an analysis that focused on Section 8(c). Using First Amendment

authority to illuminate how the posting rule implicated speech rights contained in the Act, the court held that the Board's rule violated 8(c):

> Although [Section] 8(c) precludes the Board from finding noncoercive employer speech to be an unfair labor practice, the Board's rule does both. Under the rule an employer's failure to post the required notice constitutes an unfair labor practice.  *   *   * And the Board may consider an employer's "knowing and willful" noncompliance to be "evidence of antiunion animus in cases in which unlawful motive [is] an element of the unfair labor practice."  *   *   * The Board, in other words, will use the employer's failure to post the notice as evidence of another unfair labor practice.[47]

Although the lead opinion specifically declined to reach the question of the Board's authority to promulgate a rule requiring posting of a notice, two members of the panel who concurred in the conclusions recited above, made a majority in further concluding that "[t]he NLRA – and [the rulemaking authority] in particular – simply [do] not authorize the Board to impose on an employer a freestanding obligation to educate its employees on the fine points of labor relations law." In *Chamber of Commerce of the United States; South Carolina Chamber of Commerce v National Labor Relations Board* (USCA 4th Cir. 2012) 721 F3d 152, the Fourth Circuit court of appeals reached the same conclusion as the concurring members of the District of Columbia Circuit.

To the Board's argument that the posting rule was reasonably necessary to effectuate the purposes of the Act, the Court held that "[t]he NLRB is 'bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate" and that Congress had made the Board a purely reactive body, whose functions were not set in motion until a party filed a representation petition or a ULP charge.

> The Board contends that the Act presupposes knowledge of NLRA rights and their enforcement mechanisms, and that "employee knowledge of NLRA rights and how to enforce them within statutory timeframes is crucial to effectuate Congress's national labor policy through the processes established by Sections 8, 9, and 10. [Cite]" Essentially, the Board argues that because the enforcement functions provided for by Sections 9 and 10 are reactive, it was necessary to proactively create the challenged rule in order for

---

[47]The lead opinion affirmed the district court's holding that an employer's failure to post the required notice might toll the 6 month statute of limitations also violated the Act.

employees to undertake their role in instigating those processes. With this reasoning, the Board attempts to derive from provisions governing the functions and operations of the agency the authority to do something entirely distinct from those functions.[48]

In other words, both courts also held that however employees came to know about their rights was irrelevant to the Board's ability to perform its statutory functions: its role was limited to "lying-in-wait" for persons or parties to either file charges or raise representation issues.

Because the lead opinion in *NAM* explicitly treated the 8(c) problem as one of statutory interpretation, the question becomes whether this Board has to follow *NAM* in interpreting any effect that Labor Code Section 1155 might have on a proposed worker education regulation.

To accept the *NAM* court's interpretation of 8(c) as applicable precedent under our Act would upset settled law concerning the Board's remedial authority. This is so because if the posting of a notice concerning workers' rights violates 8(c) because it "puts words in the mouths of employers," it would follow that requiring employers to permit union organizers to enter their property to explain the benefits of representation would also violate 8(c). This, in turn, would put into question this Board's standard remedy for denials of organizational access, a remedy that has been consistently applied by the Board and that has received judicial approval. See, e.g. *Tex-Cal Land Management v Agricultural Labor Relations Board* (1979) 24 Cal 3d 335 (Board properly held the denial of organizational access to be an unfair labor practice.)

─────────────────────

[48] The opinion goes on to consider the effect of Congress's failure to include a posting provision in the NLRA or, as the court puts it, "to impose duties upon employers proactively." The court noted that during its consideration of what became the NLRA, the 73rd Congress rejected a bill to include a provision that required any employer that was a party to a contract that conflicted with the NLRA 1) to notify its employees of that fact and 2) that made it an unfair labor practice to fail to do so. "Had Congress intended to require the posting of notices or make the failure to do so punishable as a ULP, it could have made that intent clear in its legislation." *Chamber of Commerce,* at 163, and esp. n. 13 The court also noted that the Railway Labor Act, which was being considered by the same Congress that enacted the Wagner Act, specifically included various posting provisions. The court concluded from this that when Congress intends notices to be posted, it specifically provides for them. It drew the same conclusion from the inclusion of posting provisions in other labor-related statutes.

To the extent, then, that the question is solely one of statutory interpretation, such an interpretation would run afoul of the ordinary rule that requires the parts of a statute to be interpreted as a whole and in light of the effect that a reading of any given part might have on the entire statutory scheme. *(Santa Barbara Taxpayers Association v. County of Santa Barbara* (1987) 194 Cal.App.3d 674, *Swaithes v Superior Court* (1989) 212 Cal App 3d 1082, *Industrial Indemnity Co. v Workers Comp. Appeals Bd*. (1978) 85 Cal 3d 1028.)

Since the exercise of employee Section 1152 rights when there are no alternative channels of effective communication has repeatedly been held to outweigh employer interests that are also respected by the state,[49] it would follow that the employees' right to information under Section 1152 would also outweigh whatever protection Labor Code Section 1155 might provide against an employer's having to accommodate messages with which it might disagree.

The scope of the statutory command to follow NLRA precedent was first construed in *Agricultural Labor Relations Board v Superior Court.* In that case, the employer argued that the Board's adoption of a rule regulating union access to employer property violated Section 1148 in that the NLRB decided questions of union access to employer property on a case-by-case basis. The court rejected that contention, first, on the grounds that "precedents" did not mean "procedure" or "practices." But more important, for present purposes, the Court concluded that "the Legislature intended [the Board] to select and follow only those precedents which are relevant to the particular problems of labor relations on the California agricultural scene." *Ibid*, at p. 413; See also, *F & P Growers Association v Agricultural Labor Relations Board* (1985) 168 Cal App 3d 667, 673: ["The

---

[49] In *Agricultural Labor Relations Board v Superior Court of Tulare County (Pandol)* (1976) 16 Cal 3d 392, 406, the Supreme Court held that property rights are not paramount to employees' rights to effective access to information. Quoting from *Babcock and Wilcox v NLRB* (1972) 351 US 105, 112, the court said:

"[E]mployers' property rights must give way to whenever the two interests are found to be in irreconcilable conflict: 'Organization rights are granted to workers by the same authority . . . that preserves property rights. Accommodation between the two must be obtained with as little destruction of one as is consistent with maintenance of the other. . . . But when the inaccessibility of employees makes ineffective the reasonable attempts by non-employees to communicate with them through the usual channels, the right to  exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize.'"

[l]egislature intended the board to select and follow only those federal precedents which are relevant to the particular problems of labor relations on the California labor scene."]

This might seem a weak reed upon which to rely in distinguishing what the national Board was prevented from doing and what this Board is proposing to do since the problem of employee ignorance of the NLRA sought to be addressed by the national Board might seem little different from the problem this Board seeks to address. Nevertheless, there are a number of differences.

In support of its proposed regulation, this Board has held hearings on the need for education and has established a record upon which to draw and to make determinations; by way of contrast, the national Board essentially relied on the argument that "for employees to exercise their NLRA rights. . . they must know that those rights exist" and that "lack of notice of their rights disempowers employees."[50] The record made by this Board goes beyond the argument that employees must know about the Act before they can resort to it: while it is trivially true that one cannot use a car if one does not know it is in the garage, it is not trivially true that if one does not know a vehicle is available, it cannot be used when it is needed. The Board's hearings, as discussed above, have shown both that there is little awareness of the Act's procedures as vehicles for the assertion of rights and that for the Act to function properly as a provider of rights and protections  the deficit in workers' knowledge of the Act must be eliminated.

Evidence presented at the hearings establishes that California's farmworker population is largely illiterate, largely undocumented and that, by and large, farmworkers have never

---

[50] The Notice of the Final Rule states:

[T]he Board . . . *believes* that many employees are unaware of their NLRA rights and therefore cannot properly exercise [them.] The Board based this finding on several factors: the comparatively small percentage of private sector employees who are represented by unions and *thus* have ready access to information about the NLRA, the high percentage of immigrants in the labor force, who are *likely* to be unfamiliar with workplace rights in the United States; studies *indicating* that employees and high school students about to enter the workforce are generally uninformed about labor law; and the absence of a requirement that, except in very limited circumstances, employers or anyone else inform employees about their NLRA rights.[Emphases added.] See, p. 6, https://www.federal register.gov/articles/2010/12/22/2010-32019/proposed-rules-governing-notification-of-employee-rights-under-the-national-labor-relations-act.

been exposed to the idea that workers have rights or that there are such things as labor organizations. Several witnesses testified that some of the most basic concepts of labor law, such as that the law protects the right of workers to act together and that it prohibits retaliation against them for doing so, are not intuitively understood by workers.

Adding more weight to the need for worker education is the influx of a new generation of workers from more remote areas of Mexico whose native language is not Spanish, but one of the so-called indigenous languages, such as Mixteco, Zapotec, Triqui, Chatino, Purepecha as well as many others. According to witnesses, the very idea that workers have rights that the state might protect does not exist in their culture, besides which they have a tradition of working without complaint. Even though many of these workers speak what one witness characterized as "market-level" Spanish, meaning enough Spanish to do basic business, their understanding of more complicated concepts, such as those contained in the Act, would be extremely hard to understandably convey in such basic Spanish. Similarly, written materials would be all but useless since most of these workers do not read in any of these languages even assuming the indigenous languages have a written counterpart. In other words, these workers do not understand the very regime of law represented by the Act, and since indigenous workers are more prone to suffer poor labor conditions than Mestizo Mexican workers, this group of workers especially needs to understand that such a regime exists.

Moreover, substantial evidence presented at the Board's hearings indicates that traditional forms of outreach which the Board has engaged in have not closed the "information gap" revealed at the hearings and that reliance upon technology cannot be counted on to close it either.

The second difference that makes the federal cases inapplicable as precedent is that procedures that serve both to inform employees of their rights under the Act and to facilitate the election process, and which are clearly beyond the specific statutory "means" authorized by the legislature, have been created by this Board and upheld by the California courts. This history renders the courts' conclusions in the *NAM* and the *Chamber of Commerce* cases, that the national Board is a purely "reactive" agency, inapplicable to the interpretation of the authority of this Board.

The linchpin of both courts' majority opinions was the conclusion that the national Board's functions are limited to responding to parties who have initiated actions either by filing charges or taking advantage of the Board's specifically defined statutory

procedures.[51] And in reaching this conclusion, both courts explicitly rejected declarations of policy or statements of purpose as useful in construing the scope of the national Board's authority in crafting means to fulfill the Board's specific statutory functions.  By way of contrast, this Board's authority to make rules has repeatedly been read in light of the entire Act, including its statement of purposes, and when so read this Board's authority to create obligations on parties prior to their initiating any actions under the statute has been upheld. The ALRA, then, has not been read, as the federal Courts of Appeals read the NLRA, as though the Act's election and unfair labor practice procedures were isolated "reactive" functions.

Thus, in construing the Board's authority to promulgate the Access Rule to facilitate union organizing activity, the court in *Agricultural Labor Relations Board v Superior Court*, supra, at p. 416, wrote:

> [On the basis of the factual findings made after hearing] the ALRB formally found that "Generally, unions seeking to organize agricultural employees do not have available alternative channels of effective communication. Alternative channels of effective communication which have been found adequate in industrial setting do not exist or are insufficient in the context of agricultural labor. [Cite] From this finding – and in furtherance of the expressed intent of the framers of the act – the Board concluded . . . that "The

---

[51] Thus, in *Chamber of Commerce,* the court wrote:

The Board points to a number of sections in the Act, arguing that the rule is necessary to carry them out. The Chamber responds that no provision of the Act requires employers who have not committed labor violations to be subject to a duty to post employee notices. We agree. The NLRB serves expressly reactive roles: conducting representation elections and resolving ULP charges.

* * *

Section 1, which lays out the purpose and aspirations of the NLRA, does not provide the Board with authority to Act. The Board argues that because Section 1 sets forth the Act's policy in broad terms, it is 'specifically designed to permit the Board to spell out [its] applications. [Citation omitted]' However, any argument that the statute's statement of purpose can provide the agency with authority to promulgate any regulation in furtherance of that purpose is unavailing. The NLRB is "'bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate for the pursuit of those purposes." *Chamber,* supra, at 162, See also, *NAM* at 967.

legislatively declared purpose of bringing certainty and a sense of fair play to a presently unstable and potentially volatile condition in the agricultural fields of California can best be served by the adoption of rules on access which provide clarity and predictability to all parties."

We conclude from the foregoing that the decision of the Board to create a limited right of access by means of a detailed and specific regulation *does not conflict with any intent of the Legislature*. . . .

And just as the Board created an obligation on employers to permit union organizers to enter an employer's property prior to any labor organizations having filed a petition for certification, the Board also required employers to furnish a list of their employees names, current street addresses, and job classifications – in the Board's terminology a prepetition list – prior to the filing of a petition under Labor Code Section 1156.3(c). This rule, too, was upheld by the Supreme Court in *Harry Carian, Inc. v Agricultural Labor Relations Board* (1984) 36 Cal 3d 654, where the court observed:

The rule in dispute here differs from the federal policy in requiring that an employer furnish a list of names and addresses prior to the scheduling of an election [indeed, prior to the filing of a petition for certification under Labor Code Section 1156.3(c)], upon notice by a union of its intent to organize the employer's employees. Petitioners would have us say that this difference is fatal to the validity of the ALRB's rule.

\* \* \*

The Board adopted the prepetition list rule . . . after this court upheld the board's access rule, and following public hearings in which the Board heard comments . . . regarding the access rule in operation. From these hearings and from its own experience the board reached two conclusions: that access should henceforth be limited to periods of seasonal peak, and that during such periods the opportunity of employees and union organizers to communicate with one another should be enhanced by making available to an organizing union a list of employees with names and addresses.

As important as facilitating the education of employees was to the Supreme Court's upholding the Access and the Prepetition List rules, was the fact that both rules also served to facilitate the unique election processes of the Act, which are so different from those of the NLRA. The Court wrote:

[In upholding the Access Rule,] we took note of the ALRA's requirement for swift elections, "a difficulty not faced by the NLRB," and a factor likely to render traditional channels of communication too slow to be effective.

32

*   *   *

While facilitation of communication between employees and union organizers appears to be the prime motivation for the rule, the board has also explained that the rule serves as an aid to the board's election process: "Under a statutory command to conduct elections within seven days from the time a petition is filed, this Board has required that an election eligibility list be submitted within 48 hours, allowing a maximum of five days for investigation and correction of defects in the list and for use of the list to contact and inform employees of election issues. *   *   * These requirements place severe time constraints on the ability of the Board agents to investigate showing of interest, scope and composition of unit questions, and to arrange for orderly conduct of the election itself. *   *   * If the experience of this Board has taught that secret ballot elections can be properly conducted within seven days, it has also taught that much time is consumed in investigating these questions after the election in challenged ballot and objections proceedings. Moreover, a certain number of elections are inevitably set aside as a result of errors resulting from inadequate information at the pre-election stage. . . . The process of filing a response [to the preelection list requirement] coupled with increased contact with an employer's work force resulting from use of the list itself will bring to light possible disputes over units and voting eligibility 'early in the election campaign rather than in the last few days before the election.' *   *   * The parties themselves will be better prepared to respond to both pre- and post-election investigations of such questions, and serious problems in conduct of the election resulting from short pre-election investigations will be minimized. Thus the pre-petition list requirement as presently enacted will contribute substantially to the prompt and orderly resolution of the election proceedings which are the prerequisite to the collective bargaining process at the heart of this Act."

*   *   *

The board has authority to promulgate "such rules and regulations as may be necessary to carry out [the provisions]" of the ALRA. *   *   * Those provisions include the fundamental declaration of employee rights "to self-organization, to form, join, or assist labor organizations ...." (§ 1152), as well as the board's authority to administer and certify elections (§ 1156.3). The

33

prepetition list requirement is functionally related to both those provisions, and the board's explanation of the necessity for the requirement is patently rational, based upon the board's experience, and well within its policy discretion.   *   *   * We conclude that the regulation is valid.[52]

These cases clearly indicate that this agency has neither confined itself nor been consigned to merely "reactive" roles and that, especially in the area of facilitating employee education and the election process, the Board's authority to impose obligations on parties has been upheld.

## IV. The Board's Regulatory Authority

Labor Code Section 1144 provides that "[t]he board may from time to time make, amend, and rescind, in the manner prescribed in Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code, such rules and regulations as may be necessary to carry out this part." An agency that has been delegated rulemaking authority has been delegated the power to make law:

It is a "black letter" proposition that there are two[53] categories of administrative rules and that the distinction between them derives from their different sources

---

[52] *Harry Carian Inc., supra*, 36 Cal 3d at 666 - 668.

[53] The second of the two categories referred to by the Court in this passage is the power to make rules "interpreting a statute."

Unlike quasi-legislative rules, an agency's interpretation does not implicate the exercise of delegated lawmaking power; instead, it represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts. But because the agency will often be interpreting a statute within its administrative jurisdiction, it may possess familiarity with satellite legal and regulatory issues. It is this "expertise", expressed as an interpretation (whether in a regulation or less formally . . . ) that is the source of the presumptive value of the agency's views  An important corollary of agency's interpretations, however, is their diminished power to bind. Because an interpretation is an agency's *legal opinion*, however "expert," rather than the exercise of a delegated legislative power, it commands a commensurably lesser degree of judicial deference. (*Yamaha Corporation of America v State Board of Equalization, supra*, 19 Cal 4th 5-6)

Footnote continued----

and ultimately from the constitutional doctrine of the separation of powers. One kind – quasi-legislative rules – represents an authentic form of substantive lawmaking. Within its jurisdiction, the agency has been delegated the Legislature's lawmaking power. * * * Because agencies granted such substantive rulemaking power are truly "making law," their quasi-legislative rules have the dignity of statutes. When a court assesses the validity of such rules, the scope of its review is narrow. If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purposes of the statute, judicial review is at an end.[54]

However, the initial question, whether an agency's rule "does lie" within the lawmaking authority delegated by the Legislature, is essentially a judicial question and "[a] court does not . . . defer to an agency's view when deciding this. . . ." A court will afford no more than "*respectful nondeference*"[55] to an agency's view on that question.

---

Footnote continued----

A regulation does not have to be the one or the other; it may entail both a "legislative' and an "interpretive" component: "'[A]dministrative rules do not always fall neatly into one category or the other; the terms designate opposite ends of an administrative continuum, depending on the breadth of the authority delegated by the Legislature.' Regulations that fall somewhere in the continuum may have both quasi-legislative and interpretive characteristics, as when an administrative agency exercises a legislatively delegated power to interpret key statutory terms." (*Peter Ramirez v Yosemite Water Company, Inc.* (1999) 20 Cal 4th 2d 844, 853.)

[54] *Yamaha Corporation of America v State Board of Equalization* (1998) 19 Cal 4th 1, 3

[55] This is the Court's own description of "the appropriate judicial attitude" in deciding questions of consistency. In this connection, it should be added that the "current" characterization of the appropriate judicial attitude as one of "respectful nondeference" cannot be easily squared with every other description of it. For example, in *Agricultural Labor Relations Board v Tulare County Superior Court* (1976) 16 Cal 3d 393, 411 Justice Mosk put the matter this way:

An administrative regulation, however, must also comport with various statutory requisites to validity. At the outset we take note of certain principles that govern this matter; although these rules have been often restated, it would be well to remember they are not merely empty rhetoric. First, our task is to inquire into the legality of the challenged regulation, not its wisdom. [Cite] Second, in reviewing the legality of a regulation adopted pursuant to a delegation of legislative power, the judicial function is limited to determining whether the regulation (1) is

Footnote continued----

This principle is codified in Government Code Section 11342.1, which requires that "[e]ach regulation adopted . . . shall be within the scope of authority conferred," and in Government Code Section 11342.2, which provides that, to be valid, every regulation must be "consistent and not in conflict with the statute and reasonably necessary to effectuate [its] purpose. . . ." *Association for Retarded Citizens – California v. Department of Developmental Services* (1985) 38 Cal 3d 384, pp. 390 – 391. The most common shorthand formulation for reviewing the threshold validity of a regulation – that is, whether it is within the scope of delegated authority – is: Does the regulation "alter or amend or enlarge or impair" the scope of a statute? *Morris v Williams* (1967) 67 Cal 2d. 733, 748. *Association for Retarded Citizens*, supra, at p. 391; *Irma Aguirre v Tony Lee* (1993) 20 Cal App 4th 1646, 1652.

If an agency regulation is determined to be consistent with and not in conflict with the agency's enabling statute, an agency must also show that it is reasonably necessary to effectuate its purposes. The necessary prong has its own standard, namely, whether the agency has acted in an arbitrary or capricious manner.[56]

As a general proposition, the *San Diego Nursery* case makes it clear that "*an appropriately tailored rule* authorizing prepetition access for a limited purpose" transgresses no statutory command; however, it also begs the question of what would constitute "an appropriately tailored rule."

Although exactly how the program operated over 30 years ago is hard to pin down from the materials still available to the Board, it is clear from the opinion in *San Diego Nursery* that

---

Footnote continued----

"within the scope of the authority conferred" [Citing Government Code Section 11373, the predecessor to current Section 11342.1] and (2) is "reasonably necessary to effectuate the purpose of the statute." [Citing Government Code Section 11374, the predecessor to current Section 11342.2] Moreover, "these issues do not present a matter for the independent judgment of an appellate tribunal; rather both come to this court freighted with the strong presumption of regularity accorded administrative rules and regulations." [Cite] See also, *Moore v California State Board of Accountancy* (1992) 2 Cal 4th 999, 1014

Speaking of the "strong presumption of regularity", the Court in *Yamaha* commented: "we may have overstate[d] the level of deference [paid to administrative views of "consistency"] for "[a] court does not, in other words, defer to an agency's view when deciding whether a regulation lies within the scope of authority delegated by the agency." *Yamaha,* p. 11, fn. 4.

[56] *San Francisco Fire Fighters Local 798 v San Francisco* (2006) 38 Cal 4th 653, at 667

Board agents sought access after a union had filed both a notice to take access and a notice to organize, which, the court noted, "evidence[d] the fact that the [union] would engage in an organizational drive among the Employer's workforce which might culminate in an election."[57] By way of contrast, the educational access this memorandum is considering is designed to take place in the absence of organizing activity among California farmworkers. Moreover, the court did not ground the Board agents' authority to take access in Section 1152 rights alone, but looked to connect the program with "the performance of duties imposed by the Act." In the case of the worker education program at issue in *San Diego Nursery*, the court agreed with the Board that Labor Code Sections 1151 and 1151(a), which together give the Board "free access to all places of labor" "for the purpose of all hearings and investigations", authorized the Board to take access to educate workers so long such access could be reasonably considered part of an "investigation."[58]

V.  Staff Recommendation

Against the backdrop of the influx of a new and growing group of (indigenous) farmworkers with little or no understanding that they have any rights under law and the ineffectiveness of traditional methods for education engaged in by the Board to reach significant numbers of farmworkers, it is suggested that the Board could find 1) that the right of self-organization or to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, will always remain paper rights unless agricultural employees know that they have them, 2) that creating an avenue for employees to take the initiative in learning about their rights is necessary for them to obtain knowledge of them, 3) that, in the absence of union organizing activity, and of effective alternative means of informing employees about their rights, direct access by Board agents to the worksite is necessary to provide such information, and 4) that such access will reciprocally serve to provide the Board

---

[57] *San Diego Nursery, supra*, at 131-132

[58] Noting that federal precedent treated "the entire representation process" as an investigation, and that this Board had further created a series of steps, including the Access Rule and the requirement to provide a Prepetition list so that unions could inform employees about their rights under the Act, which steps, as quasi-legislative rules, were now part of the statutory election process, the court concluded that once a union had taken those steps, the Board was authorized to take access to "advise, notify or educate" employees and employers of their rights and obligations under the Act and to aid the election process.

with information that will enable it to more efficiently conduct elections within the brief statutory window for holding elections.

In accord with these findings, the Board could adopt a regulation providing that, upon the filing of an appropriate petition by employees, agents of the Board in a special unit that will take no part in investigating and prosecuting unfair labor practice complaints, will be authorized to take access to the property of an employer whose employees filed the petition for the purpose of informing employees of their rights under the Act to engage in protected concerted activity including their right to petition for an election.

It is also proposed that the regulation could require that, after service of the employee petition upon the employer, the employer shall be required to submit information about the location of the employer's fields, the present complement of the employer's employees, and the employer's peak employment, so that Board agents can more precisely conduct their field educational activities without interfering with company productivity and properly inform employees about their rights under the Act.

A proposed draft of a Worker Education Regulation

In *San Diego Nursery v Agricultural Labor Relations Board* (1979) 100 Cal 3d 128, the court of appeals held that the Board's authority to take access to all places of labor included the authority to advise, notify, or educating employees about their rights and obligations under the Act so long as it also serves investigatory purposes.

Draft of Proposed Regulation

Upon the filing a Notice of Concerted Activity Education by two or more employees with a regional office or with the unit for worker education in Sacramento, either the regional office or the worker education unit shall immediately conduct an investigation to determine if a notice of intention to take access or a notice of intention to organize has been filed by any labor organization or if the employees are currently represented by a labor organization.

If the Notice of Concerted Activity Education is filed with a regional office and if the regional office determines that there is no valid notice of intention to take access or notice to organize the employees of the employer on file and that no labor organization is currently certified to represent the employees of the employer, the Regional Director shall notify the unit for worker education.

Within 24 hours of receipt of the notice of Concerted Activity Education Director by the worker education unit, the unit shall serve the Notice upon the employer. Within 24 hours of service of such notice upon the employer, the employer shall provide the location of the

38

employer's fields, the number of employees employed in the week during which the notice was filed, and the employer's peak seasonal employment.

Upon receipt of the information referred to above, the unit for worker education shall endeavor to make voluntary arrangements as to particular times and places where its representatives may meet with and speak to employees to advise them of their rights under the Act and to answer such questions as they might have. Such voluntary arrangements shall include the employer's notifying employees that a representative of the unit for worker education will be available to inform employees about their rights under the ALRA at the time and place agreed to and that their attendance is voluntary.

If no agreement is reached pursuant to the preceding paragraph, the unit for worker education shall use its discretion in setting the time and place where it intends to take access and shall thereupon notify the employer of the time and the place where it intends to do so, provided that a minimum of one day's notice shall be given. The employer shall be responsible for notifying employees of the chosen time and place.

Such access shall take place during the lunch period only and at the place where employees take their lunch. Access shall terminate at the conclusion of the lunch period. If employees take their lunch in the field, Board representatives may enter the field. Access for the purpose of worker education shall be available only among the crew or crews that filed such notice.

Employers, supervisors and representatives of the employer may not be present during the employee information period.

During such presentations, Board representatives will neither solicit charges nor use any information obtained during the question period for the purpose of making referrals to other agencies for enforcement actions. The Worker Education Unit is there for the purpose of explaining the rights of employees under the ALRA and the procedures available under the Act.

Interference with employee right to receive information may be grounds for the Board to find an unfair labor practice.

# Exhibit B

# *California's Indigenous Farmworkers*



**Final Report of the
Indigenous Farmworker Study (IFS)
To the California Endowment
January 2010**
Web Version I

## By Richard Mines, Sandra Nichols and David Runsten

Consult indigenousfarmworkers.org for further information.

**This project was done in collaboration with California Rural Legal Assistance**



**Acknowledgements:**

This work took two and a half years.  In order to be successful we needed the close cooperation of many indigenous communities and organizations.  Our deepest debt is for the warm reception of the members of the nine case study communities including their filial branches in Mexico and the United States.  The town authorities in Mexico in each case gave us their permission to carry out the study without which our work would have been impossible.

We benefitted from the effort of many indigenous-speaking interviewers.  The CRLA outreach workers Fausto Sánchez, Mariano Álvarez, and Jesús Estrada worked diligently to collect interviews.  In addition, Antonio Flores, Lorenzo Oropesa, and Irma Luna also collected many interviews.  Several privately hired interviewers came through with remarkable skill as well.  The most important of these were Jorge Sanjuan and Antonino Mateo of the Fresno area and Juan Ramón in the San Diego area.  Amadeo Lopez and Paulino Martinez lent an important hand collecting data from the Triqui speakers.

We need to make a special mention of Anna García who is undoubtedly the nation's preeminent farmworker interviewer.  During the crunch of the data collection for the Indigenous Community Survey, she came through with a critical effort to complete our objectives.  Anna also found Aline Doignon who did a sterling job entering all of the data.

There were a series of other indigenous speaking interviewers who collected data.  These included Jesús Orduña, Rosa López, Merced Olvera, Catalina Navarette, and Nicolasa Revolledo.   Rosario Aguirre, though not indigenous, also collected information.

Since none of our principal investigators is a specialist in indigenous workers, our study is built on the pioneering scholarship of others.  We are especially grateful to the late Michael Kearney and his former student, the medical anthropologist Bonnie Bade.  Also, Carol Zabin's path-breaking work was crucial.  The work on indigenous farmworkers of these scholars and many others cited in our bibliography laid the foundation for the study we undertook.

In addition, several indigenous organizations lent a hand in promoting our research including the Frente Indígena de Organizaciones Binacionales of Fresno, the Unidad Popular Benito Juárez of Bakersfield, the Unión Indígena of Santa Rosa, and the Educación y Apoyo para las Comunidades Indígenas of Oxnard.  Another group with deep roots in the Mixteco community in Oxnard, the Mixteco/Indigenous Community Organizing Project led by Sandy Young, supported our work.  Adam Sanders and Bernadina Gonzalez, who run an indigenous support group in Hollister, were generous with their time.  Herlindo Ramirez, a generous-spirited community leader in the Watsonville area facilitated our work in the settlement from San Martín Peras.

We benefitted from the support of our Advisory Committee that provided input into how best to carry out the work.  These include Sandy Young, Edward Kissam, Gaspar Rivera

Salgado, Martha Guzman, Konane Martinez, Rufino Dominguez, Jonathan Fox, Hector Hernandez, Yolanda Cruz and Philip Martin.   Edward Kissam, Margaret Handley, Mike Courville and Sandy Young commented on a draft of this report.

Filemón López and María Eraña of Radio Bilingüe generously allowed us to report on the project twice during their popular radio program La Hora Mixteca.

The staff of the California Rural Legal Assistance (CRLA), including Jeff Ponting, Alegría de la Cruz, Michael Meuter, Frank Bittner, Carolina Banbury and the legal directors and staff of the various CRLA offices where the indigenous live were our partners in this work from the beginning.  Haydée Díaz was crucial in the effort to raise money for the project in the first place.

We would like to express our particular gratitude to Daniel Carroll of the Department of Labor who allowed us to analyze fully the National Agricultural Workers Survey.  This unique and inimitable source of data on farmworkers allowed us to make quantitative comparisons between indigenous and other Mexican farmworkers in California.

Finally, our program officer at the California Endowment, Larry Gonzalez, understood the need to expand our knowledge about indigenous farmworkers and argued strongly for funding the project.

*Final Report Indigenous Farmworker Study*
**Table of Contents**

<u>Subsection</u>                                                                                            <u>Page</u>

Section I.
***Introduction and Overview***

*I-1 Purpose of the study*                                                                *1*
*I-2 Who are indigenous farmworkers*                                          *1*
*I-3  A new group enters at bottom rung of labor market*         *2*
*I-4 Indigenous farmworkers face extraordinary hardships*     *2*
*I-5 Indigenous expand their presence in California agriculture*  *3*
*I-6 Unique needs of California's indigenous farmworkers*       *4*
*I-7 IFS approach to special challenges*                                     *4*
*I-8 What's in the different sections of the report*                     *5*

Section II.
***Indigenous Farmworkers: Origins, Routes to California and Settlement Patterns***

*Executive Summary*                                                                     *7*
*II-1  IFS estimate of population in California*                           *8*
*II-2 Indigenous farmworkers come from Oaxaca and Guerrero*  *9*
*III-3 History of the source region of indigenous farmworkers*  *10*
*II-4 Mexican republican period*                                              *11*
*II-5 Need to migrate*                                                               *12*
*II-6 Migration to other parts of Mexico*                                 *13*
*II-7 Concentrations in different parts of California*                *16*
*II-8 Temporary migration within the united states*                *18*

Section III.
***Network Analysis: The Gateway to Understanding Indigenous Farmworkers***

*Executive Summary*                                                                     *20*
*III-1 The network approach*                                                     *20*
*III-2 How to understand the different types of networks*         *21*
*III-3 Short description of nine community networks*                 *22*

Section IV.
***A Binational Look at Household Composition, at Gender & Age Distribution,
and at Educational Experiences***

*Executive Summary*                                                                     *27*
*IV-1 Introduction*                                                                      *27*
*IV-2 Disadvantages faced by indigenous Mexican farmworkers*  *28*
*IV-3 Indigenous are poorer than other Mexicans*                   *28*
*IV-4 Binational household composition-methods*                    *30*
*IV-5 Binational household composition-total population*          *31*
*IV-6 Binational household composition-cohabitation of relatives*  *32*
*IV-7 Binational household composition-distribution of nuclear family*  *32*

iv

| Subsection | Page |
|---|---|
| *IV-8 Contradiction between improving education and educational Stagnation* | *35* |
| *IV-9 Education and labor force participation in United States* | *36* |

Section V.
**Language and Culture**

| | |
|---|---|
| *Executive Summary* | *39* |
| *V-1 Introduction* | *39* |
| *V-2 Main indigenous languages spoken by California farmworkers* | *40* |
| *V-3 Potential threats to native languages* | *41* |
| *V-4 Language challenges within families* | *43* |
| *V-5 Hometown-- cultural focus of indigenous communities* | *43* |
| *V-6 Individual obligations to hometown* | *47* |
| *V-7 Collective obligations to hometown* | *48* |

Section VI
**Work Conditions, Income and Asset**

| | |
|---|---|
| *Executive Summary* | *51* |
| *VI-1 Improvement of conditions for those who stay in agriculture* | *51* |
| *VI-2 Over time average conditions for indigenous have not improved:* | *54* |
| *VI-3 Strong ties back to México affect acquisition of U.S. assets* | *56* |
| *VI-4 Detailed look at indigenous workers shows few wage differences* | *57* |
| *VI-5 Poor working conditions independent of wage levels* | *60* |
| *VI-6 Worker complaints* | *62* |

Section VII.
**Housing and Living Conditions**

| | |
|---|---|
| *Executive Summary* | *64* |
| *VII-1 Introduction* | *64* |
| *VII-2 Ownership and types of dwellings* | *64* |
| *VII-3 Rent and mortgage level:* | *65* |
| *VII-4 Crowded dwellings* | *67* |
| *VII-5 Complaints about living conditions* | *70* |

Section VIII.
**Health & Access to Care**

| | |
|---|---|
| *Executive Summary* | *71* |
| *VIII-1  Overview:  Low Access to Care* | *71* |
| *VIII-2  Factors that account for low access* | *73* |
| *VIII-2.1  Lack of insurance* | *73* |
| *VIII-2.2  Other factors affecting low access* | *73* |
| *VIII-2.3  Transportation* | *74* |
| *VIII-2.4  Long waits, poor hours and humiliating treatment* | *74* |
| *VIII-2.5  Cultural-linguistic barriers* | *76* |
| *VIII-2.6  Fear of Cesarean sections* | *77* |
| *VIII-2.7  Seeking medical treatment in Mexico* | *80* |

| Subsection | Page |
|---|---|
| *VIII-2.8  Public health care for the indigenous in Mexico* | *80* |
| *VIII-2.9  Undocumented status* | *83* |
| *VIII-3  Indigenous Perspectives: disease, health & healing* | *83* |
| *VIII-3.1  A different worldview* | *83* |
| *VIII-3.2  Use of traditional healers in California* | *85* |
| *VIII-3.3  Perinatal care* | *86* |
| *VIII-3.4  Coping with illness* | *87* |
| *VIII-4  Provider Perspectives* | *88* |
| *VIII-4.1  A recent phenomenon* | *88* |
| *VIII-4.2  Provider-patient communication gap* | *88* |
| *VIII-4.3  Reticence to speak up* | *89* |
| *VIII-4.4  Lack of suitable educational material* | *89* |
| *VIII-4.5  Time, staffing and budget constraints* | *89* |
| *VIII-4.6  Hiring translators* | *90* |
| *VIII-4.7  Legal issues* | *90* |
| *VIII-4.8  Male dominance* | *90* |
| *VIII-4.9  Building bridges* | *90* |
| *VIII-5  Health concerns and needs* | *91* |
| *VIII-5.1  Extreme crowding* | *91* |
| *VIII-5.2  Isolation and depression among women* | *94* |
| *VIII-5.3  Mental health problems among men* | *95* |
| *VIII-5.4  HIV/AIDS* | *96* |
| *VIII-5.5  Phenomenon of teenage pregnancy* | *96* |
| *VIII-5.6  Domestic violence* | *98* |
| *Afterword* | *100* |
| *Bibliography* | *103* |
| *Appendix 1- Sources of Data for the Indigenous Farmworker Study (IFS) project* | *109* |
| *Appendix II.  The Network Approach to data gathering and Analysis* | *114* |
| *Appendix III.  Population Estimates* | *120* |
| *Appendix IV.  Languages in California* | *122* |
| *Appendix V.  List of Interviewees* | *123* |

List of Tables and Charts

Names of Tables and Charts                                        Page No.

Chart I-1.  Percent of South Mexicans  among
US Farmworkers from Mexico in California                          3

Table I-1.  Survey Techniques in the IFS                         4

Table II-1.   Estimates of the California Mexican Indigenous Farmworker
Labor Force                                                      8

Chart II-1.  Percent Distribution of Adult Indigenous
Mexican California Farmworkers by State of Origin                9

Chart II-2.  Percent Distribution of Indigenous Mexican Farmworkers
in California by Language Group                                  10

Chart II-3- Percent Distribution of Destinations in Mexico for Temporary
Work for 63 Oaxaca and Guerrero Towns                           15

Chart II-4  Percent Distribution of Settlement Areas in Mexico
for Temporary Work for 63 Oaxaca and Guerrero Towns             16

Chart II-5. Percent of Southern Mexican of Total Mexican Farmworkers
in each of Four Regions-- Early and Recent Periods Compared     17

Chart II-6.  Percent Distribution of Indigenous Farmworker Adults
by 12 CA Regions                                                18

Chart II-7.  Percent of time spent outside of CA                19

Table III-1  Nine Community Case Studies:
Examples of Hometown Immigrant Networks                         22

Chart IV-1.  Median Age of Farmworkers:
South, Rest of Mexico Compared Over Time                        29

Chart IV-2.  Median Years in the US over time
in US: South, Rest of Mexico                                    29

Chart IV-3.  Percent of Total Population Resident at the Addresses
by gender grouped by children and adults                        32

Chart IV-4.  Total Population within Nuclear Family Network
by Gender in Mexico and the US                                  34

Chart IV-5.  Average Years of School by  Age Group among
U.S. Resident Mexican Born                                      36

Names of Tables and Charts                                            Page No.

Table IV-1.   Mean Years of School by Remoteness
of the Town to Major Cities in Mexico  (18 to 25 years old only)          36

Chart IV-6.  Numbers of US-Resident Mexican Indigenous Children
Born in US and Mexico                                                     37

Chart IV-7.   Average Years of School by Age at Arrival in US
(Mexican Born and 17 to 20 years old)                                    37

Chart IV-8.  Number of 15 to 17 Year Olds Who Work
 in the Field by Age of Arrival in the US                                38

Chart V-1.  Percent Distribution of the Population in Mexico
of Major Native Languages                                                40

Chart V-2  Proportion of Language Spoken
to Children by Time in the US                                            41

Chart V-3- Proportion of Language Spoken to
Children by Location of Spouse                                           42

Chart V-4. Percentage Speak only Native Language
to Child, Spouse by Hometown Network                                     43

Chart V-5- Percent Distribution of Contributions by Object of Charity
by Years in the US                                                       48

Chart V-6- Median Dollars of Collective
Remittance by Time in the US                                             49

Chart V-7- Percent that have done cargo in last 5 years by
Years in the US                                                          49

Chart VI-1. Income of Interview Only by Years in US -
South, Rest of Mexico Compared by Years in US                            52

Chart VI-2.  Percentage who own cars -
South, Rest of Mexico Compared by Years in the US                        52

Chart VI-3. Dollars per Hour- South -
Rest of Mexico by Years in US                                            53

Chart VI-4.  Percent who paid for Rides
from a Raitero by Years in the US                                        54

Chart VI-5.  Percent who Own Car -
South, Rest of Mexico Compared Over Time                                 55

| Names of Tables and Charts | Page No. |
|---|---|
| Chart VI-6.  Percent of Households who Own US Dwelling - South, Rest of Mexico Over Time | 56 |
| Chart VI-7.  Percent that who own Home in Mexico – South, Rest of Mexico Compared by Years in the US | 57 |
| Chart VI-8-  Average Wage by Time in the US – 2008 | 58 |
| Chart VI-9 -  Average Wage by Crop 2008 | 59 |
| Chart VI-10   Average Wage  by Region 2008 | 60 |
| Chart VI-11.  Percentage of Farm Labor Contractor Employees by CA Region | 61 |
| Chart VI-12. Percent Worker Participation in Working Conditions Measured by Gender | 62 |
| Table VI-1.  Legal Complaints by Workers | 63 |
| Chart VII-1. Percent Distribution of Type of Dwelling- NAWS (South Mexicans only) and ICS Compared | 65 |
| Chart VII-2- Dollars per Month paid in Rent by Location of Spouse, Unmarried | 65 |
| Chart VII-3. Median Rent per month paid by Hometown Network- Households with Wife in the Home Only | 66 |
| Chart VII-4.  Average People per Room by Hometown Network | 68 |
| Chart VII-5.  Average People per Room by California Region | 69 |
| Chart VII-6. Percent of Sleeping Locations by Type of Room | 69 |
| Chart VII-7- Major Complaints about Housing by Percent of Complain | 70 |
| Chart VIII-1.  Percent Interviewees make Medical Visit – ICS & NAWS 2 year period, CHIS 1 year period before interview | 72 |
| Chart VIII-2.  Percent covered by Medical Insurance (including public insurance) | 73 |
| Chart VIII-3   Percent Distribution Age of Mother at Birth of  First Child | 97 |

Appendix Tables and Charts:

Target Criteria Chart                                                              110

Table B-1.   Ways to Compare Indigenous Immigrant Networks          112

Chart B-1 Distribution of Degree of Settlement for
Nine Hometown Networks by Median Year Arrived                      113

Chart B-2. Percent of time since 12 spent in Mexico by Town          114

Chart B-3. Percent of Household Children (under 18) Born in Mexico   115

Chart B-4.  Average Years of School for 18 to 25 year Old -
9 Hometowns Networks                                              116

Chart B-5.  Percent speak only Native Language to
Spouse, Children by Hometown                                      116

Chart B-6.  Percentage of Interviewees with
Car or Truck in US                                                117

Section I.
***Introduction and Overview***

*I-1.  Purpose of the study:*

The Indigenous Farmworker Study (IFS)[1] was implemented in conjunction with the
Indigenous Program of California Rural Legal Assistance (CRLA).   The California
Endowment funded the project with the goal of providing guidance for the design of
policies and programs serving the indigenous farmworker community and of supporting
indigenous organizations struggling to organize their own communities.   The IFS builds
on quite similar work done in the early 1990s by the California Institute for Rural Studies
also in collaboration with CRLA.[2]   This document shares the information and insights
we collected from 2007 to 2009 about the history, languages, demography, and culture of
indigenous farmworkers and outlines the economic and social challenges they face.

Immigration policies for managing flows, immigrant policies for integrating newcomers,
and development policies in the places of origin have to adjust to the reality of a new,
very different group of international migrants.   Despite the deep understanding that
indigenous leaders have of their own towns and networks, the indigenous community
organizations themselves need to formulate an overview of the new migration patterns
their communities are experiencing.  And, the service delivery providers and foundations
that seek to help the indigenous need complete information about the new occupants of
the entry level farm jobs.   And finally, public infrastructure needs to be customized to
this unique group with distinct migration patterns, health care ideas, and methods of
community organization.

*I-2 Who are indigenous farmworkers?*

In our study, we do not pretend to define a strict line between who is an indigenous
Mexican and who is not.   In considering this issue, one soon discovers that it is not for
outsiders but for the indigenous community members themselves to identify who belongs
to each of the indigenous groups.  First, one must understand that the indigenous identity
of the individual is usually shared with a group of people with the same language and
often from the same locality.  To be indigenous in Mexico encompasses identification
with one of a huge variety of languages, groups and customs.[3]   Still, in order to
determine who to include in our study, we had to draw some rough distinctions.  In
making these distinctions, there is no implication of a racial genotype defining who is
indigenous.  We included only people from hometowns in Mexico where the Native
American language is still spoken and where the obligations of community service, so

---

[1] Four seasoned farmworker researchers--Richard Mines, Sandra Nichols, Anna Garcia and David Runsten
--staffed this project.  The CRLA's indigenous-speaking Community Outreach Workers and private
indigenous-speaking interviewers played the irreplaceable role of cultural intermediaries.
[2]  For reports of the earlier studies see Zabin, Kearney, Garcia, et al. 1993 and Runsten and Kearney, 1994.
[3] For a subtle discussion of this issue see Navarette Linares, 2008, pp. 10-12,
http://www.cdi.gob.mx/index.php?Itemid=24&option=com_docman

central to indigenous life, are still practiced.[4]  We limited our study to people from indigenous towns whose people have a presence in California agriculture.  There are many Mexican indigenous towns with settlements in California whose members do not work in agriculture.  While recognizing that no strict line can be drawn, we nonetheless compare the unique social, demographic and economic characteristics of indigenous communities with other Mexicans.  We label the non-indigenous Mexicans as mestizos.[5]

*I-3 A new group enters at the bottom rung of the labor market:*

The indigenous farmworkers are the most recent of many groups that have occupied the bottom rung of the farm labor market in California.   The U.S. food system has long been dependent on the influx of an ever-changing, newly-arrived group of workers that set the wages and working conditions at the entry level in the farm labor market.   The indigenous workers are already dominant in many of the most arduous farm labor tasks (e.g. picking raisin grapes and strawberries).  These entry-level conditions have been used to control (and limit) labor costs of the approximately 700,000-strong California farm labor force.   The U.S. and Mexican societies continue to be confronted with the social costs of this system of labor utilization.  The resolution of this problem has taken on a new complication as the newcomer immigrants are now increasingly indigenous-speaking Mexicans with a different history and patterns of migration, with different customs and of course, different languages.  Approaches to facing this old problem now have to accommodate these "new immigrants."

*I-4 Indigenous farmworkers face extraordinary hardships:*

On average, the indigenous people living in Mexico are poorer, less educated, and have higher infant mortality rates than the mestizo population.[6]  This is in part due to their isolation in remote areas.  Though many thousands of indigenous have migrated to the large urban centers and border areas, the places where the majority of the people still speak indigenous languages and practice traditional indigenous customs tend to be small and remote towns.  One contributor to their disadvantaged status is the systematic discrimination of the colonial and Mexican governments and the mestizo population in general toward the indigenous.  As a group they have been intentionally deprived of employment and educational opportunities and public services commensurate with their share of the population.  The lower levels of health, education and income for the indigenous as compared to the mestizos also exist in large Mexican cities, the Mexican border areas, and in California.  In Section IV below, we detail the disadvantages faced by indigenous farmworkers as compared to other Mexican workers on California's farms.[7]

---

[4] See Section V below for a full discussion of language and community obligations.  See Section II for a discussion of the evolving place of the indigenous over the course of recent centuries.

[5] Mestizos are first-language Spanish-speaking Mexicans who do not identify themselves as indigenous. Mestizo means "mixed" in Spanish and refers to people of mixed Spanish and indigenous heritage.

[6] See Navarette Linares, 2008, pp. 105 to 112

[7] The authors analyzed the National Agricultural Workers Survey (NAWS) data from the Department of Labor for this report.  (http://www.doleta.gov/agworker/naws.cfm)   The survey, begun in 1988, takes a sample of about 2,500 farmworkers per year nationally, and about 700 in California.  This survey makes it

*I-5 The indigenous expand their presence in California agriculture:*

Despite the relative isolation of the indigenous, the language barriers they face, the resource-based obstacles to travel, and the increasing difficulties of crossing the border for all Mexicans, the indigenous have figured out how to migrate in recent decades across the international border into the United States.  In fact, the heavily indigenous swath of Mexico south of Mexico City that encompasses Guerrero, Puebla and Oaxaca has become as committed to cross-border migration as are the traditional 'mestizo' international migratory areas of the west-central region that began their treks northward many decades ago.[8]   This expanded migration is clearly visible in the increase of southerners among all Mexican farmworkers in California.[9]  We use southern Mexicans as a proxy for indigenous when analyzing the U.S. Department of Labor's National Agricultural Workers Survey (NAWS) data.[10]  Chart I-1 demonstrates the enormous change in recent decades; the proportion of southerners grew by four times in less than two decades, from 7% in the 1991-1993 period, to 29% in the 2006-2008 period.[11]



clear that the indigenous group is the youngest, least settled, most poorly paid and housed, and most recently immigrated group of farmworkers.  Comparisons between the indigenous and other Mexican farmworkers analyzed in the NAWS will be detailed in Section IV, below.

[8] See Paris Pombo, 2004, p. 1  The main sending states of the west-central region  are Jalisco, Guanajuato, Michoacán, and Zacatecas.

[9] See Section II below for population estimates for indigenous Mexicans in rural California.

[10] The details of the choice of southern Mexicans as proxies for the indigenous are explained in Section II, p. 16.

[11] The NAWS asks respondents to identify themselves by race (white, black, Asian, indigenous, etc.).  The proportion of those who identify themselves by the racial category *indigenous* grew from a miniscule percentage in the 1991-1993 period to 23% by the 2006-2008 period for Mexicans working in California agriculture (N=12,843).   For the effort being made to better identify the indigenous by NAWS staff  see is Gabbard, Kissam, Glassnapp, et al, 2008.

*I-6 The unique needs of California's indigenous farmworkers:*

In California, farmworkers in general and particularly the poorest ones, the indigenous, are undercounted by all the official census takers.[12]  As will be shown in Section VIII, the inability to gather information about the indigenous population has led to widespread unawareness of this community's needs; and, in some cases, service providers may even be unaware of the community's existence.  As we will explain in Sections V and VIII, the language barriers and the unique cultural traits of the population make it critical that customized programs be designed and implemented to accommodate the significant differences with other Mexican immigrants and the substantially greater barriers to access that the indigenous population faces.  Under current conditions, the service providers, who more often than not would like to render the highest level of service possible, are being asked to accommodate a population that they do not know or understand.

*I-7 Indigenous Farmworker Study approach to special challenges:*

To study indigenous farmworkers entails several unusual challenges.   First, they come from towns that are isolated with a long history of discrimination and exploitation by non-indigenous strangers.   As a result, indigenous peoples tend to be difficult to approach.   Their experience has taught them not to trust outsiders.   The largest barrier is language, because although some speak Spanish well and most speak it to some extent, most prefer to speak in their own languages.  Most have a limited Spanish vocabulary that constrains their ability to express what they are feeling.  This presents great obstacles to data collection that consequently can only be accomplished through an intermediary group of cultural and linguistic interpreters.

| Table I-1    Survey Techniques in the Indigenous Farmworker Study | | |
|---|---|---|
| **Technique** | **Acronym** | **Description** |
| *Count of Hometown Networks* | *CHTN* | Interviewed members of 350 Mexican Indigenous Sending Communities and gathered estimates of population and location of settlements |
| *Survey of Key Informants* | *SKI* | Gathered community–level data from leaders in 67 sending networks about jobs, U.S. and Mexican migration destinations (including the periods of outflows), and use of services by the network and the importance of community institutions |
| *Indigenous Community Survey* | *ICS* | For nine sending networks, the survey gathered information with 400 respondents about demography of the family, migration history of the respondent, housing arrangements, employment conditions and health care utilization. |
| *Provider Key Informant Interviews* | *PKI* | Gathered information on the experiences and point of view of providers of social services to indigenous farmworkers. |

In light of these challenges, the IFS undertook a gradual process of building trust with the communities and devised a stepwise method of data collection (see summary in Table I-1).  First, our indigenous-speaking interviewers spread out all over California and carried out a census-like **Count of Hometown Networks** gathering data on about 350 Mexican localities.  For each of these networks, the interviewers asked questions of one or more

---

[12] See Jacobs and  Kissam, 2002 and  Gabbard, Kissam and Martin, 1993.

members of each network, allowing us to make population estimates for each network and to determine the distribution of its members across California.[13]   Our next activity was to do interviews with community representatives from a few dozen sending towns, in order to get more in-depth information from which we could narrow our search for representative case study communities and deepen our understanding of indigenous farmworker migration.  In the winter and spring of 2007-2008, the IFS chose 67 representative towns that encompassed the major language groups, places of origin and destinations in California. The ***Survey of Key Informants*** was done with a representative (or two) of each community.   The survey gathered community-level data from the community leaders about jobs, U.S. and Mexican migration destinations (including the periods of outflows), the use of services by the network, and the importance of community institutions.  The next step, in the spring and summer of 2008 was to visit the selected hometowns in central Mexico and their daughter border settlements in order to familiarize ourselves with the conditions in the places of origin and to ask permission of town authorities to conduct a detailed survey among their community members.  In the fall and winter of 2008, we conducted the main data gathering of the IFS, the ***Indigenous Community Survey***, in nine hometown networks in California.  These nine communities cover four languages, two Mexican states, and include both deeply rooted and newcomer networks.  The survey gathered information about demography of the family, migration history of the respondent, housing arrangements, employment conditions and health care utilization.  The survey used universe lists (as best as could be obtained) of all people from the town living in California agricultural areas.   Then, a selection technique was instituted for each town to include representative proportions of men and women, of old and young, of the unmarried, and of people with spouses and families in Mexico and those with their families in the United States.  An average of over 40 respondents from each community were given an hour-long sit-down interview, often in their homes.  This procedure has guaranteed a representative distribution of interviewees.  Finally, during the winter of 2008-2009 and spring of 2009, we carried out ***Provider Key Informant Interviews***.   The point of view of providers completed the picture of the information gathered from the community families.

*I-8 What's in the different sections of the report:*

In Section II, we outline the history of the immigrant networks in their places of origin, elsewhere in Mexico, and in their settlement communities in California.  Section III provides a brief introduction to our basic approach of using the hometown networks as the foundation upon which we build our study.  A full explanation of this approach is found in Appendix II.  Section IV describes the demographic traits of the population in a bi-national context and details the economic and social barriers faced by indigenous farmworkers.    In Section V, we identify the language groups and the community organizational structures unique to the indigenous Mexican groups working in California's fields.  Section VI describes the income and assets of the community and the working conditions and wages it faces in the labor market.  In Section VII, the housing

---

[13] In addition, during the count we verified the presence in California of 150 other hometown Mexican indigenous networks for which we don't have population estimates.

arrangements and the level of crowdedness are detailed for the different parts of California.  Section VIII explains in detail the barriers to health care, the social service needs of the indigenous community and the provider perspectives on the population.

Section II.
***Indigenous Farmworkers: Origins,***
***Routes to California, and Settlement Patterns***

Executive Summary

- The IFS was able to estimate the rural California population of 342 Mexican Hometown Networks at about 53,000 adults.   Recognizing that this is incomplete, the National Agricultural Workers Survey (NAWS) data were used to make a point estimate of the total adult population of about 120,000.   This estimate is for Mexican indigenous residents of rural California.  Including children raises the point estimate to 165,000.

- A large majority of California's indigenous farmworkers come from a very concentrated area in Western and Southern Oaxaca and in Eastern Guerrero. A large majority speak one of three languages—Mixteco, Zapoteco or Triqui.

- The Spaniards continued a hierarchical social structure inherited from the Aztecs. During the colonial period, the environment was deeply scarred and the native population decimated.

- The years following the establishment of the Mexican Republic have provided little relief for the oppressed indigenous population.  Land reform and disputes over natural resources have driven them into servitude and in some cases forced them to flee to less productive areas.  Meanwhile, assimilationist social policies attempted but failed to eliminate their languages and culture.

- The indigenous of Oaxaca and Guerrero (especially in remote areas) had considerable economic self-sufficiency until the middle of the 20th Century.  But as the modern market economy deepened its penetration, the people saw themselves forced to replace home production and local trade with imported goods.  This reliance soon led to migration out of the area in search of cash.  Migration also became necessary as a growing population has faced a food scarcity resulting from eroded terrain and lack of consistent government incentives for staple products.

- The indigenous by the 1940s went to Veracruz and then later to Morelos, Sonora, Sinaloa and Baja California on seasonal treks to pay their bills.  Later on, many of the internal migrants settled in their temporary work locations, especially in Baja California.

- About half of the indigenous in California work in the Central Coast area, about a third in the Central Valley, while the San Diego area and the North Coast split the rest.

- Temporary migration within the United States is still practiced by indigenous farmworkers.   About two-thirds of the 67 hometown networks in the Survey of Key Informants had migrants who made annual treks away from home to seek work in other areas.   About a third of the destinations are in Oregon, a third in Washington and a third of the work destinations are elsewhere in California.

7

*II-1 IFS estimate of the indigenous farmworker population in California:*

In the IFS' Count of Hometown Networks, we gathered data from respondents from 342 Mexican villages and estimated that 53,602 Mexican indigenous adults from these places live in rural California.  Since we could not find all the sending hometown networks, we recognize that this is an incomplete count.  As a result, we turned to the NAWS to estimate a range for the total number of indigenous Mexican farmworkers in California.

We start with the total number of Mexicans in California agriculture, which has been independently estimated at 700,000 using two distinct techniques.[14]  Then, we take the proportion of southern Mexicans in the NAWS over time to check the rising share of indigenous.[15]  Table II-1 shows these estimates for the 1991-1995 period and the 2004-2008 period.   The data are presented with a 10% range around the point estimate to emphasize the conservative nature of our estimates.   Our point estimate for the early 1990s is just over 30,000 and for the late 2000s about 118,000.

| Table II-1. | | | |
| --- | --- | --- | --- |
| Estimates of the California Mexican Indigenous Farmworker Labor Force | | | |
|  | Mean 5-year estimate | -10% | +10% |
| 1991-1995 | 31,800 | 28,600 | 35,000 |
| 2004-2008 | 117,850 | 106,000 | 130,000 |
| Source: NAWS, ICS, Larson, Mines | | | |

Our estimate of 53,602 adults in rural California from the 342 localities for which we had some estimate of the numbers of migrants in California is therefore about 45 percent of our estimate of the total number of Mexican indigenous farmworkers in California in the relevant period. Since the Count of Hometown Networks done by the Indigenous Farmworker study also identified an additional 156 villages with migrants in rural California but for which we were unable to make population estimates, and since the earlier CIRS study in 1994 identified an additional 101 localities (not located in 2007) from Oaxaca alone that had California farmworkers, these estimates of over 100,000 indigenous immigrant farmworkers in California are quite plausible.

The estimate of 117,850 adults in farm work would imply a population of about 165,000 indigenous Mexicans in rural California if we include the children. Since not all

---

[14] See Larson, 2000, p.16 (http://www.ncfh.org/enumeration/PDF2%20California.pdf) ; and Mines. 2006

[15] In the early 1990s, the average proportion was about 8% while in recent years it has been about 25% (see II-1).  See Appendix III (NAWS' estimate of total population) for a full explanation.

indigenous immigrants work in agriculture it is likely that the total population of the indigenous Mexicans (adults and children) in rural California is greater than 165,000. This estimate excludes the populations of the large cities: San Francisco, Oakland, San Jose, Los Angeles, Orange County, and San Diego.[16]



*II-2 Indigenous farmworkers come from Oaxaca and Guerrero:*

Our study has demonstrated that California's indigenous farmworkers are very concentrated both by place of origin in Mexico and by language group.   Almost all originate in Eastern Guerrero or in Western and Southern Oaxaca where three native languages predominate—Mixteco, Zapoteco and Triqui.  In fact, over 80% of the farmworkers come from Oaxaca, another 9% are from Guerrero, 2% come from Puebla and 1 % are from Michoacán; only about 4% originate in other Mexican states (see Chart II-1, above).[17]   Over half of the immigrants are Mixteco speakers, while 26% speak Zapoteco and 9% speak Triqui.[18]  Chatino and Nahuatl speakers are about 2% each of the population; only about 7% are from towns where other indigenous languages are spoken (see Chart II-2, below).[19]   Moreover, a large majority of indigenous-speaking Mexicans working in California agriculture hail from small towns in the mountainous areas of Oaxaca and Guerrero where local languages predominate and not from Mexico's large urban areas where many indigenous now also live.[20]   Section V below has a more complete discussion of language.

---

[16]  For a discussion of the urban  population see: Lopez and Runsten, 2004.

[17]  These numbers are based on a hometown 'count' of 342 points of origin done by 40 IFS indigenous-speaking interviewers in late 2007.  The population estimates are detailed earlier in this chapter.

[18]   See list of other 21 languages in Appendix IV.

[19]  These three language groups represent only about 15% of all the Mexican indigenous languages speakers in Mexico.  Still, they are the ones that come to do California farm work.

[20]  The median size in Oaxaca of towns with 50% or more indigenous speakers is 117.   Only 6% have more than 1,000 people. (see http://www.inegi.org.mx/est/contenidos/espanol/sistemas/conteo2005/localidad/iter/default.asp?c=9448). Half of the 347 towns from all states enumerated by our study are smaller than 500 people and 90% are smaller than 3,250



*II-3 History of the source region of indigenous farmworkers:*

Before the Spanish came to the New World, Mixtecos, Triquis and Zapotecos lived, in large measure, isolated from the rest of Mexico.  They lived in a strict, socially hierarchical society in which the majority of the population was peasants that paid tribute and had work obligations to a small ruling class.   It was in the 15th century, not long before the Spanish came, that the Aztecs conquered these three peoples and subjugated them to their own taxation system.  The Aztecs often did not disturb the local power relations but just collected taxes from the elite groups who continued to dominate their ethnic kinfolk.

When the Spanish colonized Oaxaca and Guerrero, conditions changed dramatically for the indigenous people of the area.[21]  The Spanish implemented economic, cultural and demographic policies that devastated not only the native people of Oaxaca and Guerrero, but the environment where they lived.   The population of hundreds of thousands of people in the area was ravaged by disease, abusive labor practices, and the insistence of the Spanish authorities that the people be concentrated in population centers where disease and exploitation accelerated the demographic collapse of the population.  Moreover, the Catholic clergy made every effort to eradicate the native religious beliefs and to destroy the cultural artifacts of pre-Columbian life.

The native people had been able to sustain a large population in the region by achieving a delicate balance with their natural environment.   They took advantage of the summer rains and heat to grow corn, beans and squash on the plains and on erosion-resistant

according to the Mexican census.  There are large groups of people who identify themselves as indigenous in large Mexican cities.   However, we did not find many of these people working in California agriculture.
[21] See Zabin, et al, 1994, pp. 39-58, Edinger, 1996, pp. 35-45, see also Terraciano, 2000

terraces in the mountainous areas.   The Spanish brought in new economic activities that devastated the traditional economy of the region including the oxen-drawn plow that continues to destroy delicate mountainous top soil and generate extreme erosion in the area.  Huge acreages were devoted to silk and dye production and to the grazing of hoofed animals.[22]  The terraces were laid low, the native plant population was altered, and the native people driven from productive to more remote areas.

In the first hundred years after the conquest by the Spaniards, the population may have declined by as much as 90 percent.   By 1620, the population began to stabilize and slowly grow.  However, it is only in recent decades that the population levels existing before the conquest have been restored.[23]

*II-4 The Mexican Republic:*

After 300 years under colonial rule, at the beginning of the 19th Century, the Mexicans declared their independence from Spain.   But the lot of the indigenous people did not improve under the new republic.  Policies aimed at opening the Mexican economy to capitalist development and social policies focused on culturally homogenizing the Mexican population wrought havoc on indigenous languages and cultures.  Reforms often transferred communal lands to private haciendas where the indigenous either worked as low-wage laborers or fled to less fertile areas.  Other policies divided lands between neighboring towns in ways that intentionally maximized conflict and enhanced loyalty to colonial authorities and the Catholic Church at the expense of collective action by indigenous peoples in their defense against a hostile state.  At the same time, policies of *desindianización* deliberately attempted to eliminate the language and identity of the indigenous peoples.   According to official censuses, in 1808, 60% of Mexico's population was indigenous; by 1921 that proportion had fallen to 29%.[24]   From the point of view of the Mexican government, the indigenous people represented backwardness and were a problem that needed to be eliminated as Mexico modernized.   Even in the government-run indigenous schools, begun in the early 1900s, indigenous languages were discouraged.

The attitude of the government and the non-indigenous Mexican population in general has led to a deep-rooted discrimination against the indigenous in both the private sector and in the distribution of public resources.  The indigenous have been viewed as peoples worthy only of pity and subject to derision in the popular media.[25]  At the same time that Mexicans view the pre-Columbian past with pride, the mestizo Mexicans have, at least until recently, demeaned the contemporary indigenous population.   In fact, it is misleading to view the indigenous as some remnant of a picturesque past, because over the last 500 years they have made important adaptations that have allowed their cultures to endure, although this has meant considerable alterations in their way of life.   Despite

---

[22] See Zabin, 1994 p. 45. See also Melville, 1994.
[23] See Edinger, 1996 p. 40, and Borah. 1951
[24] See  Navarette Linares, 2008, p. 38
[25] The practice of making fun of the indigenous people is popular on Spanish language radio and TV broadcast in the United States as well.

ferocious efforts of the dominant culture to eliminate them, indigenous people have survived.[26]  In recent years, public attitudes in Mexico may be changing as indigenous people have claimed the right to adapt to the modern world in their own way, harmonizing their traditions with necessary changes.[27]

*II-5 The need to migrate:*

Despite aggressive efforts by Mexican society to eliminate indigenous cultures, the peoples living in the Oaxaca-Guerrero place of origin of today's California farmworkers had by the early twentieth century carved out for themselves a self-sufficient existence. The Triquis, Zapotecos and Mixtecos made, grew or raised almost all the products that they needed to survive.   They made their own clothes, footwear, drinks, building materials, and grew their own food.[28]  There was regional specialization in various products and commodities that nourished a rich trade within the indigenous areas. Surely, life was desperately poor for the vast majority and, when the rains failed, hunting and gathering was used to tide people over the bad times.[29]

However, by the middle of the twentieth century, the regional isolation and the barter economy of the Oaxaca-Guerrero area under discussion was fast disappearing.  The expansive cash economy of urban Mexico and of the larger world finally penetrated into the isolated areas inhabited by the indigenous.   The time-consuming and difficult ways of producing the needed goods locally were gradually cast aside by a hunger for cheaper and less work-intensive imported items.   The old ways had their advantages.  People worked in collective agreements to produce many of their necessities.  But these advantages were eroded by the persistent penetration of the outside world.   Outside consumer products were cheap and many were long lasting.  Imported cloth, hats and shoes soon replaced 'manta' cloth, palm sombreros and huaraches.   Imports of Coca Cola and Tequila replaced locally made 'tapache' and mezcal.  Plastic buckets replaced earthenware pots.

Another factor that has created a 'need to migrate' for corn producers has been the withdrawal of government support for corn production.  Over the last 20 years, the Mexican state has eliminated the parastatal firms that provided subsidized seed, fertilizer and credit and that guaranteed minimum prices.  In the meantime, the lessening of trade restrictions has increased competition from U.S. corn producers, resulting in lower prices for Mexican corn farmers. It must be remembered that many indigenous Mexican farmers also have relied on cash crops such as coffee that can supply an alternative income source to migration.  The repeated collapse of the price of coffee after the elimination of quotas from the International Coffee Agreement in 1989, along with the repeated devaluation of

---

[26] At present, about 10 million Mexicans out of 110 million (about 9%) identify themselves as indigenous. See Fernández, García, and Ávila. 2002
[27] See Navarette Linares, 2008 p. 12-13, In recent years, the 'bilingual" schools are teaching in native languages and have largely dropped their 'acculturist' themes.
[28] See Edinger, 1996 p. 94-110
[29] One of the interviewers in this study told us that in his Mixteco village in Guerrero in the 1980s there were times that people ate ground up banana roots, hunted frogs and armadillos in order to survive years of low rainfall.

the Mexican peso, has lessened the importance of this cash crop alternative and induced migration.[30] Furthermore, in more recent years, the introduction of running water and electricity to the areas opened up the possibility for plumbing fixtures and electrical appliances of various kinds that also created a need for cash.

In addition to the need to import consumer, building and farm input products, the eroded terrain has not adequately supplied the food needs for an expanding population.  The introduction of chemical fertilizers, pesticides and pumps in order to increase production (especially for export) may have been counterproductive in these environmentally marginal environments.  As one Mixteco farmer complained near his farm in Oaxaca: "we no longer have the same yields as before because the fertilizers have 'spoiled' the land.   We have to leave them fallow several years before they recapture their natural soil richness."[31]   And, the introduction of gasoline-powered water pumps, while increasing yields, has failed to raise incomes for local producers since intermediaries, mostly city people, who sell the pumps and fuel, and market the commercial commodities, capture most of the extra value produced.   In the meantime, because land and water are allocated to export crops, less of the staple crops destined for local consumption are produced.[32]

The inexorable integration of the Oaxaca-Guerrero area into the larger economy meant that in order to survive, the local people had to seek jobs paying cash to pay for both the imported consumer goods and for the shortfall in food to eat.

*II-6 Migration to other parts of Mexico:*

There has been considerable ethnographic work and some survey work about the migration out of the Oaxaca-Guerrero indigenous areas to elsewhere in Mexico.[33]   The basic patterns as to Mexican states of destination revealed by these studies are confirmed by our survey research.  Below, we describe the migration out of the Oaxaca/Guerrero areas.   The beginning dates of the migration to the different destination points are difficult to pin down since there are few witnesses alive who actually went in the first forays out from the early-migrating communities. We report here the dates reported by our living informants.[34]   Also, as we discuss below, the earlier migrants came largely from the towns near the major roads in Oaxaca while the more remote towns joined the migrant stream later.

---

[30] See Lewis and Runsten, 2008 " pp. 275-290.

[31] Interview conducted by Rick Mines in Santa Rosa Caxtlahuaca, June, 2008.   See also Edinger. 1996, pp. 185-211

[32] See Edinger, 1996.

[33] See Veslasco, 2005; Pombo Paris, 2004; Edinger, 1996;  Zabin et al, 1994; Posadas Segura, 2005; Stephen, 2008; Cohen, 2000; Hirabayashi, 1993, Kearney, 1986.   For an interesting survey done in the northwest of Oaxaca in the late 1980s see Alcalá, et al, 1994.

[34] The source of these data are the Survey of Key Informants done among 67 sending communities in the summer of 2008.   Data were collected on work and settlement destinations in Mexico and the United States for the home community networks of the informants.  For this analysis just the 63 Oaxacan and Guerrense towns were used.

With time variation among the communities, the migrants, starting in the 1940s (or earlier), began working in sugar cane and pineapples in Veracruz.  For this long trip made by foot or by bus, the workers travelled east for about 250 miles.  Soon, the huge uptick in industrial agricultural production elsewhere in Mexico, the improvement of roads out of Oaxaca and the labor recruitment campaigns carried out by distant employers in the indigenous areas, led to large flows of temporary labor migration.  In the 1960s, the indigenous migrants began going north (by bus for about 500 miles) to Morelos to work in vegetable row crops.[35]  And, shortly thereafter, they went far north (over 1,500 miles) to Sonora where they worked in cotton and grapes.  In addition, also by the 1960s, they began to migrate to the northwestern state of Sinaloa to work in tomatoes, peppers and other vegetables.   In the 1950s, the Northwest vegetable industry had been opened up by enhanced state-sponsored irrigation projects.  And, finally, by the 1970s, the indigenous migrants travelling back and forth from their homes began to cross the Sea of Cortez to Baja California, mostly to work in asparagus, tomatoes and wine grapes.   Later, in the 1980s, strawberries were introduced to Baja California by U.S. entrepreneurs and became an important source of work for the indigenous migrants.  These migrations were mostly seasonal and involved harsh working and living conditions.  Many of the indigenous farmworkers were transported by bus to and from Sinaloa or Baja free of charge.[36]  According to informants, natives of the communities recruited their co-villagers for work in Northwestern Mexico.

Our survey collection effort among community leaders in California (the Survey of Key Informants-SKI) has allowed us to quantify the reports of these migration patterns chronicled in earlier studies.  Our informants were able to provide us the start-up dates (mentioned above) and the frequency of visits to the Mexican destination points for temporary work migration.   As seen in Chart II-3, the most important temporary Mexican work destination for those living in California today was Sinaloa.  Thousands of indigenous workers made (and continue to make) the trek north to the vegetable fields near Culiacán.  Almost 30% of work destinations in the Indigenous Farmworker Study's Survey of Key Informants were in Sinaloa.  Second in importance was Veracruz with 20%, Baja California came third with 17%, Morelos fourth with 10%, and Sonora was fifth with 6 percent.

---

[35] We have evidence of one man who went from the Mixteca to Acatlán de Perez, Veracruz in 1930 to cut sugar cane (interview in Santa Rosa Caxtlahuaca, June 2009).  Also, Edinger, 1996 quotes an elderly man in 1984 who went to Veracruz to cut sugar cane in the 1920s.

[36] An elderly informant in San Miguel Tlacotepec worked as a recruiter in the 1970s and made announcements over loudspeakers in several towns in his area.



**Chart II-3- Percent Distribuition of Destinations in Mexico for Temporary Work for 63 Oaxaca and Guerrero Towns**

Source: Key Informant Inteviews (IFS) 68 interviews, 184 destinations

In addition to their work destinations, respondents told us the places where their communities formed settlements in Mexico. The Oaxacan/Guerrerenses created long-term settlements in agricultural work areas like Sinaloa, Sonora and Veracruz and even more of them in the state of Mexico and in Mexico City (about 10% each of the settlement destinations). However, by far the most common place to settle (over half of the settlements) was Baja California (see Chart II-4, below). Apart from the Valley of San Quintín, where large indigenous settlements took root, many also settled in the Tijuana and Ensenada areas. Some of the Tijuana residents commute daily to San Diego to work.[37]

---

[37] We can confirm these major destination points with another source of information also from the Indigenous Farmworker Study--the Indigenous Community Survey (ICS).[37] This survey shows that while in Mexico people spent most of their time in their home state, significant amounts of time were also spent elsewhere. The Indigenous Community Survey shows that most time has been spent in Sinaloa (almost 8% of the adult lives in Mexico). Next comes Baja California with over 6%, and then trailing behind are Sonora, Mexico City, Morelos and the state of Mexico. For the predominantly young current indigenous Mexican farmworker population surveyed by the ICS who are working in California, few spent time in Veracruz or other states of Mexico.

15



*II-7 Concentrations of indigenous farmworkers in different parts of California:*

We have two corroborating sources of information from which to estimate the distribution of Mexican indigenous farmworkers in California: the Indigenous Farmworker Study's Count of Hometown Networks and the National Agricultural Workers Survey (NAWS) done by the U.S. Department of Labor.

In the NAWS analysis, we use a proxy for the indigenous farmworkers.  Namely, we use all those Mexicans from the southern states to represent the indigenous.   If we take the proportion of southern Mexican farmworkers among all Mexican farmworkers by region where the survey was done, we come up with an estimate of the proportional concentration of southern (by proxy, indigenous) farmworkers in each California region.[38]  The NAWS data does not allow us to compare the concentration of southerners across the California regions but only within a single region.  In Chart II-5, one can see that the greatest concentration of southerners (as a percent of all Mexican farmworkers) in the decade of the 1990s was in the San Joaquin Valley and the Coastal region (about 10% each).   The Desert and Sacramento Valley both had percentages below 5% of southerners.  In the current decade of the 2000s, the proportion of southerners in all areas except the Desert has increased.  Now, both in the Coastal region and in the San Joaquin Valley, about one quarter of the farmworkers in these regions are from the south of Mexico.   Since the Sacramento Valley and the Desert have relatively small total farmworker populations, it is clear that the vast majority of indigenous farmworkers, according to the NAWS, are concentrated in the San Joaquin Valley and along the Coast.

---

[38] Farmworkers from the states of Campeche, Chiapas, Guerrero, Oaxaca, Puebla, Tabasco, Veracruz, Yucatan are our proxy for indigenous.  All others are considered the Rest of Mexico.



When we turn to the data from the count done by the Count of Hometown Networks of the Indigenous Farmworker Study, we can enter into more regional detail and we can compare the distribution across regions. In addition, the Indigenous Farmworker Study's hometown count has the advantage of being made up of 'pure' indigenous people since only indigenous towns were eligible for the count.  In Chart II-6, we see that the Fresno-Madera area is the most popular spot for indigenous farmworkers (almost one quarter of the population is settled there).  Next in importance is the Santa Maria area (17%), followed by the San Diego, Salinas and Ventura areas (between 10% and 16% each). The North Coast and Watsonville come next in importance (5% each) followed by the Bakersfield and Tulare areas.  Lastly, we note that the North San Joaquin Valley, the Sacramento Valley and the Desert area have relatively fewer indigenous farmworkers (see Chart II-6).   Moreover, if we group the areas into larger units, we discover that the Central Coast area from Oxnard to Watsonville[39] has almost half (46%) of the farmworkers, the Central Valley has about a third, San Diego has 16% and the North Coast just 5%. Despite the fact that the Central Valley has most of California's agriculture, it appears that a clear plurality of the indigenous work force labors along the Central Coast.

---

[39] The Central Coast includes all of Ventura, Santa Barbara, Monterey, Santa Cruz and San Benito counties. The Central Valley includes both the San Joaquin and Sacramento Valleys.   The North Coast includes Solano, Napa, Sonoma and Mendocino counties.



**Chart II-6.  Percent Distribution of Indigenous Farmworker Adults by 12 CA Regions**

Source:  IFS Count of Home Town Networks, 2007- Esimated minimum of 53,602

*II-8 Temporary migration among indigenous California farmworkers within the United States:*

We have two data sources to describe temporary migration by indigenous farmworkers once they come to California, both from the Indigenous Farmworker Study—the Indigenous Community Survey (ICS) and the Survey of Key Informants (SKI).[40]   Both are only partial glimpses into these complicated movement patterns that vary greatly among hometown networks.[41]   Once in the United States, the ICS' interviewees stayed to work mostly in California—only 7% of their time in the United States (since the age of 12) has been spent outside of California.[42]   The pattern for men migrating temporarily outside of California is much stronger than for women.   Overall, these California-based men have spent 9% of their time in the United States working outside of California (not an insignificant amount), while women have spent only 2% of their time in the United States in cross-state migration journeys.   In Chart II-7 below, we can see that Oregon, Florida and Washington are the most frequented migration destinations for these California-based interviewees from these nine hometown networks.  Although the sample is small, the pattern of quite limited movement outside of the state is a significant finding.

---

[40] The NAWS was not analyzed for detailed intra-U.S. migration patterns for this report.

[41] The ICS has the advantage of providing actual percentages of time spent outside of California in different U.S. states.  However, it has two distinct disadvantages--it has information only about nine hometown networks and it has little information about movements within California.  The SKI has the advantage that it covers more (but still a small minority of) towns and has data about within-California movements of migrants.   However, unlike the ICS it does not have detailed information on the amount of time spent in different destination points.

[42] This does not mean that other members of their communities have not settled in other states, but only that those interviewed in California have migrated outside of California to other states only for limited but significant time periods.



Our second data source, the Survey of Key Informants, provides data on a somewhat wider sample of communities since representatives of 67 hometown community networks (rather than nine in the Indigenous Community Survey) were surveyed. It also has data on movement within California which is significant for many indigenous networks.[43] It should be remembered, that though these 67 networks are representative of the total indigenous farmworker population in many ways, the intra-U.S. migration patterns of these networks can give only a flavor for the highly varied movements of indigenous peoples in California to destinations elsewhere in the United States. Each of the hometown networks has its own unique pattern.

Of the 67 towns, 44 sending hometown networks (about two-thirds) reported having temporary work migration. About a third of the destinations are in Oregon, a third in Washington, and a third elsewhere in California. New York and Florida have only a small draw for these 67 communities.[44] At least for these 67 communities, there are still significant numbers of migrants leaving California for temporary migration destinations every year. The informants report that about 500 to 600 men go to each of the three main destinations (CA, OR, WA) each year from all of these 44 sending hometown networks combined. The ones that go to Oregon are most likely to take their families—about half do. Those that go to Washington take their families about a third of the time. And those that migrate around California take their families much less--less than a fifth of the time.

---

[43] For example, a large proportion of San Martin Peras immigrants alternate between the Oxnard and Watsonville areas where they engage in strawberry harvesting.

[44] Notice that this is similar to the ICS data with the exception that Florida is much less prominent in this larger sample of networks.

Section III.
***Network Analysis--The Gateway to Understanding Indigenous Farmworkers***

Executive Summary:

- Indigenous Mexican immigrants to California agriculture are small town individuals whose primary loyalty is to their hometown network (HTN).
- We use the HTNs as the building blocks of our study.
- There are considerable differences across HTNs, accounting for how well individual networks adapt to U.S. institutions.  It is important for those dealing with individual indigenous immigrants to understand the nature of the network to which individuals belong.
- To demonstrate the differences between networks, we compare nine case study HTNs using a set of key features of which perhaps the most important is the age or maturity of the network (median year of arrival).

*III-1 The network approach:*

Social networks based on relationships formed in the hometown are recognized as crucial to the behavior of international immigrants from rural areas.  This migrant network structure evolved from traditional systems of mutual exchange necessary for survival in poor rural environments.[45]   At first, the pioneering migrants from a village face great odds to cross borders, find housing and obtain employment.  But over time those who come first facilitate the process by giving shelter and job tips to their friends and relatives from the home area.  Soon, what started as an opportunity for those few willing and able to make the trek becomes a mass phenomenon open to a large proportion of the residents of the hometown.[46]   In time, women and children join their men folk in the migration destinations.  Meanwhile, the tastes of the home and destination communities begin to change because of improved economic opportunities.   Those who go first are envied and emulated by those who follow them in the migrant circuit.  The immigran**ts** settled in the destination regions begin to acquire more material goods and take the lead in pushing for more services in the United States.  As the network gets more deeply rooted north of the border, it tends to form concentrated communities in a few destination points, while at the same time searching for new geographic opportunities.   As the old networks become settled and seek better conditions for their members, often employers will switch to more newly arrived, and more easily exploited, immigrant communities that are just beginning the staged settlement process.

Indigenous farmworker networks fit this pattern, identifying strongly with their hometown communities.[47]  This trait is true to some extent for all people "away from home" in a foreign environment.   People from the same place tend to identify with each

---

[45] Mines and Anzaldua, 1982, p. 85, also see Lomnitz, 1989
[46] Massey, et al, 1994,  p. 1498,  see also Nichols, 2006
[47] For other discussions of Mixtec social networks and migration see for example Kearney and Nagengast 1989; Bade 2004

20

other and seek ways to implement strategies of common assistance.  This tendency is particularly strong among the Mexican indigenous settlers in the United States.  These immigrants, largely from small towns, are not "mass society" individuals who easily identify their fate with broad collective objectives of the larger society.  Instead, their experience teaches them not to trust the outsider who has traditionally discriminated against them.  This tendency is further reinforced by the localized nature of the dialects of the indigenous languages these small town dwellers speak.[48]  Often, people from a nearby town may speak their language with a different tone and vocabulary.  Furthermore, the indigenous political organization[49] within the community often reinforces obligations of mutual help that create ties to the people in their hometown network.  People from their hometown are their special *paisanos*.[50]

Because of the strength of these hometown ties, we decided to use the binational immigration network as the fundamental building block of our effort to understand Mexican indigenous farmworker issues.  We consciously posited that to understand how to improve the lives of the indigenous immigrant community required that we understand the community networks that dictate the behavior of their members.  We defined the universe for our study to be made up of a few hundred hometown networks that we identified early on in the study.[51]

*III-2 How to understand the different types of networks.*

It is crucial to understand the variation in the age and maturation of immigrant networks. There is a spectrum of newcomer to settled networks that have very distinct patterns of household composition, work, housing, organizational structures, and receipt of social services.  To provide appropriate services to these communities, as well as strengthen their internal organization, it is important to grasp the great variation across communities. Some have long histories in the United States as migratory communities; others are newcomer networks.  When dealing with individuals or groups from a given community, one needs to understand where they fit within the continuum of types of communities found in the universe of indigenous farmworker sending networks.  These communities vary by a series of readily observable concrete factors that can be learned by paying close attention to the community traits of the hometown network.

The most determining characteristic of a migration network is its age or time that its members have spent in the United States.  So, we make age of the network our point of departure for distinguishing among them, while remembering that there are many other equally important factors to keep in mind while familiarizing oneself with these communities.  The point here is not to engage in fine academic distinctions but to help understand how to tell one network from another so that one can relate to the community with which one is dealing.   Table III-1, below, identifies the nine communities we will

---

[48] See Section II for a discussion of how the Mexican State intentionally fragmented indigenous communities in Mexico.
[49] Referred to as 'usos y costumbres' by Mexicans
[50] The towns are referred as "closed corporate communities" by anthropologists (see Wolf, 1957)
[51] See Sources of Data in Appendix I for details.

be discussing.   We did an in-depth survey with an average of over 40 people from each community.  The first two communities are much more established than the other seven.  However, as is detailed in Appendix I, there are important differences among the other seven as well.  All the towns except for Magdalena Loxicha (i.e. eight of the nine) have managed to send large numbers of people and a significant proportion of their populations to California.

*III-3 A short description of the nine community networks:*

We will be using these nine quite distinct and representative communities throughout this report to demonstrate the variety of experiences faced by immigrant indigenous networks in the hope of understanding the key features of these communities.   Understanding these communities should facilitate an understanding of the variety of types of communities encountered in the larger indigenous settlement community.

| Table III-1:  Nine Community Case Studies:  Examples of Hometown Immigrant Networks | | | |
|---|---|---|---|
| Level Of Maturity | Real Name | Shortened Name for Graphs | Language Spoken in Hometown |
| *Very Settled* | Santa María Teposlantongo | tepos | Mixteco |
| | San Miguel Cuevas | cuevas | Mixteco |
| | | | |
| *Medium Level Of Connectedness* | Santa Cruz Rio Venado | venado | Triqui |
| | San Juan Piñas | piñas | Mixteco |
| | Cerro del Aire | cerro | Chatino |
| | | | |
| *Newcomer With Large Presence* | Candelaria la Unión | candelaria | Mixteco |
| | San Martín Peras | peras | Mixteco |
| | Jicayán de Tovar | jicayan | Mixteco |
| | | | |
| *Startup Newcomer Network* | Magdalena Loxicha | loxicha | Zapoteco |

In addition to age of the network, there are several other important traits about the typical person in each of the networks.  These include the proportion of his or her life spent in the United States, the location of his nuclear family (Mexico or California), the cultural assimilation of his network back in Mexico and the assets he holds in the California.  In Appendix II there is a systematic comparison of the nine case study towns with regard to all of these major distinguishing features.  A review of these methods is helpful for those working with indigenous immigrant networks. Below, we describe in brief the major traits of each of the nine hometown community networks.  Again, for a deeper comparison consult Appendix II.

1)  Santa María Teposlantongo—very settled

This is a Mixteco-speaking Oaxacan community found in the San Juan Mixtepec region of Oaxaca, not far from, and equidistant between, the two well-connected cities of Tlaxiaco and Santiago Juxtlahuaca.  Its people have been migrating for decades.  They have settled populations in Veracruz and in Baja California.  They participated in the Bracero Program and began coming in limited numbers to California in the 1960s.  By

the early 1980s, a substantial settlement community including women and children
existed in the Arvin-Lamont area where they have done grape and vegetable work.
Younger people continue to come to the United States from the village but go mostly to
Florida and Indiana.   The settlers from Tepos speak Spanish without difficulty.  They are
predominantly an older group (median age=36) and have all their minor children with
them in California.  Their adult children are also in the United States.  A few have houses
and almost all have cars.

2)      San Miguel Cuevas—very settled

These Mixteco speakers come from a town right near the small city of Santiago
Juxtlahuaca in Oaxaca, which is connected by paved road to the rest of Mexico.  Its
people have daughter communities in Baja California and Mexico City.  The people from
Cuevas also came as Braceros and settled in California first in the 1960s.  Again, by the
1980s, they had settled as families in the Fresno area where they have specialized in
grape work.   Many settlers from Cuevas still take the seasonal trek north to do farm work
in Oregon where there is a settlement of people from their hometown.  Younger people
continue to come from the hometown to a growing California settlement.  In general, the
settlers speak Spanish well.   Again, they are an older group (median age=34) without
minor children in living Mexico.   Their nuclear families have moved to the United
States.  A few have houses and a large number own trailers in the Fresno area.  Most have
cars.

3)      Santa Cruz Río Venado—medium level of connectedness

These Triqui speakers must traverse an unimproved dirt road (impassable in the summer
rainy season) from their hometown to reach the small city of Putla de Guerrero, Oaxaca,
which is connected by paved road to Tlaxiaco and thus to the rest of Mexico.  The people
of Venado travelled widely around Mexico and the town has filial communities in
Sonora, Jalisco, Baja California and Veracruz.  Though it had pioneers arrive before the
immigration amnesty of 1986-1988, it had very little presence in the United States until
the 1990s.   Settlers first went to the Madera area but at some time in the mid-1990s,
they shifted their main settlement to Greenfield (Monterey County) where they are
engaged in vegetable work.   The Spanish of the settlers from Venado is very uneven.
This is a relatively young group (median age=29) and a large proportion of the settlers'
minor children are still in the hometown.  They all rent and live in crowded apartments in
California, but most own cars.

4)      San Juan Piñas-- medium level of connectedness

Piñas is a Mixteco town that is situated on the western edge of the municipio of Santiago
Juxtlahuaca, Oaxaca.  It is joined by unpaved roads to the city of Santiago Juxtlahuaca.
The people of Piñas travelled extensively around Mexico seeking farm work throughout
the second half of the twentieth century and left settlements in Sonora and Baja
California.  A few participated as Braceros and the migration of male pioneers began in
the 1970s.   The median age of the population of the settlers is relatively high (33 years).

However, women and families did not start coming until after the 1986 immigration amnesty, and settled family-based communities probably didn't appear until the mid-1990s.   They are mostly settled in the San Diego and Santa Maria areas where they work in vegetables and strawberries.   Some in San Diego have found work in construction. The ability to speak Spanish among the settlers from Piñas is mixed, perhaps a reflection of its isolation and relatively low educational levels.  Despite the relatively early arrival of pioneers, a minority of the settlers are couples living together and a large proportion of the minor children of the settlers are in the village.   No one in the sample owned a home and a minority owned cars.

5)      Cerro del Aire-- medium level of connectedness

Cerro, which has a Chatino-speaking population, is connected by an improved (graveled) road to the main highway between Puerto Escondido and Oaxaca City.   It is a community that until recently has not been exposed to the outside world and has travelled very little around Mexico looking for work, unlike other towns in the study.  Still, some people have settled in Oaxaca City.[52]  In Cerro's case, once people found the means to leave their community, they came straight to the United States.  In California, almost all have followed the lead of one pioneer who came to Petaluma where they work in wine grapes and landscaping.   Although this pioneer and his wife came in time for the amnesty of 1986, most Cerro settlers came in the late 1990s and most women came after 2000.  Despite the late entry into the migration stream, most of the settlers from this coastal region speak Spanish well and use it with their children who are resident in California.  Still, the majority of the relatively young settlers (median age=28) have not settled with their spouses in California and a majority of their minor children are still back in Oaxaca.

6)      Candelaria la Unión—newcomer with large presence

This Mixteco-speaking town, in the *municipio* of San Pablo Tijaltepec, is located over a long and tortuous, although graveled, road an hour from the small city of Chalcatongo de Hidalgo in the district of Tlaxiaco, Oaxaca.   The people from Candelaria did travel elsewhere in Mexico to work and formed settlements in Baja California and Mexico City. Although people from the Chalcatongo area have a history of Bracero participation, for the San Pablo Tijaltepec area, migration seems to have been delayed by the poor roads. They settled very late in California.   The first pioneers did not arrive until the 1990s, and most of the settlers arrived well into the decade of the 2000s.   They settled in Taft and Santa Maria where they work in grapes, vegetables and strawberries.  Despite their isolation and recent arrival, many appear to speak Spanish well and the settlers have a relatively high educational level.  With respect to the presence of the spouse and children, the men of Candelaria have an unusual pattern.  Despite their late arrival in California, their relative youth (median age=27), and the fact that a large proportion (41%) of the minor children are still in the village, an extremely high percentage of the settlers (78%)

---

[52] It is typical for Chatino girls to go to Oaxaca City and work as maids.  It was in Oaxaca City that Chatinos learned of opportunities to migrate to the United States (personal communication with Yolanda Cruz, Chatino immigrant).

are here with their spouse.   It appears that the people have made the calculation that it is worth having two wage earners in California even if it means leaving the children with the grandparents in the village.  Not surprisingly all are renters, and less than half own cars.

7)      San Martín Peras— newcomer with large presence

San Martín Peras, located in the far west of Oaxaca near the Guerrero border, is the chief town in the *municipio* of the same name.  It is the region's administrative center and has the largest population of the nine communities under study.   The town was founded and built into a population center only in recent decades.  It is still isolated by poor roads from the city of Santiago Juxtlahuaca, from where the roads lead out of the region. Despite its remoteness, the people of Peras have travelled widely in Mexico in search of work.  There is a very large settlement of people from the town in the San Quintín Valley in Baja California.   The first pioneers came in the late 1970s to California but it was not until after the immigration amnesty of 1986 that large numbers crossed the border.   Most men arrived after the late 1990s and most women came after 2000.   They have settled predominantly in Oxnard and Watsonville where they work in the strawberry industry. There is a great deal of seasonal movement between these two areas.  The people of Peras speak Spanish in a very uneven way and have one of the lowest educational levels. However, like Candelaria, a majority are in California with their spouse.  Again, this is true despite their relatively young age (median age=27) and the fact that a large proportion of the minor children are in Mexico.    None own their houses, though a majority owns a car.

8)      Jicayán de Tovar— newcomer with large presence

Jicayán is a Mixteco-speaking town on the Guerrero side of the border.  It has tortuous roads that until 2008 were impassable in the rainy season.  To reach the outside world, one must pass through Santiago Juxtlahuaca in Oaxaca, since it is isolated from the rest of Guerrero.   Despite being isolated by bad roads, people from Jicayán managed to travel to the coast of Guerrero to work in the tourist and construction industry.  They also have travelled to other states in Mexico, though they started in the 1980s, much later than many other towns.  Settlement communities were established in Baja California, Michoacán and Mexico City.   Although one pioneer came before the immigration amnesty of 1986, most people came after 2000 (median age=26).   The settlers of Jicayán speak a very poor Spanish in general and their educational level is the lowest among the nine communities.   A minority has spouses living with them and 60% of the minor children of the settlers live in Mexico.   No one owned a home but many had cars which they use to shuttle back and forth between Caruthers/Raisin City and Santa Maria, according to the fluctuating agricultural labor demand in grapes and strawberries.

9)      Magdalena Loxicha—startup newcomer network

Loxicha, a Zapoteco-speaking town, is located on an unreliable but gravel road in a remote area north of the highway between Puerto Escondido and Puerto Angel, Oaxaca.

This town was very late to enter the migrant stream.   There is no evidence of anyone leaving the hometown before 1990.  There are no settlements elsewhere in Mexico. People came straight to the United States. No one in the older generation speaks Spanish very well in the town.  However, despite its isolation and lack of migration history, the language skills are changing quickly.   Children converse in Spanish on the streets of the hometown, and the young settler population in California speaks Spanish well.  Though there were isolated pioneers in the 1990s, almost all of the relatively small number of people from Loxicha has come to California since 2000 (median age=25).  They have settled almost exclusively in the San Diego area where they work in the strawberry and tomato fields. Loxicha is the one town of the nine with very little settlement of women and children.  We found only two women from the community in California and both had very young children.  About 80% of the men in our sample did not have a spouse with them and a large majority of their children were in Mexico.   The men from Loxicha have no houses and only 20% have cars.

Section IV
*A Binational Look at Household Composition,*
*Gender and Age Distribution, and Educational Experiences*

Executive Summary:

- The indigenous are younger and more recently arrived than mestizos.  This explains in part why they are poorer and have fewer assets.
- If we count all the residents at the rural California addresses (residences) where the indigenous immigrants are living, we find that two thirds are adults and 60% of these adults are men.  Only one third are children under 18.   A surprisingly high 39% of the occupants of the housing are subleasing residents not well known to the principal residents.
- The survey found that within nuclear families it is extremely common to have some members living in Mexico while others live in the United States.  Summing across all members of the nuclear families in the survey irrespective of place of residence, we find that two thirds live north of the border and one third live in Mexico.  The majority of those living in Mexico were women and the majority of those living in the United States were men.
- Within these binational families there are more children between the ages of 0 to 5 resident in the United States, while more of the children of the respondents aged 6 to 14 are resident in Mexico.  This implies that some people are leaving older children in Mexico with grandparents or relatives, and continuing to have children after coming to California.  A small number also send their U.S.-born children to Mexico to be cared for by relatives.
- The nuclear family members outside the household are mostly wives and minor children in Mexico.  However, some husbands and adult children live away from the household in the United States probably due to seasonal labor migration.
- Younger farmworkers have on average more education than older ones.  However, the average educational level of Mexicans in California agriculture is not increasing.  Perhaps, the source regions of the newer more recent waves of immigrants have lower educational levels than the veteran immigrant sending areas.
- Children that come to California before age 12 have a better chance of getting education and of not working in the fields than those that come at 12 or older.

*IV-1 Introduction:*

The history and network structure of indigenous farmworker immigrant communities discussed above has created a distinct household organization with important branches in both countries.   Although similar to households in other Mexican farmworker immigrant communities, indigenous households have some unique qualities.[53]  First, we will show based on the National Agricultural Workers Survey (the NAWS) that indigenous in

---

[53] For further discussion of comparison between mestizo and indigenous networks see Bade, 1994 (Sweatbaths, Sacrifice and Surgery)

California have more 'disadvantages' than other Mexican immigrant farmworkers.  Then, by using our recently completed survey (the Indigenous Community Survey-ICS), conducted only among the indigenous, we will describe in detail how the family members are distributed between the two countries and how the educational opportunities differ for different immigrant groups.


*IV-2 The disadvantages faced by indigenous Mexican farmworkers:*

The indigenous farmworkers are a younger and poorer population than other Mexican immigrants.   They have fewer assets, less education and speak less English (and Spanish) than other Mexicans.   They are also a more "newcomer" group.  These disadvantages that shape the lives of the indigenous are difficult but important to demonstrate.

The only source of data useable for comparing traits of different kinds of Mexican farmworkers is the National Agricultural Workers Survey (NAWS).  Unfortunately, in order to make comparisons between the indigenous and other Mexican farmworker immigrants in the NAWS, we still have to designate a group that stands in for indigenous because we cannot identify them with sufficient precision as yet in the NAWS.   We call this group a proxy for the indigenous.[54]   We have chosen people who originate in a few southern states to represent the indigenous farmworker population because we know that a large proportion of these southerners are indigenous while the vast majority of people from the rest of Mexico are not indigenous but rather mestizo (non-indigenous) people.[55] We recognize that the comparisons that we give below are an attenuated version of difficult-to-capture contrasts between the indigenous and others.   Although the South may be mostly indigenous and the rest of Mexico has only a small minority of indigenous, the comparison is diluted by the fact that neither geographically-defined group is either purely indigenous or purely mestizo. Therefore, as you look over the comparisons in the next few of pages, remember that though the findings demonstrate the disadvantages faced by indigenous people, they actually understate these differences with the mestizos.

*IV-3  The younger and more recently-arrived indigenous are poorer than other Mexicans:*

As described in the Introduction and in Section II, the population of southerners has been expanding quickly over the years.[56]   Interestingly, at the same time that the age of the

---

[54] The NAWS survey has for some years worked diligently to create ways to distinguish accurately the indigenous population among its interviewees.  It is currently experimenting with new questions to accurately identify this group that is reluctant to self identify.   For details see Gabbard, Kissam, Glassnapp et al., 2008

[55] Again, the southern states are: Campeche, Chiapas, Guerrero, Oaxaca, Puebla, Tabasco, Veracruz, Yucatan; all others are considered the Rest of Mexico.

[56] Recall that the proportion of southerners (among all Mexican farmworkers) increased from 7% to 29% when comparing 1991-93 with 2006-2008.  The NAWS interviewed about 12,800 Mexican farmworkers from 1991 to 2008 in California.

typical farmworker from elsewhere in Mexico is increasing (somewhat) over these years, the age of the typical southerner is not (see Chart IV-1, below).   The average age of a southerner in recent years has been about 25; while for those from elsewhere in Mexico, the average is closer to 35.  And, this is true despite the median age of entry for the two groups being nearly the same (20 years old).    This remarkably lower average age demonstrates a unique pattern for the indigenous.  Although we cannot know for certain what explains this difference, the relatively recent entry of the indigenous hometowns into the international migration stream is clearly one main contributor.[57]  As can be seen in Chart IV-2, the median years in the United States for a southerner is far less than for a farmworker from elsewhere in Mexico and this difference has expanded over time.  In the 2006 to 2008 period for example, the median years in the United States for a southerner is only two years while for a Mexican farmworker from elsewhere it is 11 years (Chart IV-2).  It is clear that the villages of origin of the indigenous (at least for those working in California agriculture) are on average much newer to the international migrant stream and therefore are still composed of young new arrivals while the mestizo hometowns are on average more settled networks composed of a large proportion of settled veterans in the United States.  Namely, though there are plenty of newcomers continuously arriving from elsewhere in Mexico, the proportion of newcomers is much higher among the southerners than among those California farmworkers from elsewhere in Mexico.



[57] Another contributing factor may be that recent mestizo immigrants no longer enter agriculture as a first job at the same rate as recent indigenous immigrants.



This more recent arrival explains, in part, why the southerners are much poorer.   For example, the median family income in the 2006 to 2008 period was $13,750 for a southerner and $22,500 for a California farmworker from elsewhere in Mexico.   It also means that southerners have many fewer assets.   For example, among married men accompanied by their families, only 13 percent of southerners own their dwelling while 29 percent of those from the rest of Mexico do.   Comparing this same group for ownership of vehicles, 61% of the southerners and 77% of those from the rest of Mexico own cars or trucks.  This same disadvantage also applies to education and the ability to speak English.  The NAWS shows fewer years of school completed in Mexico for young southerners than for young people from the rest of Mexico.[58]   It is also likely that the quality of education is lower in indigenous areas.[59]  This lack of educational opportunity coupled with their lower level of Spanish language skills means that indigenous face more obstacles in learning English than other Mexicans.

Finally, the NAWS shows us how the southerners are much more likely to suffer from the 'disadvantage' of family separation from their nuclear family back home than other Mexican immigrants.  Among NAWS respondents, 64% of the married southerners versus 51% of the married farmworkers from the rest of Mexico have their spouses back home in Mexico.

*IV-4 The binational household composition from the Indigenous Community Survey-the methods:*

We can rely on the NAWS and previous ethnographic research to demonstrate that the indigenous population is different from other Mexican farmworkers.   But, to describe the intricate binational household structure of these inward-looking indigenous communities from our own work, we turn to the Indigenous Community Survey (ICS).   Below, we use

---

[58] For people 18 to 25 years old, southerners average 6.5 years of school compared to 7.3 years for those from the rest of Mexico (NAWS 1991 to 2008).

[59] See Skoufias, Lunde, Patrinos, et al, 2007

the ICS to explain how various closely-connected households double up together at the same address.  Moreover, the Indigenous Community Survey describes in some detail the important presence of renters from outside the immediate social circle of the principal residents at the address.   Further, the ICS details the exact age and gender distribution of the principal residents at the interviewed site and it details the distribution of close relatives of the nuclear families of these residents who live in Mexico or elsewhere in the United States.   The makeup of the households provides insight into the needs and behaviors of the indigenous farmworker population.

Beyond information about the 400 representative respondents in the Indigenous Community Survey, we collected information from the respondent about hundreds of others who were either resident in the household or members of the nuclear families of the residents but living elsewhere.   In this way, we have been able to build a number-based portrait of how a large proportion of people related to the respondent are distributed.

The 400 interviews were done at 345 distinct addresses because many of the interviewees lived at the same address as another interviewee from the same Mexican town network.[60] In effect, we have information on 400 distinct households living at 345 separate residences.  This doubling (or tripling) up of households at one dwelling in order to save rent money is quite common.[61]  We collected information about people who had three different types of relationships to the respondent.  One group included the respondent and those in his dwelling that are well known to the respondent (Known Residents); almost this entire group is relatives of the interviewee but it includes a few friends.  We were able to collect detailed demographic information about 1,628 of these Known Residents. Another group (the Unknown Residents) was composed of 1,029 people living at the residences (usually renters), who were not close friends or relatives of the interviewee, although they usually speak the same indigenous language.  For this group, the only information we have is their gender and whether or not they are children (under 18) or adults.  We also gathered information on a third group of people (Out-of-Home Relatives) made up of the respondents' nuclear family members living outside the household, mostly in the home communities in Mexico.[62]   We were able to collect complete information on these 860 out-of-home individuals since they are well known to the respondent.

*IV-5 The binational household composition—the total population at the residences:*

Before turning to the more complete data on the Known Residents, we point out two interesting findings about the total population of residents living together. First, of the more than 2,600 people (Known and Unknown Residents) living at these 345 residences,

---

[60] A small proportion was living in  outdoor encampments and had no dwelling.

[61]  We paid careful attention to each individual in the population to avoid any double counting of people who may have been reported by more than one respondent.

[62] For married people we asked about spouse and children, for unmarried about parents and siblings.

a surprisingly high proportion (39%) are Unknown Residents.  Also, since the total population of residents is made up of 40% adult males and 25% adult females, that means that only a third (35%) of all residents are children (see Chart IV-3, below).  The population is two-thirds (nearly all) working adults.



*IV-6 The Binational household composition—the cohabitation of close relatives:*

A look at the data from the Known Residents makes it clear how closely many of the households are knit together by nuclear family.  At the 345 addresses, fully 52 residences included married children living in the dwelling with one or both of their parents.  In many cases, there is more than one married child at these cross-generational family residences.  In addition, there are 24 households at these 345 addresses that have married siblings living at the same address as the interviewee.  Again, there are cases where several married siblings live together.  In sum, it is quite common for these addresses to have multiple households from the same natal or nuclear family.   When we factor in that six of the households have both married children and married siblings living together, we are left with 70 out of 345 addresses (20%) which have either cohabitating married siblings, or a parent living with a married child.

*IV-7 The binational household composition—the distribution of the binational nuclear families:*

For the purpose of estimating the binational population distribution, we limited our analysis of the Known Residents and Out-of-Home Relatives just to nuclear family relatives of the respondent (i.e., children, parents and siblings, plus a few grandparents and grandchildren).  For all these 'known' nuclear family relatives, we had age and gender information.   Most (83%) of the Out-of-Home Relatives were back home in Mexico.

These combined data allow us to construct an approximate picture of the total nuclear family network of the respondents wherever they might be in the two countries.   This picture provides insights about how the population is distributed between Mexico and the United States in total numbers and with respect to age and gender.  Overall, we show that within the nuclear family networks most people reside north of the border. However, in

Mexico most members of the networks are female and in the United States most members are male.  Next, we detail that there are more very young children in the United States than in Mexico but for children in the middle age range there are more in Mexico than the United States.  Finally, we describe the nuclear family members that are located in Mexico outside the hometowns and in the United States outside the interviewee's residence.

In total, we have gender, age and location information on almost 2,200 members of the nuclear families of the respondents.   We notice immediately that there are more people in the networks in the United States (69%) than in Mexico (31%).   International migration, despite its short history for some communities, has meant the transfer of a large majority of nuclear family members to the United States for those households with migrants.  Secondly, we observe that among those of all ages in the United States, most are men (56%), and among those in Mexico most are women (58%).  This gender pattern applies to the children as well as the adults.  For those under 18, in Mexico 52% of the children are females, while in the United States 52% are males.

Taking a closer look at this population by age group and gender in the two countries provides useful insights about how this transnational community is distributed.   Before reading on, take a moment to look at Chart IV-4 below and familiarize yourself with the four categories displayed in the chart: Mexican resident males (blue bar), Mexican resident females (red bar), U.S. resident males (yellow bar), U.S. resident females (green bar).  Notice that the Mexican-resident bars (red and blue) appear to the left of the U.S.-resident bars (yellow and green).

The Chart shows that for most age categories there are more males and more females in the United States than in Mexico.  In fact, from ages 0 to 5 and from 15 to 39, there are more of both males and females in California than in Mexico.  Moreover, for all age ranges from 12 to 59, there are more males in California than in Mexico.  Nevertheless, there are important examples when there are more males or females of a given age range in Mexico than in the United States.  First, for all women above 40, there are more females in these U.S.-oriented nuclear families in Mexico than in the United States.  For men this is true only for men 60 or more.  In the case of men, this phenomenon reflects the location of the fathers of the California-based respondents; in the case of women, the pattern reflects the location of wives as well as mothers.

33



Another important exception is the female children from 6 to 14 and the male children from 6 to 11.[63]   In these cases, there are more of these relatively 'older' children in Mexico than there are in the United States.   Recall that we discovered that many families leave their first born (relatively older) children in Mexico to be raised by grandparents and migrate as a couple to California where they continue to produce more (the last born) offspring north of the border.[64]   The married young male indigenous farmworker immigrants in California often decide to be joined by their wife in California and leave (some or all of) their children in the hometown because it makes sense to them economically.[65]   First, the costs of raising children in California are high, including food, clothes and child care while the parents are working.   Second, it is difficult to safely pass young children across the border.   Third, the young immigrants believe that they can feel sure that the remittances to their parents will be used in a productive manner if the expressed destination of the money is for the sustenance of both their parents and their children.[66]

---

[63] Young teenage boys may come to (or stay in) the United States in preference to girls due to their greater wage-earning capacity as farmworkers.

[64] There are many couples living here in the newer networks who have all their children abroad.  But in addition, four of the nine communities interviewed by the ICS have families with children living in both places.   It should be pointed out that some families return their U.S.-born children to Mexico to be cared for by relatives while they remain in the United States.  A discussion of indigenous grandparents taking care of children is found in Navarette Linares, 2008, p. 126

[65] In the ICS, we had data on the years in the United States for 159 men and on their resident wives.  The average time since arrival in the U.S. for men is 13.8 years and for the women it is 8 years.   Therefore, on average, men come 5.8 years before their wives to the United States.

[66] One of our Mixteco-speaking interviewers, Jorge Sanjuan from Teposcolula, Oaxaca, is the source of this insight.  Some parents may decide to send their children back to Mexico due to the fear of raising children in what is perceived as a dangerous environment.

It is not surprising that there are more young children 0-5 and young adults 18 to 39 north of the border since the United States attracts young workers of reproductive age. However, it is critical to remember that in the age range of 18 to 39, a large proportion of the immigrant households are not families living together but are solo workers (especially men) without children accompanying them in the US.

Most of the nuclear family relatives living away from the respondent are spouses and children residing in Mexico.   The 65 spouses (almost all women) resident in Mexico have a lot of minor children (279) living with them.   The few (7) spouses living away from their interviewee partners but residing elsewhere in the U.S. are almost all men with few children living with them.   Almost all the relatives living away from the interviewee in the United States are adults (most are siblings and children of the respondent).   The majority of relatives living in Mexico are children.   Overall 82% of all the Out-of-Home Relatives are residing in Mexico.

The location of the family in Mexico is surprisingly concentrated in the home regions. Among the spouses living in Mexico, 92% live in the home states of Oaxaca and Guerrero.  Among the children, 93% live in the home state.   Those relatively few not in the home states are predominantly found in Sonora and Baja California.  The migration from the border to California seems less important than it once was, at least for members of these California-based nuclear family networks.   The vast majority of the migrants in these networks are coming directly to the United States from their home states now.   The ones who lived for a time in the border areas in large measure have moved their families to the United States.[67]

*IV-8 A contradiction between improving education across Mexican generations coupled with educational stagnation among California farmworkers:*

First, it is clear for the indigenous sampled by the Indigenous Community Survey that school attendance has been improving over time.  Namely, the younger the age cohort the higher the level of education.[68]   However, the average is still between 7 and 8 years of school for the cohort from 18 to 20 at the time of the interview (see chart IV-5, below). For the older cohorts, it is obvious that in previous times access to education was more difficult.   The oldest cohorts hardly attended school at all.

Ironically, this relatively better education for the young compared to their fathers has not meant an improving level of average education levels for Mexicans in California agriculture over time.   According to the NAWS, the average years of school for farmworkers interviewed in the 1990s is no lower than those interviewed in the 2000 to 2008 period.[69]   In our Indigenous Community Survey sample, the level of education declines according to how difficult road access is to major cities (see Table IV-1, below).

---

[67] There continues to be heavy migration to the Mexican border states from indigenous areas but not from these family networks with roots in California.

[68] The older cohorts in the NAWS show much lower levels of education than for younger cohorts.  This is true for the south and for the rest of Mexico.

[69] This is true for both the South and the rest of Mexico.

It is known that in the migratory source regions of Mexico, more remote areas (many of them indigenous) with fewer political assets and poorer roads receive fewer educational resources.   Since California agriculture is being continuously replenished by new waves of immigrants while the older cohorts leave, it may be that the average educational level of farmworkers is not improving because the source of immigrants is continuously shifting to more remote areas with low levels of education.



| Table IV-1.   Mean Years of School by Remoteness of the Town to Major Cities in Mexico  (18 to 25 years old only) | | |
|---|---|---|
| town | mean years of school | state of road |
| tepos | 9.8 | paved road to big town-near tlaxiaco |
| cuevas | 7.8 | paved road to big town near juxtlahuaca |
| candelaria | 7.7 | 45 minutes. from chalcatongo by gravel |
| cerro | 7.1 | 45 minutes from santos reyes nopola  by gravel |
| venado | 6.7 | 1 hr, dirt from Putla Villa de Guerrero |
| loxicha | 6.5 | 1.5 hrs. gravel and dirt to Main road |
| piñas | 6.2 | 1.25 hrs, gravel to Juxtlahuaca |
| peras | 4.4 | 1.25 hrs, gravel to Juxtlahuaca |
| jicayan | 4 | 3 hrs, gravel & dirt to Juxtlahuaca |

IV-9 *Analysis of education and labor force participation in the United States:*

Most children living in the Indigenous Community Survey households were born in the United States.  Almost half of the children residents (49%) in these households are less than six. Taken overall, 70% of the U.S. residents less than 18 were born north of the border.  However, as is evident in Chart IV-6, the older the child, the greater the likelihood of being born in Mexico.   For those less than six, 90% were born in the United States while for those 15 to 17, 75% were born in Mexico.  As we will see below, place of birth and age of arrival have impacts on education and labor force participation.



For the group of young Mexican-born indigenous immigrants, the age of arrival in the United States makes a big difference in how many years of school they are able to achieve.  We have information for 146 young Mexican-born immigrants resident in the United States who were aged 17 to 20 at the time of the survey.  Those that came before age 12 had a median of 10 years of school while those who came at 12 or older had a median of 7 years of school.  In Chart IV-7, one can observe a watershed point at approximately 10 or 11 years old of age at arrival.  After this point, educational achievement (above the eighth grade) becomes less likely.   Age of arrival is crucial for education. Among the U.S.-born 17 to 20 year old group (there are only 20), the achievement is even higher. The median years of school for these U.S. citizens is 11.5 years.



These young people who arrive after 11 years old don't go to school, in part, because they work in the fields.   Among the 79 Mexican-born children from 15 to 17 found in the survey, most (68%) arrived when they were at least 12 years old.  And, it is clear that age of arrival, like for educational level, determines whether one works in the field.  As shown in Chart IV-8, the vast majority of those who arrived at 12 years or older work a month or more per year in the fields while the majority of those 15 to 17 year olds who came earlier in their life do not work in agriculture.[70]  This is typical of the community in general since 93% of the men and 88% of the women over 18 work a month or more in the agricultural fields.  Almost all in the community, even young mothers, are available for work when they can find it.



Chart IV-8.  Number of 15 to 17 Year Olds Who Work in the Field by Age of Arrival in the US

Source: Indigenous Community Survey - 79 Individuals

---

[70] There are only twenty-eight 15 to 17 year old U.S.-born children in these households.   Slightly over half of these (16 of them) work in the fields.

Section V.
*Language and Culture*


Executive Summary:


- There are 6 million native language speakers in Mexico.  The major Mexican native languages--Maya and Nahuatl--are not spoken much in rural California.  The three indigenous languages spoken widely by farmworkers are Mixteco, Zapoteco and Triqui.
- The total number of Mexican native language speakers (in both countries) may be declining.  Pressure on the young to shun their parents' language is widespread in Mexico and the United States.
- In California, within the family, it is common for the parents and children to communicate across generations in a second language for both sides, namely Spanish.
- The obligations to the hometown are strict and are crucial for maintaining loyalty to the community of origin.  There are various examples of expatriate assemblies of hometown representatives meeting in their adopted United States who have authority over hometown affairs back in Mexico.
- The system of *usos y costumbres* has become controversial.   Some argue that its flexibility enhances community life, others that its arbitrary nature undermines democratic decision-making.
- The system of obligations is evolving in some communities and discussions are going on among community members about how to harmonize the old customs with new realities.
- The ICS shows that individuals with family in the hometown remit at high levels to their families; but those with family in the US tend to decrease their remittances over time.
- However, collective remittances and collective work obligations to the community do not decrease over time.  In fact, there seems to be more interest in giving to public works in the village as the immigrants stay longer in the United States.

*V-1 Introduction:*

In this section, we provide details about the variety of languages spoken by California's indigenous farmworkers and the unique community obligations that influence the immigrants' behavior.  We start by explaining how the most important indigenous languages spoken in California agriculture are a rather small subset of the huge language mix in polyglot Mexico.  Then, we note the impending decline of these languages and the role of language in California's indigenous households.  Next, we give details about the community organizational structure with its extraordinary focus on the hometown.  Finally, we use evidence from the ICS to explain how the immigrants fulfill their work

and monetary obligations to their hometown from the settlements in the United States. Interestingly, those who stay in California for many years continue to fulfill their obligations to their hometown.

*V-2 Main languages spoken in  California Agriculture:*

Mexico has over six million native language speakers distributed among many distinct languages.[71]  Only seven of these languages (listed in Chart V-1, below) make up two-thirds of all the indigenous language speakers in Mexico.  Although all seven of these languages are spoken by California farmworkers, only those who speak two of these—the Mixtecos and the Zapotecos, have a large presence in the state's fields and orchards.  Each of these two groups have about a half million speakers between the two countries.  There is a third group with a major presence in California agriculture, the Triquis, but this is a smaller linguistic community with only about 40,000 speakers in Mexico and the United States combined.  These three language groups together represent a large majority (88%) of the Mexican indigenous groups in California agriculture.[72]   The other groups, such as the Nahuatl and Maya, although numerous in Mexico, have a small presence in California agriculture.  In all, in the Indigenous Farmworker Study, we found 23 different indigenous languages spoken representing 13 different Mexican states.[73]



**Chart V-1.  Percent Distribution of the Population in Mexico of Major Native Languages**

**Source:  Mexican Census, 2000 - 6,004,000  Speakers**

---

[71] Many Mexican languages have variants that are not necessarily mutually intelligible even within the same language.  There were over 250 native languages at the time of the conquest.  There are reported to be 68 still spoken. The Catálogo de Lenguas Indígenas 2008 reports 11 language families, 68 language groupings, and 364 variants.  See
http://www.cdi.gob.mx/index.php?option=com_content&task=view&id=272&Itemid=58
[72] See Chart II-2 , Section II, p. 10
[73] These data were collected during the Hometown Count carried out by the IFS in late fall of 2007 (see Appendix I for details).

*V-3 Potential threats to the native languages:*

The indigenous language speakers of Mexico as a group are facing a severe language survival challenge in the decades to come.   The population of the speakers of these languages had been increasing steadily from a total population of about 3 million in 1970 to 6 million by 2000.   However, for the first time in 2005 a small decline was registered in the population of these indigenous language speakers in Mexico.  It could be a turning point has been reached.[74]   One major reason for the decrease is the declining proportion of native language speakers among the younger groups in Mexican hometowns.[75] The young indigenous Mexicans are losing interest in their ancestral tongues.  Two other major factors are a falling birth rate and the emigration of the indigenous to the United States and urban Mexico.

It is no surprise that the issue of disappearing language is also a major issue among the representative nine hometown network groups we studied in detail.  This problem, depending on the hometown network, is observable in the hometowns, at the border, and in the California settlements.  First, the use of the native language is declining in many of the home villages in Oaxaca and Guerrero.  Many in the younger generation in the hometowns themselves seem more attracted to the internet than to the native language of their forbearers.   These networks all have co-villagers living along the border.  In Tijuana, we interviewed several families who spoke to their children in Mixteco. According to the informants their children understood the parents' native language but were reticent to speak it.[76]  However, we observed many children actually speaking Mixteco to their parents in the border settlements.



In rural California, the pressure on the young to shun the native language of their parents also appears quite common but not universal.  In the ICS, we asked respondents whether

---

[74] See Comisión Nacional para el Desarrollo de los Pueblos Indígenas, 2006
[75] See Gráfica 2, p. 174 in Fernández, García, and Ávila, 2002
[76] According to one Mixteco informant on the border:  "The majority of the children don't want to speak it (el mixteco)", interview with Anna Garcia, May 2008, Valle Verde, Tijuana

they spoke exclusively in their native language to a range of their relatives.  Almost all speak the indigenous language to their parents and a large majority speaks it to their spouses and siblings.   However, the practice of speaking in the native tongue to children declines as soon as the family gets established in the United States.   For the newcomers, who have been in California for two years or less, over two-thirds speak to their children exclusively in their native language (see Chart V-2, above).  However, once established here for three or more years the rate drops to about 40% where it apparently remains.  It appears that a large minority continues the tradition of speaking only in the native language (40%) while the rest (60%) once established in California speak either only Spanish or a mixture of Spanish and the native language to their children.[77]

There is clear evidence from the ICS that bringing children to the United States accentuates language loss.   If we divide the group into those whose wife is in Mexico with the children and those whose wife is present in the U.S. household, we find that many more parents speak only the native language to their children in Mexico than in the United States (see Chart V-3).   In Mexico, in these nine indigenous communities, over 70% of the parents speak the indigenous language to their children while in California half as many (35%) do.



Although the majority, address their spouses in the language of their hometown idiom, speaking the native language to one's spouse varies somewhat from one hometown network to another.  In the very settled Mixteco communities of Santa María Teposlantongo and San Miguel Cuevas and the Chatino community of Cerro del Aire only about 60% speak their native language to their spouses whereas for all the other hometown networks (Mixteco, Zapoteco and Triqui), 80% or more speak to their spouses in their ancestral tongue (see Chart V-4).   However, the variation of speaking the hometown language to the children varies enormously depending on the network.   Only

---

[77] The constant influx of new immigrants from the hometowns to California tends to increase native language use even by those who are long time U.S. residents.

about 20% of the parents in the settled networks from Tepos and Cuevas speak to their children in the native language, while 80% of the parents from San Juan Piñas and Magdalena Loxicha do (Chart V-4, below).



*V-4 Language challenges within the families*

There is a major language barrier that exists within families among California's indigenous population.  As can be seen in Chart V-3 above, many parents (about one third when both parents are present in California) speak only Spanish to their children. The parents are usually most fluent in the indigenous language and speak Spanish in a limited fashion.  But many of the children, born here or who have come at a very early age, speak English as a first language.[78]  Therefore, although both the parents and children speak some Spanish, it is a second language for both sides that becomes the de facto *lingua franca* of the household.  This intra-family language barrier occurs on top of the already extreme cultural shock for these rural and traditional people trying to raise their children in an unfamiliar and for them often uncontrollable environment.  This language barrier may explain some of the communication problems experienced by clinicians who attempt to communicate with indigenous parents through their English-speaking children.[79]

*V-5 The hometown-- the cultural focus of indigenous communities:*

The hometown locality is cherished by the indigenous communities.  First, the agricultural land, water and surrounding pasture and forest lands are usually communally

---

[78] Many rural California towns use Spanish as a lingua franca.  As a result, it is not uncommon for the young people (born or early arrivers) to speak Spanish better than English.
[79] Edward Kissam drew my attention to this problem.  Personal communication with Edward Kissam, September, 2009.

owned and are seen as the source of the uniqueness of the community's culture and of its economic survival.  Moreover, the customs and language of the hometown is the focal point of identity for this people who traditionally have lived out their lives according to strict rules of mutual community obligations.[80]  The people report that the stringent enforcement of loyalty to their hometown and its customs has ensured the survival of their communities as separate peoples in the face of efforts at cultural extermination by the colonial Spanish and then the Mexican governments.  The customs vary greatly from one community to another in the Oaxaca and Guerrero area, which is the source of most of California's indigenous farmworkers.  However, there are a series of general traits shared by most speakers of the original languages of Mexico.  The land usually cannot be bought or sold and usufruct rights are enjoyed only so long as the community participant is a citizen in good standing of his hometown.  This implies holding a series of community-service positions (cargos) and performing work assignments (tequios).  Traditionally, there is very little marriage outside the hometown and property changes hands normally through inheritance rather than by sale.

The community citizens living in (or visiting) the home communities meet in assembly in the middle of the year and select the people obligated to carry out the cargos in the following year.  This assembly usually has traditionally been made up of the adult married males in the community.   In recent years, in part due to the lack of men in the hometowns, increasingly women have been allowed to exercise more citizenship rights.[81]  However, it is important to remember that, by and large, women's participation has remained limited and constrained to traditional female roles.[82]  In some communities, those men who have completed all the cargos make up a Council of Elders or Principals that has special influence over the decisions of the community assembly.   Often, if one does not do service to the community, one can lose one's property, including one's own house.  In other words, one literally owns one's own real property only if one participates in the community.  In the mestizo communities, small property ownership is quite common and the obligation to serve the community is not normally seen as obligatory.  Most of the indigenous informants report a strong obligation to their home community even if they have lived the greater part of their adult life in Baja California or the United States.[83]   People who do not serve their communities can be fined and even jailed upon returning home to their native towns.[84]   Non-complying community members can also lose their right to be buried in their hometown.

The cargos can be quite numerous.  In San Juan Piñas, for example, we counted 91 cargos that need to be performed in one year (including 7 women *promotoras de la clínica*, these last being the only cargos held by women, and they were non-voting

---

[80] Kearney and Besserer, 2004,  and Navarette Linares, 2008, p. 45
[81] According to one study, 248 of the 418 Oaxacan municipios that practice "usos and costumbres" have participating women.  See also Kearney and Besserer, 2004
[82] For the constraints on recent female participation see Kearney and Besserer, 2004
[83] One man who has not lived in San Agustin Atenango for many years makes about $350 a month in Baja California in the strawberry industry.  He pays $60 a month (a fifth of his income) in various fees to the community to maintain the right to keep his house there.  Interview with Richard Mines in Vicente Guerrero, June 2008
[84] Interview with interviewee from San Martín Peras, Watsonville, CA, Anna Garcia, December, 2008.

positions).  These include the positions of mayors, treasurers, secretaries, land commissioners that run the towns and protect the surrounding pasture lands and forests. Plus, there are a series of committees to maintain the school, church, clinics, water supply and roads.  All are staffed without compensation to the office holder.  This system of free service to the community is nearly universal in these areas.   The cargos usually include civil as well as religious (festival) obligations.  The duties can be quite costly to the individual and serve as a way of reducing the wealth disparities in the community since successful members are often assigned to the expensive jobs of organizing festivals whose benefits are enjoyed by all.  A man who begins young serving in the most humble cargo and who eventually completes all of the cargos, reaches old age imbued with great respect.

The system of indigenous governance and maintenance of community services is called '*usos y costumbres*' in Mexico.   In many Mexican states, the rules in this system have been given official status by law.  The rules, since they are not written but passed down by a verbal tradition, can be flexibly adapted to the particular situation confronting the community.  But, by the same token, this lack of written rules may appear arbitrary to participants who resent the lack of a secret ballot, or their exclusion from citizenship because they are women or are deemed not to have fulfilled their community duties.   The Oaxacan law of 1995 that recognized '*usos and costumbres*' as prevalent in most Oaxacan municipalities is controversial.   Some say it protects the rights of the indigenous from interference from 'mestizo' authorities while others say it discriminates against women and has enshrined undemocratic practices from the past.[85]

In the second half of the twentieth century, as permanent and back-and-forth migration became a large feature of these communities, it has become difficult to find available candidates for the cargo and tequio obligations.  First, since so many adult married males are absent from the community, women and unmarried men have been drawn upon in some cases to fulfill the duties of governing and maintaining the hometown.[86] Moreover, this lack of manpower has meant that occupants of the posts do not have to climb up the pyramid of jobs starting at the bottom any longer.  It is common to see a very young man as '*agente municipal*' or mayor of a hometown in indigenous Mexico.[87]

Informants from some villages report that individuals working in California who cannot return to the village to do their "tequio" service send money home either to their parents or siblings, so that the individual receiving the money can pay another individual to perform the service for the émigré living in the U.S.  In one community, in order to get out of serving in some of the higher cargo jobs, one has to pay a $1,500 fine.[88] Obviously, to leave a good job in the United States to return home is a huge burden for

---

[85]Aguilar Rivera, 2008; see also Kearney and Besserer, 2004 who mention the case of San Jerónimo del Progreso that has maintained its independence from Silacoyoápam, the county seat, which is a Mestizo town.
[86] It is not uncommon for an absent male to be assigned to a cargo over a female who is present in the hometown, according to Maria Christina Velasquez cited in Kearney and Besserer, 2004.
[87] For discussion of the changing rules of the traditional system of Usos y Costumbres, see Cornelius, 2009, especially the essay by Jorge Hernandez Díaz.
[88] Interview of Anna Garcia with resident of Concepcion Itunyoso, April 2008.

many in the United States.   For this reason, some indigenous immigrants, even after many years in California, prefer work in the informal agricultural sector to allow them the flexibility to return home and comply with their 'cargo' obligations.[89]

These 'cargos' can be seen as burdensome to the individual but they also hold together communities where many inhabitants have to leave at a very young age to make a living. Community development projects on both sides of the border may be able to benefit from maximizing the positive aspects of this system and minimizing the negative ones.  In San Juan Piñas, for example, the community has made substantive changes that might serve as examples to other communities.  They have limited the cargos that were previously three years in length to just one and a half years in length.  In most communities, people are obligated to take turns funding several religious fiestas during the year.   In San Juan Piñas, they have eliminated the obligation for many of the minor fiestas and focused all responsibilities on the single annual celebration of their town saint.  In the past, there has been an exclusionary policy toward villagers who have converted from Catholicism to other (evangelical Christian) religions.  Many of these converted families have fled San Juan Piñas and forfeited their property.   But recently, the town authorities have allowed these people to re-enter the village and visit their relatives if they agree to do some 'secular' jobs.  And, finally, the town has introduced a policy of fining families who allow their children to drop out of secondary school, a decision that has promoted education in the village.  The costs of the cargo system are quite high all across the indigenous region.  Huge sums are spent on fiestas—a custom that is often exacerbated by the deeper pockets of the émigrés in the United States who are expected to provide ever more lavish fiestas.  The idea of channeling these resources for productive purposes is being openly discussed by members of many communities.[90]

In many cases, the indigenous communities have adapted their governance procedures to involve those living abroad.   In the case of Santa Maria Tindú, an assembly in Madera, California, and another one in northern Oregon meet and exercise a critical influence on activities that take place in the hometown.[91]  In another Mixteco town in Puebla, émigrés in New York City exercise close control over affairs in their native town.[92]  Members of the San Juan Piñas community living in the Central Coast town of Santa Maria have formed an association with immigrants from the neighboring towns Tierra Colorada, Santa Cruz Yucucani and San José Yosocañu in order to raise funds to repatriate the remains of a deceased for burial in the hometown.[93]

In both the Mexican border areas and in California, organizations have been formed that have successfully grouped people from across many hometowns.[94]   Some of the groups

---

[89] Interview of Richard Mines with immigrant from San Miguel Cuevas, September 2008

[90] See discussion of this in Navarrete Linares, 2008, p. 68

[91] See Rocío Gil, *Fronteras de Pertenencia*, Universidad Autónoma Metropolitana, México, 2006, pp. 218-224

[92] Smith, 1994

[93] Interview by Sandra Nichols with Jesús Estrada, Santa María, November 6, 2007.

[94] Two of the current organizations active in Pan-ethnic activity are the Frente Indigena de Organizaciones Binacionales based in Fresno and the Unidad Popular Benito Juarez based in Bakersfield.  The California

have forged a pan-ethnic (and transnational) indigenous identity.  This process results from conditions in the emigration settlement areas that tend to unite distinct indigenous groups against discriminatory practices suffered at the hands of the greater dominant non-indigenous society.[95]

*V-6 Individual obligations to the hometown-evidence from the Indigenous Community Survey:*

The answers to questions in a survey about remitting money to families, to the hometown and about fulfilling service obligations are colored by guilt and regret.[96]   For reasons explained above, a large majority feel a deep obligation to make these contributions to their families and communities.  However, often the desire to meet these obligations is blocked by lack of sufficient income in the United States.[97]

Across the communities, we found that people with a spouse with them in the United States remit less to their families back in Mexico over time.  But, surprisingly, as people stay longer, and as communities acquire deeper roots north of the border, their rates of 'collective' remittances and fulfillment of community obligations do not seem to decrease.

Men whose wives are living with them in the United States show a steep decline in remitting money home over time.  For these spouse-accompanied men who have been here for two years or less, 69 percent of the remitters send money once a month or more.  However, for long-stayers, the remittances drop off considerably.  For those with spouses living with them with 9 years or more in the United States, only 23 percent remit once a month or more.

Regardless of time in the United States, remittances seem to vary according to personal obligations in the hometown.  About three out of four of those remitters whose spouse is in Mexico send money once a month, while those with the spouse living with them in the United States remit only that frequently about a third of the time.   About half of the unmarried individuals remit once a month or more.  Those whose wife and children are in Mexico must remit to their dependent nuclear family frequently, and the unmarried are under strong pressure to remit to support their parents and siblings.  However, those who are living with their spouse in the United States believe their first obligation is to support

---

Rural Legal Assistance and the United Farm Workers of America both have small groups of indigenous speaking outreach workers that promote indigenous rights.
[95] For a discussion of the pan-ethnic groups see three articles in J. Fox and G. Rivera-Salgado, 2004, including  Jonathan Fox and Gaspar Rivera, "Building Civil Society among Indigenous Migrants", Kearney and Besserer, "Oaxacan Municipal Governance in Transnational Context",  G. Rivera and Luis Escala, "Identidad Colectiva y Estrategias Organizativas entre Migrantes Indigenas y Mestizos." Also see Navarete Linares, 2008, p. 127
[96] Some respondents preferred not to answer questions about remittances to family.
[97] Overall, 338 respondents or 85% tell us that they have remitted money to their families in the year before the interview.  Of these, only 265 tell us the number of times per year that they remit money home—73 don't respond to this question of frequency, in some cases this may be due to embarrassment.   Of those that respond about half (47%) say that they remit at least once a month (12 times a year) and the other half (53%) indicate that they send money back 8 times a year or less.

their nuclear family and feel less obliged to send needed resources to their parents back home unless they have children being raised by the grandparents.

*V-7 Collective obligations to the hometown-evidence from the ICS:*

As with individual family remittances, the proportion of people who give some kind of collective remittance to the hometown is quite high—three quarters of the respondents say that they contribute.[98]  However, in contrast to individual remittances, the proportion that contributes for collective community activities does not decline as the migrants spend more time in the United States.  Those with 6 years or more in the United States are actually somewhat more likely to contribute than the more newly arrived.



We also asked respondents to identify the purpose of their monetary contribution to the home village.   The answers fell into three categories: to church construction projects, to fiestas and to public works.   The biggest two were for fiestas and for public works while contributions to church projects were somewhat less generous.  The contribution for fiestas seems to predominate in the early years in the United States for the immigrants.  And, although fiestas continue to attract a large proportion of contribution dollars, there is a decline in their relative importance over time (see Chart V-5, above).  However, the interest in helping with public works in the hometown shows a small increase over time. Public works represents 23% of the contributions for those with two years or less in the United States but 36% for those with 9 years of more of tenure north of the border.  It appears that over time, émigrés, though still interested in financing fiestas, maintain and even increase their interest in improving the infrastructure in their hometown.

To be sure, the amount of the gift is on average relatively small—the median is $80 per year.  But, again, the more settled in the United States, with presumably fewer ties to the hometown, are much more generous in their gifts than the new arrivals to the United States.   The newcomers in the United States—those with less than two years here—give a median of just $50 per contributor while those here nine years or more give a median of

---

[98] In many communities, women are not expected to make a contribution.  Only 55% of women make a contribution to the hometown in the ICS data.

$90 (see Chart V-6, below).    Also, those with a spouse in Mexico give much less per contributor (median $50) than their more settled co-villagers with a spouse in the United States (median $100).   This is due in part to the fact that the man whose wife and children are in the village is sending larger family remittances than one whose wife is in the United States, leaving less income available to donate to the community.



As we discussed above, the immigrants also have work (tequio) and office-holding responsibilities (cargos) to their hometowns.   With respect to these obligations, our data in Chart V-7 above demonstrate that the commitment to collective obligations to the hometown does not decline as a result of longer residence in the United States.  For the largest age group, the 21 to 39 year olds (left side of Chart V-7), the commitment increases with time in the United States from 10% for those in the United States for less than two years to 31% for those with nine or more years of U.S. residence.  For the smaller and older group from 40 to 59 (right side of Chart V-7), the pattern is harder to explain.  The biggest commitment for this age group is for those in the United States from 3 to 5 years.   These men came to the United States at an already advanced age with many years in the hometown.  And, many of them (50%) returned home to fulfill their

commitments.[99]   Also, the ones who have stayed for 9 years or more in this older group fulfilled their cargo service (32%).  Although the sample sizes are quite small, the data demonstrate a continued commitment to the hometown over time by both age groups.[100]

In sum, the indigenous immigrants whose families are in the United States remit less over time to their families in Mexico.  However, the collective obligations, both monetary and in terms of work, are actually more significant for those who have stayed for awhile in the United States than for those who are recently arrived.   Admittedly, the long-stayers have accumulated more assets and can more easily afford to be generous towards their home community than those with shorter time spent in the United States.   But this pattern of allegiance to the hometown also attests to the discipline of loyalty exercised by the hometown network on the indigenous immigrants.

---

[99] This may be due to their having already served multiple lower level cargos and so they continue to serve to maintain seniority and preserve their 'investment' in the system.

[100] Overall, just one quarter of the immigrants say that they have done a cargo in the last 5 years.  These responsibilities seem to be carried out more by men (29%) than women (12%).   Also, young people seem exempt until about 21 years of age.  For the tequio, our data show that young people appear obligated from age 18.   Not surprisingly, those men with wives in the village return more often to do a cargo (45%) than those without a spouse in the hometown.

Section VI.
*Work Conditions, Income and Assets*

Executive Summary:

- Those who can carve out a living at farm work in California experience improvement in working conditions, income and asset acquisition over time.
- Over time the average indigenous farmworker has not acquired more assets while the average mestizo has.  This implies that the influx at the bottom of the labor market has a high proportion of indigenous.
- The indigenous may have fewer assets than mestizos in California due to closer ties to their hometown where they are more likely to maintain a house.
- There are few wage differences across groups of indigenous farmworkers.  The most marked difference was by California region.
- Higher wages may be associated in some cases with a sped-up piece rate work environment and worse working conditions.
- Workers complained most about non-payment and underpayment of wages.

*VI-1 Improvement of conditions for those who stay in agriculture:*

Indigenous (and other Mexican) farmworkers' income, wages and working conditions improve over time for those who have figured out a way both to remain in the United States and continue doing farm work.   We need to recognize that a majority of Mexican farmworkers working in California are below the poverty line and most of the rest make a meager income.[101]   Still, if we look at the Mexican farmworkers in the National Agricultural Workers Survey that worked in California in the 2006 to 2008 period, it is clear that conditions improve for those who stay in California's fields and orchards for awhile.   The southerners (our proxy for the indigenous) clearly do worse than those from the rest of Mexico (our proxy for mestizos), but both see some improvement if they are able to carve out an existence as a California farmworker.   In Chart VI-1 below, we see that personal income during this three year period (2006-2008) varied from $10,000 a year for the newcomers to nearly $20,000 a year for the long-time committed farmworkers.  In the early years of stay there is not much difference in earnings between the southerners and others.  However, by the time the groups have been here for 9 years or longer the southerners appear to fall behind.[102]

---

[101] There is no evidence to prove this obvious fact.  The NAWS data records ranges, not point income estimates for the respondents.   Therefore, the NAWS can only estimate a minimum proportion of those living below the poverty line among farmworkers and not the true percentage. The Census Bureau and the Current Population Survey cannot be used for sources of this information because they fail to find a large proportion of the farmworkers, especially the poorer ones.

[102] The income of long stayers is greater than for newcomers for all groups regardless of gender, age, or region of origin in Mexico.



Another way to demonstrate improving income for long-time farmworkers is shown by the increasing ability to own cars in the United States as one stays longer periods.  Again, though southerners acquire cars at a much lower rate than California farmworkers from the rest of Mexico, the experienced farmworkers from the south have many more cars than newcomers.  Even if we look only at the southerners, we observe a huge increase in acquisition of vehicles as the indigenous farmworkers stay longer in California agriculture.  As Chart VI-2 shows, few in the newest group that has been in the country from 0 to 2 years have had a chance to acquire assets.  And even in the groups that have been in the United States from 3 to 5 years and from 6 to 8 years, less than 30% of the southerners have cars.   However, with the group that has stayed 9 years or more, the majority of southerners have vehicles.  As we see below, cars are crucial assets in getting to work.



This same pattern of reward for experience also applies to wages and working conditions.  Though, as can be observed in Chart VI-3, average wages per hour for farmworkers are

relatively flat and, in general, do not vary very much across groups.  The differences in hourly wages between those from the south and the rest of Mexico do not appear very significant.  The newcomers earned on average during these three years (2006 to 2008) about $7.50 an hour while the veteran workers with more than 9 years in the United States earned about $9.00 an hour.[103]   Since the typical farmworker has difficulty working as many hours per year as he or she would like, the income of farmworkers is as much related to how many hours per year they work as it is to how much they earn per hour.



An assessment of how well farmworkers are being treated by the employers is also measured by surveys.   One important gauge is whether the workers feel obliged to pay for rides to work.  Many foremen take advantage of the most vulnerable among farmworkers by charging them to get to work.   As Chart VI-4 demonstrates again, the more entrenched farmworkers suffer from this practice much less than the newcomers. And the southerners (in all the length-of-stay groups) have to put up with this practice much more than those from the rest of Mexico.  For the southerners, the practice affects over 30 percent, even for those who have been here from 6 to 8 years.  For the southerners who have lived in the United States for more than 9 years, still 15 percent have to take rides from 'raiteros'.[104]  The predominantly mestizo workers from the rest of Mexico are much less exposed to this abuse.  By the time they are experienced workers with 9 years or more in the country, only 5 percent are paying for rides.

---

[103] Minimum wage in CA was $6.75 until January 1, 2007 when it rose to $7.50.  It rose again to $8.00/hour on January 1, 2008.
[104] Raiteros or troqueros usually have vans and transport workers for high fees.  Often, the workers must accept the rides in order to obtain the work.



*VI-2 Over time average conditions for the indigenous have not improved:*

Over time, some individual indigenous farmworkers, though they do not obtain high incomes, can obtain a stable life style. As shown in Chart VI-2 above, over half of the farmworkers (from both the South and elsewhere in Mexico) who have been here for nine years have a vehicle to drive. There is a heavy flow-through of farmworkers at the bottom of the farm labor market as new immigrants arrive and veteran workers either go back to Mexico or find employment at better U.S. farm jobs or at non-farm jobs. A high proportion of the new entrants are indigenous workers, while at the same time, some of the veteran indigenous farmworkers are leaving for Mexico or better jobs.[105] The result is that the stable ones (long-timers) among them remain a minority. While over the years, many of the farmworkers from the rest of Mexico (our mestizo proxy) have settled into a more stable life style, it appears that most of the indigenous farmworkers (those from the South) have remained mired in precarious economic circumstances. This occurred because as the indigenous moved into farm work the mestizos have tended to move up to the better, longer lasting farm jobs (for example, the irrigators, the pesticide applicators and the property management jobs) while a majority of the indigenous remain in (or enter into) the temporary job slots (for example, the harvest, hoeing and pruning jobs). In Chart VI-5 below, we can observe this stubborn relative poverty of indigenous compared to mestizo farmworkers with some precision. The Chart demonstrates that already in the early 1990s, about 40 percent of those from the rest of Mexico had a vehicle. Over time, the ability to obtain a car only improved for mestizo workers observed as a group. In the more recent periods since 2003, the non-southern workers from the rest of Mexico have maintained a rate of car ownership well above 50 percent. On the other hand, the mostly indigenous southerners have not been able to keep a high rate of car ownership. In fact, according to the NAWS, as a group, southerners have

---

[105] As shown in the introduction above, the indigenous have greatly increased their proportion of all California farmworkers. The vast majority of these have most likely occupied the lowest rungs of the employment ladder.

actually lost ground.   In the 1994-1996 period, 30 percent had cars in the group, while throughout the decade after 2000, barely 20 percent have had cars.



This same pattern of improvement for the ever-changing group of farmworkers from the rest of Mexico, compared to a stagnation among those from the south, can be observed as well in the acquisition of houses.  In Chart VI-6, we see that the southerners, who have always had less than a five percent rate of home ownership, continue at that low rate as a group.   Meanwhile, the group of workers from the rest of Mexico, who always had rates of ownership above 10 percent, has in recent years increased that proportion to almost 20 percent.[106]   The indigenous from the South appear stuck at the bottom of the labor market and are less able than the other groups to adapt to U.S. society.

There are at least two possible explanations for this inability of the indigenous to, on average, acquire assets compared to the mestizo farmworkers.   As we argued for the educational level of southerners in Section IV above, the constant influx of indigenous newcomers from remote villages unaware of their rights and willing to accept low wages may, in part, explain the stagnation in asset ownership.  In addition, this stubborn inability to advance in the United States for the indigenous may be due to the segmentation of the labor market.  It may be that employers intentionally choose the indigenous networks for certain tasks in certain crops because they perceive the indigenous as more willing to work at lower wages and endure worse working conditions. This discrimination may lead to lower earnings and result in a lower level of asset acquisition.

---

[106] Mestizos since they buy more houses than the indigenous may have been more exposed to subprime lending practices than the indigenous.



**Source: NAWS 1991-2008 - 12,880 Households**

*VI-3 Strong ties back to Mexico for the indigenous affect their acquisition of U.S. assets:*

There may be another reason why indigenous farmworkers appear to have fewer assets in the United States than mestizo Mexicans. The indigenous are more likely to acquire assets in Mexico than other Mexicans.  And, this is true even for those who stay for long periods.   For the southerners in the NAWS, a higher proportion of those who stay a long time in the United States continue their interest in maintaining homes in Mexico, whereas a higher proportion of those from the rest of Mexico give up their Mexican homes as they stay longer in the United States.  In Chart VI-7, one can observe that for the southerners, the proportion maintaining a home in Mexico does not decline as much as for those from the rest of Mexico.  For those southerners who have been in the United States for 9 or more years, the rate of maintaining a house stays at a high level (48%) while for those from the rest of Mexico the rate drops off to 37%.[107]   And this same tendency of continued interest in maintaining homes is also observed for the indigenous families in the ICS.[108]   It may be that the indigenous are more likely to use their limited resources to maintain assets in Mexico because of a relatively stronger cultural bond to their hometown than the mestizos.

---

[107] One should take special notice of the indigenous who have been in the U.S. for 20 or more years and probably benefitted from the SAW program to obtain legal papers.  Over half of this group that can return securely to Mexico on a regular basis still maintain a home in Mexico despite their long years of residence north of the border.
[108] In the ICS, 50% of those with 9 years or more in the United States maintain a home in Mexico.



These strong ties to Mexico among the indigenous can be demonstrated in another way from the ICS. Those settled farmworkers with a spouse in the household in California have consistently more assets than either the unmarried farmworkers or than those with a wife in the hometown in Mexico. And the ones with a wife in Mexico (a measure of close ties to Mexico) have practically no assets in California. For example, 71% of those with a spouse in the U.S. home have a car in California compared to 38% of the unmarried and 22% of those with a spouse in the hometown. Sixteen percent of those with a wife living with them own a trailer while none of the others own one. And, finally, 8% of those with a spouse in the U.S. home are owners of a house while 3% of the unmarried and none of those with spouses abroad own a house in California. The tie to Mexico for those with families there translates into a lack of interest in acquiring assets north of the border. This tendency is stronger among indigenous than mestizos because fewer of them have their spouses living with them in the United States. In the NAWS, 26% of the California farmworkers from the South have spouses with them in California, while 42% of those from the rest of Mexico are living with their spouse north of the border.[109]

*VI-4 A detailed look at indigenous workers shows few wage differences:*

While the NAWS provides a good overview of the position of indigenous farmworkers relative to other Mexican California farmworkers, the Indigenous Community Survey (ICS) gives us a close-up look at conditions faced by indigenous workers. Although the ICS only reports data from nine hometown networks, it sheds light on the intricate relationship between income, wages and working conditions for an unquestionably pure group of indigenous farmworkers.[110]

---

[109] NAWS 1991 to 2008, N=12,882

[110] Overall 319 workers who worked at a farm job in 2008 gave us information about wages and/or working conditions. A total of 226 gave us interpretable wage data for that year.

Although there is some variation across groups with respect to wage levels, the wage and working condition dynamics of these poorly paid groups may not mean better working and living conditions for those with the higher wages.   Many times those with higher hourly wages are working for a piece rate in a sped-up work environment with poorer working conditions.  When reviewing the descriptions of the wages and working conditions, one needs to remember that all of the groups (on average) are poorly paid and endure difficult treatment.

A discussion of wages should begin by pointing out that in 2008 two thirds of the indigenous farmworkers in the ICS survey earned at the minimum wage or below.  One third of the workers earned above the minimum wage ($8.00 per hour), one third reported earning exactly the minimum and one third reported earning below the minimum.



Wages do not vary very much if we compare different groups of indigenous workers because wages are relatively flat across most groups within a region and appear to vary as much by the amount of effort put out by the individual worker as by his experience or seniority.  For example, surprisingly, the age of the worker did not have a big wage impact in the labor market for indigenous farmworkers.[111]

As discussed above using NAWS data, there is an observable reward for experience in the United States, with the newcomers earning less. Notice in Chart VI-8 (above), however, that newcomers average $7.50 while more experienced workers have only a modestly higher average at $8.25 per hour among these indigenous workers.  In fact, after the workers have been in the country 5 years, wages appear to stagnate, reflecting the fact that, as a rule, experience is not rewarded with much higher wages in California's fields.

There are significant differences in wage levels among different crops and regions of California.  The three main crop activities of ICS respondents were vegetables, grapes and field fruit (mostly strawberries).   Vegetables and grape workers reported earning slightly above minimum wages on average, while field fruit (mostly strawberries) and

---

[111] Women are paid less in the Indigenous Community Survey sample; see discussion below.

other crops (citrus and tree fruit) workers reported an average below the $8.00 per hour minimum (see Chart VI-9).



These higher wages by crop reflect regional differences.  In Santa Rosa, indigenous workers have benefitted from the relatively high hourly wages in the local grape industry; and in Salinas workers have on average earned above the minimum because of the relatively high hourly wage paid in the vegetable industry.  In all other areas, the average wage was at or below the minimum (see Chart VI-10, below).  In general, workers in Santa Maria, Oxnard, and Watsonville worked in the relatively low wage strawberry industry.   In San Diego, workers worked in the low-wage strawberry and tomato crops, while in Bakersfield and Fresno grapes predominate.  Finally, the wages of workers also varied a small amount by hometown network but the main difference again appears to be related not to the maturity of the network but to the California region where the workers lived.  In fact, the two networks with better hourly wages (Santa Cruz Río Venado and Cerro de Aire) are relatively new, unsettled networks.   That the former works in vegetables in Salinas and the latter in grapes in Santa Rosa appears to explain the moderately higher hourly wages received.



*VI-5 Poor working conditions independent of wage levels:*

Next, we try to place the wage information in a larger context by incorporating working conditions into our discussion for the various groups of indigenous farmworkers. Above, we saw that wage levels were low and fairly uniform across most differences in the population. The same finding can be reported for uniformly poor working conditions across the regions.

In the survey research, we have four ways to judge the working conditions of indigenous farmworkers. These are: (1) the extent to which they work for farm labor contractors (FLC); (2) the proportion that works on a piece rate rather than hourly basis; (3) the proportion that pay for their equipment; and, finally, (4) the proportion that pays for rides. On all four of these measures, the indigenous worker respondents in the Indigenous Community Survey reported worse conditions than those for the southerners in the NAWS.[112]

---

[112] This is not surprising since the ICS has 100 percent indigenous workers in its interviewee group, while the southern Mexicans in the NAWS are intermixed with some non-indigenous in the NAWS sample. The comparison between the NAWS and the ICS is only suggestive since no statistical measures are possible.



First, there has been a close association in farm labor survey research between farm labor contractors (FLC) and poor working conditions.   Measures of poor conditions are highly associated in the National Agricultural Workers Survey and in the Indigenous Community Survey with working for a farm labor contractor.    Interestingly, the FLC employees in the Indigenous Community Survey are paid a slightly higher wage ($8.21 vs. $8.15) than those working directly for the growers.[113]   However, this equivalence in the wage is often associated with poorer working conditions for the FLC employees. Farm labor contractors in the ICS more often pay by the piece rate than by the hour (45% vs. 30%); they more often charge their workers for equipment (63% vs. 40%); and FLC employees more often pay for rides than those working for a grower (31% vs. 21%). However, there does not seem to be any systematic relationship between lower wages and the use of FLCs.  For example, when we look at the two higher paying regions for the indigenous workers in the study, we see that Santa Rosa has a moderate amount of FLC employees (35%) while Salinas has the most (90%)—see Chart VI-11 above.[114]

Although the sample is very small, the women in the ICS seem to earn less and be more poorly treated than men.  First, there is a significant advantage in wages for men over women.[115]  Well over half the women earned below the minimum while only about one quarter of the men did.  They also appear (recall the small sample) to suffer from worse working conditions. Compared to men, they pay more often for their equipment (58% vs. 48%), they pay more often for rides (31% vs. 24%), and more of the women than the men are paid by the piece rather than by the hour (44% vs. 34%)-see Chart VI-12, below.

---

[113] In the NAWS as well, for workers from the South of Mexico for the 2006 to 2008 period, there is virtually no difference in wages between FLC and grower employees.

[114] Chart VI-11 only has data on 8 California regions where the ICS took place.  Data from the Count of Hometown Networks gathered data on 12 California regions.

[115] In the NAWS, which has very large randomly selected sample, there is very little difference in wages paid to men and women among southerners in the 2006-2008 period.



In sum, although it can be shown that two regions—Santa Rosa and Salinas—pay higher (although still low) wages to indigenous farmworkers, the working conditions in these and other areas are uniformly poor.   A slightly higher wage may reflect a sped-up piece-rate-based work environment rather than better conditions for the workers.  Finally, it is interesting that no systematic better working conditions can be attributed to the older networks as compared to the newer ones.  Again, although longevity is associated with better living standards and employment opportunities for the individual member of a network, an improved situation in the farm workplace for the whole network is not easy to demonstrate.

*VI-6 Worker complaints:*

The workers in the ICS were asked if they would like to make a legal demand regarding the complaints that they have against employers, landlords or others.  Of the 400 respondents 59 voiced a specific understandable complaint that had been bothering them.  Three regions—Bakersfield, Salinas and Santa Maria—had 85% of the complaints, and just three of the nine hometown networks—Santa Cruz Rio Venado, San Martín Peras and Santa María Teposlantongo—had 90% of the complaints.

Well over half the legal complaints were related directly to the work site (see the first three rows in Table VI-1, below).  The biggest complaint was non-payment of wages or being underpaid relative to what the employer had promised before the work (27%).  Several workers complained that the foremen would dock them pay without explanation, or would undercount the boxes (in strawberries) or pounds (in peas) in order to underpay the workers.   Another 19% complained about the working conditions.  The workers often mentioned foremen that yelled at the workers or did not provide water or bathrooms in the fields.  Three of the workers working in peas in 2008 in Greenfield actually participated in a union campaign to stop the abuses.   Another common complaint was having their injuries ignored or their doctors' bills unpaid by the responsible employer

(12%).  Several said that foremen refused to take them to the doctor after an injury.
Apart from the workplace, the most common complaint stemmed from an inability to
make themselves understood by authority figures in California (25%).   The workers
complained of accidents that could not be resolved and of fraud they had suffered that
they could not find help for.   One 27-year-old Mixteco man in Bakersfield said that his
cellular company cheated him but he could not communicate with the company and gave
up.   Another 47-year-old Mixteco man in Oxnard complained that a money transfer
company sent money for him that never reached the destination.  He could not recover his
money.  A related problem is outright discrimination due to the inability to speak Spanish
well (7%).  One 60-year-old Triqui-speaking woman in Greenfield complained that the
foreman waved her off pretending like he didn't understand her when she complained in
broken Spanish that he was undercounting her pounds picked.   Another 54-year–old
Triqui in Santa Rosa complained that other workers and foremen made fun of his Spanish
language skills humiliating him in front of other workers.  Finally, five percent
complained about abusive landlords that refused to return deposits.

| Table VI-1.  Legal Complaints by Workers | |
|---|---|
| **Type of complaint** | **Percent** |
| bad working conditions | 18.6% |
| underpaid or no pay | 27.1% |
| Foremen ignored injury or employer didn't pay doctor bills | 11.9% |
| unable to defend oneself with authorities | 25.4% |
| abuse by landlord | 5.1% |
| language or discrimination | 6.8% |
| other | 5.1% |
| Source: Indigenous Community Survey -- 59 Complaints | |

The interviewees were asked if they knew of indigenous people being helped by legal
services and 23 percent said that they had heard of such a case.[116]   Interestingly, those
who had heard of cases in which legal services had helped were less likely to report
abuses by employers such as paying for rides.[117]

---

[116] It should be noted that half of the interviewers were California Rural Legal Assistance outreach workers
asking about their own services.
[117] Since the federal agency, the Legal Services Corporation, which is an important source of funds for
California Rural Legal Assistance, has strict rules to exclude undocumented workers from legal protections,
it is not surprising that most indigenous workers are unaware of their legal rights.

Section VII.
***Housing and Living Conditions***

Executive Summary:

- Most rent an apartment or small houses where usually two or more households live.
- Both rents and crowdedness are higher on the regions along the Central Coast compared to the interior areas.
- Two-thirds of the dwellings in the ICS are extremely crowded—greater than 1.5 people per room.  In Watsonville, the most crowded place in the ICS, the average is 3.0 people per room.
- The crowdedness by hometown is highly variable with location and maturity of the network both having an impact.
- About 20 % of the people sleep outside of the bedrooms, mostly in the living room or a garage.

*VII-1 Introduction:*

The living conditions facing indigenous farmworkers, which differ across the distinct regions of California, are consistently appalling.   The degree of crowding, described in detail below, is truly remarkable.  Although it is impossible to provide numbers or percentages, many still live in make-shift shelters or without shelter at all.  The health implications of these shameful conditions are detailed in Section VIII-5.1 below.  We compare the findings about our proxy for indigenous (Southern Mexicans) from the NAWS and findings from the Indigenous Community Survey to portray the major living condition facts about indigenous farmworkers.

*VII-2 Ownership and types of dwellings:*

First, it is clear from both surveys that few indigenous farmworker families own the dwelling they occupy.   In our sample of 400 households in the ICS, only 42 (11%) owned their residence.  But, of these 42, only 18 owned houses, while 24 others owned trailers.  Another 346 (86%) rented and 11 others (or 3%) lived in the fields.[118]  And, the percentages in our sample for home ownership are undoubtedly higher than those of the general indigenous farmworker population.  In the ICS, almost all of the owners of dwellings (37 out of the 42) were from the two most settled communities—Santa María Teposlantongo and San Miguel Cuevas. The rate of ownership in the rest of the communities was just two percent.[119]  The NAWS reports that four percent of the population of southern Mexican farmworkers living in California own the dwellings in which live.[120]

---

[118] One lived in a house of refuge for battered women.
[119] It is likely that the rate of home ownership may have declined more with the foreclosure crisis.
[120] In data from the NAWS 2000-2008, for Southern Mexicans, n= 2,276 households and 3.6% own or are buying a home; for the rest of Mexico, n=10,600 and 14.1% own or are buying a home.



Most live crowded in apartments or rented houses.  In the ICS sample, the largest plurality (46%) lived in apartments and fewer lived in (almost always rented) houses (32%).  But, in the NAWS, more southern Mexicans lived in rented houses (53%) and fewer lived in apartments (34%)—see Chart VII-1, above.  A much smaller percentage lives in trailers (only 4% in the NAWS for southern Mexicans).  In addition, many (almost 10%) live in barracks, make-shift buildings and vehicles behind houses, and other structures (called in Chart VII-1:other less formal).  Finally, there are many who live in the canyons of northern San Diego County and elsewhere in the state outside in caves or in plastic structures.  That exact percentage is impossible to measure by survey research.

*VII-3 Rent and mortgage levels:*

In the ICS, the median rent for the 338 households that paid rent in 2008 was about $360 per month.  The median is much higher for households with the spouse (and usually children) present; in cases with the entire family living together, the median rent is $411 per month (see Chart VII-2).  However, in households where the spouses are in Mexico, or the respondent is single (and the rent is for one person), the median rent is only $150 per month.



The household rent doesn't vary among houses, apartments and trailers. When we compared only couples living together (usually with children) in the ICS, we found the median rent was approximately $400 per month for all the types of dwellings. The amount of mortgage paid was quite different for those owning a house from those owning a trailer. The 18 house owners had a median payment of $1,079 per month, while the median for the 24 trailer owners was $284 per month.

Not surprisingly, the rents varied greatly by locality in California. In the NAWS, the rents in the coastal region were much higher than in the San Joaquin Valley.[121] Remembering that the ICS has a very small sample, its findings clearly corroborate that the rents on the coast for indigenous workers are higher than in the San Joaquin Valley. The median rent (again just for couples living together) is from $400 to $700 in the coastal areas, while in the San Joaquin Valley (Fresno and Bakersfield), the farmworkers pay more modest rents (medians of $280 to $350).



Chart VII-3. Median Rent per month paid by Home Town Network-Households with Wife in the Home Only

Source: Indigenous Community Survey - Number of Households in Parentheses

A further proof that locality (or proximity to the coast) is the most important factor controlling rents can be seen in Chart VII-3 (above) where median rents paid by hometown networks are compared. Each hometown network is highly concentrated either on the coast or in the San Joaquin Valley. The one exception is Jicayán de Tovar that has more settlers on the coast but has many in the San Joaquin Valley as well. The rents paid by members of these hometown networks appear highly sensitive to the region. Again, for couples/families living together, the relatively recently-arrived network from Cerro del Aire pays the most rent (median $600) because its members almost all live in the high-priced Santa Rosa area.[122] The long-established networks of Santa María Teposlantongo and San Miguel Cuevas actually pay less rent despite being relatively better off economically because they live mostly in the San Joaquin Valley. The low

---

[121] The NAWS San Joaquin Valley counties are: Fresno, Kern, Kings, Madera, Merced, San Joaquin, Stanislaus, and Tulare. The coastal counties in the NAWS are: Los Angeles, Monterey, Orange, San Luis Obispo, San Mateo, Santa Clara, Santa Cruz, Solano, Sonoma, Ventura
[122] The median year of arrival of adults from Cerro del Aire is 2001. Only 3 of the 9 case study hometowns have a more recent median year of arrival.

median rent also applies to the couples/families from the other predominantly San Joaquin Valley-based network—Candelaria la Union.  All the other hometowns whose network members live mostly on the coast register higher median rents.

*VII-4 Crowded dwellings:*

The U.S. Census Bureau defines crowdedness by the total number of people sleeping in the dwelling divided by the total number of rooms, including bedrooms, living rooms, and kitchens in the living space.  If this ratio is greater than 1.0 the dwelling is considered crowded.  If the ratio rises to 1.5, then the classification used is "severely crowded."  In recent years, California, a particularly crowded state, is becoming more crowded as prices of houses and levels of rents have soared ahead of earnings.   In the 2000 Census, 9.1% of the units were considered "severely crowded" up from 7.1% in the 1990 Census.[123]

For the people in our ICS sample of 345 dwellings, the level of crowdedness is far more extreme than for Californians in general.[124]   Overall, 2/3rds of the dwellings (excluding the dwelling areas of the 11 households living in "outside" areas) surpass the 1.5 minimum to be considered "severely crowded", and 94% surpass the 1.0 minimum and are considered "crowded."  The overall median for these dwellings (with four walls) is 1.75 people per room.  It is clear that an extraordinary level of crowding exists in this population.  It is extremely common to observe three families with young children living in a small two-bedroom apartment with one of the three families sleeping in the living room.  Joint payment of rent and mortgage is very common.  Among those that rent, only 17% of the renting households pay all the rent; fully 83% share the rent with others at the residence.  Moreover, in the ICS, 12 of the 42 owners had joint possession of their dwelling with another family.   And, recall that 20 percent of the residences have either married siblings living together or parents living with married children.

The amount of crowding does vary across different kinds of dwellings.  Trailers actually appear to be less crowded (median of 1.3 people per room) than houses and apartments (1.75 people per room).   Neither the calculations for the Indigenous Community Survey nor the ones for the Census Bureau estimate take into consideration the size of the rooms, which may be smaller in trailers.

---

[123] See  http://www.census.gov/hhes/www/housing/census/historic/crowding.html; the rates of just "crowded" were 12.3% (1990) and 15.2% (2000) for California.
[124] Recall that we have 400 households sharing 345 residences.  For this reason our crowdedness calculations are based on 345 dwellings.  See Section IV for details.



There is also considerable variation by town of origin and by region in California. Looking at Chart VII-4 (above), one sees that the more settled towns of Santa Maria Teposlantongo (tepos) and San Miguel Cuevas (cuevas), along with two other town networks whose people live mostly or partially in the San Joaquin Valley (jicayan and candelaria), have lower median levels of crowdedness. However, all of the networks except San Miguel Cuevas have a median of "severe crowding". The rates of crowding (over 2.4 people per room) among those who originate in Santa Cruz Río Venado and San Martín Peras are truly shocking.

Chart VII-5 below reveals that there is a great deal of variation across California regions where the indigenous farmworkers live. The coastal regions show a much higher level of crowdedness than the interior ones. It is important to emphasize that, with the exception of Fresno,[125] all the regions have medians at or above the level of "severe crowding." In Watsonville, the crowding reaches the astonishing level of 3.0 people per room.

We can also verify the crowdedness on the coast by use of the NAWS. The NAWS also measures the number of people per room and shows a much higher level of crowdedness for southern Mexicans along the coast than in the San Joaquin Valley.[126] Another indicator of lack of adequate housing access for indigenous farmworkers along the coast is the low level of home ownership in this region. In the ICS, only five of the 42 owner-occupied dwellings are on the coast while the remaining 37 are in the San Joaquin Valley. In the NAWS, for the sample taken during the 2006-2008 period, four percent of southern

---

[125] In the ICS sample and in the San Miguel Cuevas community in general a large proportion of the population lives in trailers. The Fresno sample is made up mostly of people from San Miguel Cuevas.
[126] We are not reporting the absolute numbers for this variable from the NAWS at this time. It is not clear whether the rooms counted by the NAWS are in compliance with the Census definition. However, the numbers were collected systematically across households and regions, and the NAWS comparisons of crowdedness across variables are valid. The crowdedness is much higher for southern Mexicans than for others in the NAWS. But, again, we cannot report actual numbers at this time.

68

Mexicans own a home along the coast while seven percent of the southern Mexicans in the San Joaquin Valley do.[127]



**Chart VII-5.  Average People per Room by California Region**

Source: Indigenous Community Survey- Number of Households in Parentheses

Surprisingly, measures of crowdedness, even for expected ones like the length of time in the United States, do not vary much across the other variables.  Even if we measure the crowdedness by type of household organization in the ICS (i.e., by marital status and location of spouse), we find that there is only a small variation.  The more settled households with the wife in the home have only an slightly lower median of people per room (1.7) than the unaccompanied immigrants who are either unmarried or who have a spouse in Mexico (1.8 and 1.9 people per room respectively).    It appears that among the indigenous farmworker population all types of households live in 'severely crowded' circumstances.



**Chart VII-6. Percent of Sleeping Locations by Type of Room**

---

[127] NAWS 2006 to 2008, n=609

Another measure of crowdedness is the proportion of people sleeping outside of the bedrooms.  In the ICS, of the 2,604 individuals living in these households almost 20 percent slept in a room other than a bedroom (see Chart VII-6, above).   Of these, 14 percent of the people slept in living rooms and 5 percent slept in garages.

The crowding is exacerbated by periods during the year (usually at the peak agricultural season) when more people than normal are allowed to sleep in the dwellings.   Overall, about one fifth of the households in the ICS report extra crowding during peak season. This extra (seasonal) crowding occurs across all households but less in the ones in which the married respondent lives with his/her spouse in the household.

*VII-5 Complaints about living conditions:*

The residents of these dwellings were reported by interviewers to be reticent to complain about their housing conditions.  Still, 40% of the 400 households made one or more complaints about their dwelling.   In Chart VII-7, the 286 complaints made by 140 households are displayed.    The major complaints were lack of heating or cooling, leaky roofs and plumbing problems.   See Section VIII-5.1 for some first-hand accounts of living conditions.



70

Section VIII
**Health & Access to Care**

Executive Summary

- Overall the indigenous access health care at very low rates; however women access care at higher rates than men do.
- Factors that account for this low rate of access include systemic barriers like lack of insurance, high costs, transportation difficulties, long waits, and undocumented status plus cultural barriers such as language and unfamiliarity with U.S. medical culture.
- The indigenous are averse to the way modern medicine is practiced.  They possess a different worldview regarding disease, health and healing, which leads them to avoid care (until the condition is extreme), and is also an obstacle to compliance.
- When possible they seek care in Mexico as well as from traditional healers who operate outside of the formal medical establishment in California.
- Women, who are the most likely to seek care in California for childbirth and delivery services, present a new and time-consuming challenge.   Many providers lack sufficient familiarity with this population to make the appropriate adaptations.
- Providers, who strive to deliver culturally-appropriate care, struggle with a lack of qualified interpreters, staff shortages and an overall lack of resources.
- The extremely crowded and sub-standard conditions in which the indigenous live increase the risks for poor nutrition, infectious diseases, delayed development in children, and domestic violence.
- Women and men both suffer from depression:  in women it can be related to cultural isolation following childbirth; among unaccompanied men it can be linked to loneliness due to separation from their families.
- The inferior social status of indigenous women, combined with culturally-sanctioned early age of marriage and childbearing and low levels of education, endanger women's health and place them at high risk for physical abuse.

*VIII-1  Overview:  Low Access to Care*

Indigenous farmworkers access medical care far below the rate of the general population, and even lower than other Mexican-origin farmworkers.  In this section we examine these rates, for both men and women, and ponder the reasons that account for this extremely low rate of access.[128]

As indicated in Chart VIII-1 below, there are stark gender disparities in accessing medical care.  In all four comparisons women visit a doctor more than men.   The disparity between men and women is far more pronounced for farmworkers (using both

---

[128]   For previous work on access to care among the indigenous see Bade, 1994 (Sweatshops, Sacrifice and Surgery)

NAWS and the ICS) than it is for the general population (CHIS).[129]  In the two measures of the indigenous population, the ICS and southern Mexicans in the NAWS, the women go to the doctor at twice the rate of men or more.  If we compare farmworkers with the general population, the disparities for men are much greater than for women.   In the general population, 73% of men make a medical visit, while the three farmworker male rates vary from 24% to 43%.   The variation for women is much less.  In the general population, 86% of women make a medical visit.  For farmworker women, the rate varies from 62% to 75%.



Leaving the general population aside, Chart VIII-1 also shows stark disparities within the farmworker population.  Namely, there are differences between the indigenous and other (mestizo) farmworkers, especially for the men.   The comparison in the NAWS indicates that 24% of indigenous men (southern Mexicans) make doctor visits, while 43% of the mestizo men (rest of Mexico) make visits.    For the indigenous and mestizo women the rates are much closer: 68% for the indigenous women (southern Mexicans) and 75% for the mestizo women (Rest of Mexico).

---

[129] We used three sources: our Indigenous Community Survey (ICS), the U.S. Department of Labor's National Agricultural Workers' Survey (NAWS), and the California Health Interview Survey (CHIS).  Our rates refer to percentage of individuals who visited a medical provider one or more times.  CHIS asks for one year back, the ICS and the NAWS ask for two years back.  Therefore, if asked for a one year period, the rates for farmworkers would be even lower than reported here.  See Section IV for explanation of using southern Mexicans as a proxy for the indigenous.

### VIII-2   Factors that account for low access

What accounts for this disparity in access to care between the indigenous, mestizos and the general population?   We first cite the systemic barriers to access and then the cultural ones.   The reason most often cited is the high cost of care and lack of medical insurance.

### VIII-2.1  Lack of insurance

As can be observed in Chart VIII-2 below, the rate of insurance coverage for indigenous adults is incredibly low.  Only 9% of the southern Mexican interviewees were covered, 19% of their spouses and 74% of their generally U.S.-born children.  These rates for adult Southerners are lower than for adult farmworkers from the rest of Mexico but almost the same for children.   The indigenous children (like the mestizo children), most of whom were born here and are below the poverty line, qualify for publicly-sponsored health care.



### VIII-2.2   Other factors affecting low access

While affordability and lack of insurance are certainly important factors, they are far from the only ones.   In hundreds of interviews over the course of more than two years, our research team repeatedly encountered a population *averse* to medicine as practiced in this country, reluctant to seek care except as a last resort, not trusting of the providers they encountered, and often confused or angered by the treatment they did receive.

We argue that any effort to improve access to health care for the indigenous, in addition to addressing matters of affordability, must also understand the reasons underlying the mistrust and avoidance we encountered, and seek innovative and creative ways to meet the health care needs of this hard-to-reach population.  The discussion that follows is an attempt to begin that process.

For now, we turn to what we learned listening to indigenous informants, as well as to outreach workers and health providers, about the factors that help account for the low

rates of medical care among the indigenous. These include systemic difficulties such as lack of legal residence, transportation problems, long waits and poor treatment at clinics, and cultural-linguistic barriers that include fear of Cesarean sections, and preference for medical treatment in Mexico.

### VIII-2.3  Transportation

As noted in Section VI-1, only around fifty percent of indigenous households own cars or trucks, and among newer arrivals up to eighty percent can be without their own means of transportation. Women, who are the ones most likely to seek health care, can be left isolated with any means of getting to a health care center. Proximity to health care services varies greatly by region and those in walking distance of a clinic are the fortunate minority.[130]  In the Central Valley, where settlements are dispersed and distances considerable, having a car often determines whether one obtains medical care. The only transportation available in some isolated areas are expensive "independent" taxi/car services.[131]

A particularly dire situation exists for the tomato and strawberry pickers who live in makeshift shelters in the canyons of San Diego's north county in close proximity to upscale suburban neighborhoods. These canyon residents suffer from a not uncommon double disadvantage:  no legal papers and no vehicles apart from bicycles. As one interviewee described the situation, "We have to put up with snakes, *la migra* and thieves... If we get sick we just have to live with it or go to Tijuana... Sometimes people are able to buy [medicine] in a drugstore."[132]

Even where public transportation might exist, learning to use it can present an almost insurmountable obstacle for indigenous women who have little formal education, speak no Spanish and are struggling to cope with the shock of transition from a small, remote village in southern Mexico to an intense and confusing urban America of the 21st century. Our study has identified a number of newer networks whose members arrived in the U.S. without prior experience traveling and working outside their homelands in Mexico. If this trend continues, there will likely be increasing numbers of indigenous who arrive without basic coping skills. An activist in Santa Maria, California, described a Mixtec woman she knew who was terrified of using the bus, and noted that "many of these women come directly from their villages and can't learn from one day to the next how to function in a modern society. Those who've migrated elsewhere in Mexico are better able to handle the transition to the U.S."[133]

### VIII-2.4 Long waits, inconvenient hours and humiliating treatment

---

[130] For further discussion of the transportation barrier for the indigenous see Bade, 1994 and 2000

[131] In the case of a patient in Huron needing to get to a clinic in Fresno, the cost was $60.

[132] Interview done by Rick Mines, December, 2008

[133] In Section II we note that the indigenous in the networks we studied are coming directly to the United States more often now instead of living for a time at the border.

Even for the few with health insurance through their employer, or eligible for some form of public assistance, the delay between making an appointment and getting to see the provider is an exasperating experience.  "It can take 2-3 months and by then you're dead," complained a 69-year old former Mixtec farmworker in Santa Maria.  For him it was better to go to Mexico, pay out of pocket and be seen right away.

Taking time off work and spending it in the waiting room is another disincentive.  Time is literally money, and hours spent away from the fields and in a clinic places financial burdens on these low wage workers.  Only a few clinics offer evening hours.

The treatment received at the hands of rude receptionists is another frequent complaint.  While many indigenous men are able to make themselves understood in Spanish, simply having a Spanish-speaking person on hand is no guarantee of decent service.  Indeed, mestizo staff often perpetuate the discrimination that is widespread in Mexico. One community activist in the North Coast area is convinced that indigenous people are singled out for poorer service: "We're less important for them and so they keep you waiting for 2-3 hours."  Elsewhere in California, indigenous informants independently reported having to endure long waits and condescending treatment by clinic staff.  A Mixtec-speaking man in San Diego recalled an encounter at a local community clinic where he had been asked to bring his daughter for an x-ray.  He was made to wait several hours by a receptionist who pretended not to speak any Spanish.  When he finally got angry she suddenly shifted into fluent Spanish.

In Fresno an accomplished mother of four who speaks several variants of Mixtec, and has worked for a number of years as an interpreter at local clinics, described how "there is no respect for the patient; they gesture at them, make faces and yell at them."

Indigenous Community Survey data shows that in those communities with a longer presence in the United States, people are more likely to seek help from the health care system.  However the numbers reveal little about the quality of care or patient satisfaction.  The following is an account as told to one of our researchers by a 48 year old man from San Miguel Cuevas about a terrifying episode in Fresno:

> The man was in the hospital for two or three days and the doctors
> told him he had either cancer or AIDS.  The man was really
> frightened.  His problem was that he was vomiting blood.  He
> wasn't allowed visitors because they said he was highly
> contagious.  While he was in the hospital a nurse came by and
> threw a bag at him, and this behavior by the nurse left him really
> scared.  When he opened the bag he saw that it was food. He felt
> even sadder because they were treating him like a poor dog.  After
> two days they told him there was nothing wrong with him, and that
> maybe it was something he'd eaten.  The man said it took him a
> long time to recover from the trauma of the way they had given

him the news.  He never saw the nurse's face, only her hair.  She was blond." [134]

To be treated with respect and dignity is, of course, valued by everyone, but no more so than by indigenous communities where great store is placed on politeness, formality and courtesy.  Careless comments can easily cause deep offence, or even trauma.  Mixtec women in Ventura reported feeling humiliated by the clinic's interpreters who remarked that they were "good for producing babies but not for looking after them," and that they got sick because their homes were "like pig sties."  Affording their patients respect costs nothing but earns considerable goodwill, while a failure to do so drives patients away.  Indeed the word gets around, leading to avoidance of a given clinic or provider.  A 48-year old Triqui man who has worked for years picking lettuce and broccoli in the Salinas Valley is typical of many men who see no point in even trying to seek health care when, as he put it, "They treat us worse than dogs."  Conversely, a provider who establishes rapport with his or her patients gains a reputation for giving good care and the word quickly spreads.   Even care-averse men will travel a considerable distance to be seen by someone they feel is trustworthy, albeit only as a last resort.  Such is the case with "*La Doctora*" as they refer to the Physician's Assistant at a small rural clinic in western Sonoma County.  This woman, who does not speak their language and who admits to only rudimentary Spanish, is nevertheless greatly appreciated by Mixtec and Zapotec men who work in the vineyards and dairies of the North Coast.

Nor is the poor treatment confined to front-line personnel.[135]  In the Central Valley region an advocate expressed deep frustration at the attitude of agencies in her area where the indigenous are regarded as "low status."  She likened it to "pulling teeth" to get clinic administrators and social service providers to make use of indigenous interpreters already available in the area, and lamented the overall resistance to providing culturally-competent services.

### VIII-2.5  Cultural-linguistic barriers

The ability to communicate is critical in the physician-patient encounter.  One of the physician's first steps in caring for a patient is obtaining an accurate history.  A practitioner places great importance on this step, and uses his or her powers of listening, together with the physical examination and, if needed, tests to arrive at a diagnosis and a decision regarding treatment.  The inability of patient and doctor to understand each other erects a barrier from the outset, heightening the risk of misdiagnosis, inappropriate treatment and non-compliance by the patient.  For a western-trained physician the challenge of treating an indigenous patient goes beyond simple translation barriers.  Elizabeth Gomez is a trained medical interpreter who works at the Oxnard Clinic.  Ms. Gomez, who is trilingual in English, Spanish and her native Mixtec, explains that there are often no words in Mixtec for numerous medical conditions such as asthma, tuberculosis, anemia and diabetes. She must also improvise language to explain to parents why their children need to be vaccinated, why they may be at high risk for lead

---

[134] Information gathered by interviewer Anna García.
[135] For further discussion of behavior toward the indigenous by medical personnel see Bade, 2004, 2005

poisoning, or should be tested for anemia.[136]   As for women's health, there are often no terms in Mixtec for certain body parts, particularly those relating to the reproductive system.  It is even difficult to explain a procedure such as a cervical exam, or a concept such as contraception.  Ms. Gomez says that it takes her considerable time and tact to put a woman at ease and establish trust.  The problems are the same in Mexico.  She knows of no culturally-sensitive medical care for the indigenous in Mexico, nor any effort there to educate or inform patients about their prescribed treatment.  She points out that no vocabulary has been developed in the home country to bridge the divide between biomedical and traditional approaches to healing.

### VIII-2.6  Fear of Cesarean sections

During our research, an illustrative example of the communication gap emerged on the subject of Cesarean sections.  Repeatedly, indigenous women we interviewed expressed their distress at having their babies delivered by C-section.  At first, we wondered if indigenous women were being subjected to this procedure at a rate higher than other groups.  While we are unable to answer that question quantitatively,[137] probing the matter did shed light on a subject where poor communication across the cultural-linguistic divide has created an arena rife with misunderstanding.  In fact, some indigenous activists believed it was yet another conspiracy against the indigenous:  by performing C-sections on defenseless indigenous women, the hospitals, in their opinion, could extract additional money from the government, since they believed that reimbursement for C-sections would be higher than for vaginal births.[138]

Probing the issue was not an easy matter, given the reticence about discussing reproductive matters, especially in the presence of a male interpreter, as well as the reluctance to complain or appear ungrateful for free care. Finally, one of our Mixtec interpreters, after sufficient trust was established, reported that women were very angry, that they felt they were being forced against their will to have C-sections, and that they believe they're being assigned incompetent doctors who don't know how to deliver babies and thus resort to performing C-sections.  He concluded the litany of complaints with a question and a plea: "They want to know *why* they are always told they have to have a C-section?"  Interestingly, it was our interpreter's wife who stepped forward to shed light on the matter.

---

[136] Alarm over lead poisoning in mestizo and indigenous children has been growing in recent years. Sources of contamination include exposure to lead paint in sub-standard housing as well as folk remedies, foods and candies imported from Mexico.  For an account of  research into an outbreak of lead poisoning among Oaxacan children and pregnant women living in the Central Coast, see Handley, et al, May, 2007. pp. 900-906.  For an account of how lead-contaminated food items from Oaxaca are inadvertently transported to California,  see Handley and Grieshop, 2007, pp. 1205-1206.
http://ije.oxfordjournals.org/cgi/content/full/36/6/1205
[137] Administrative data is not collected for the indigenous as a distinct group.
[138] From the perspective of traditional medicine, a Zapotec midwife told community workers that when doctors practice Cesareans, they cut not only the skin and layers of muscles and fat, but also the different layers of energy that our body has, so after that, the women need to seek treatment from a traditional healer to help them heal and recover.  (Personal Communication with Nayamín Martinez, December, 2009).

The interpreter's wife, whom we will call Francisca, has been working as a Mixtec interpreter for more than five years at a local clinic. Francisca explained that there are several reasons why indigenous women might have to have a C-section.  First, because they only come to the clinic at the end of their pregnancy.  Since they are not accustomed to prenatal care in Oaxaca, they "just wait 'till it's time for the baby to be born." According to clinical regulations, this automatically puts them in a high-risk category, increasing their chances for a C-section. Francisca believes this is an important area needing attention: there should be outreach to pregnant indigenous women explaining the importance of prenatal visits.  These kinds of outreach efforts for farmworkers do exist in her area, but they're only conducted in Spanish and thus they fail to reach the many Mixtec women who don't understand Spanish.[139]

A woman also might receive a C-section for the seemingly obvious reason that she's already had one before.  When Francisca is called in to interpret, she is able to explain that there's a risk of complications, including the possibility that the previous sutures might burst, a fact the women had not understood.  There are educators at the clinic that are supposed to explain this, but when things get busy they may not have the time or remember to bring Francisca in to interpret.  She also suspects that the doctors don't realize that the Mixtec women they are attending simply don't understand what is happening to them.  In spite of the years Francisca has worked at the clinic, she is still not clear how the facility is organized nor does she have the confidence to approach anyone in authority to voice her concerns

Francisca's account also prompted discussion of a related matter that had been bothering her husband:  he knew of two Mixtec women who had stayed away from the clinic and given birth at home.  Now they were finding themselves unable to obtain birth certificates or documentation for their infants.  He offered this as another example of what happens when Mixtec girls arrive not knowing anything about how things are done in this country, and he longed for a program to educate indigenous girls and women about pregnancy and childbirth.

Nearly three hundred miles away, a resident working the emergency room of a county hospital provided a physician's perspective, confirming and expanding on much of what Francisca told us.  This doctor has gone to considerable lengths to learn about Oaxaca's indigenous peoples, with the intention of providing care in a culturally-sensitive manner. But communicating with indigenous patients in the hospital setting, even with an interpreter on hand, presents even well-intentioned physicians with huge challenges.  He told of Mixtec women who have been picking strawberries along the Central Coast as follow-the-crop migrants, with little or no prenatal care, arriving at the hospital ER ready to deliver:

> They may be higher risk but it's difficult to explain that they may
> need a C-section; they're very resistant to having a C-section.

---

[139] One Family Nurse Practitioner in Ventura County, who serves many Mixtec patients, has collected data from her own practice demonstrating that culturally appropriate care does lead to earlier dates of entry into prenatal care for pregnant Mixtec women.

Often there's a perception that if the doctor is no good, they'll get a
C-section.  There's not a good understanding of C-sections and
they see it as 'the worst thing that can happen.'

By law, hospitals are required to provide care in a language the patient can understand,
but when situations arise outside of normal hours, and the on-staff  interpreter is not
available, they may turn to a telephone interpretation service.  This at least puts the
hospital in legal compliance, the resident explained, but it's seldom satisfactory.  When a
woman is in labor they need to conduct regular vaginal checks given the complications
than can and do arise, however the women are "very fearful of male providers and they
don't understand the procedures and it's hard to explain things to them."

Even outside of the intensity of the Emergency Room, language can raise a barrier to
appropriate care.  A Mixtec woman who works as an interpreter in Fresno expressed her
concerns:  "I don't think they prescribe the right medicine for what we have because they
don't understand what we're saying."   One of our Mixtec informants in the Watsonville
area, and an activist within his community, reported that people complain that the doctors
don't give people very much information. The same informant also wondered about the
extent to which the indigenous themselves bore part of the responsibility.  From personal
experience he knew that doctors and nurses tried to explain things, such as how to take
the medicine being prescribed.  He went on to speculate that a cultural behavior may be
at work here, noting that the indigenous, when asked a question, instead of admitting they
didn't understand, or requesting clarification, simply answer "*si*" to all questions, in order
to avoid an impolite "*no*."  And so perhaps the doctors simply assumed they had
understood.

The resident at the county hospital concurred that most of his colleagues don't have an
effective connection to the indigenous population, and so while he believes that his
colleagues genuinely strive to provide good, culturally-sensitive care, they simply don't
know how.  For example, "They think Mixtec women are very stoic and don't want pain
medication because they don't speak up.  It's a pattern they fall into," he says, "and they
just assume all sorts of things."

Many physicians simply rely on the patient to bring in a friend, a relative or even a child
to interpret.  Often it can be a male relative and, again, with the extreme sensitivity
around the female body, this raises barriers to effective communication and care.

The cultural-linguistic barrier, though daunting, is not insurmountable.  In the downtown
Oxnard branch of the Clinicas del Camino Real, they employ a process of "relay"
interpretation: on staff is a female Mixtec-Spanish speaker who interprets between the
patient and a bilingual Spanish-English health assistant who then interprets for the
English-only health provider.  Tending a Mixtec-only patient does take more time, but
one OB/GYN Nurse Practitioner, who speaks only English, has found the extra effort
worthwhile.  She reports that her Mixtec patients are attentive, compliant, and return for
their follow-up appointments on time.

79

### VIII-2.7  Seeking medical treatment in Mexico

Many of the indigenous we interviewed opt for the trouble and expense of seeking care in Mexico.  The reasons given are multiple:  because costs are a fraction of those in California, they don't have to deal with confusing paperwork, they can pay out of pocket for immediate attention, and medicine is practiced more to their liking.  Those living throughout the southern half of the state reported travelling for medical and dental treatment in Tijuana, as well as to purchase medicine.  The same was true even for people living further afield.  People in the Central Valley, in the Fresno-Madera, Tulare and Bakersfield regions all reported going to Tijuana for medical attention and medicine, as did people living on the Central Coast in the Ventura, Santa Maria, Salinas and Watsonville regions.  While proximity to the border and having legal U.S. residence obviously facilitate this cross-border care-seeking, even those without documents reported risking the trip to obtain medical treatment that they deemed affordable and effective.

A 36-year old Triqui farmworker who lives in a men's group house in Greenfield put it this way:  "When they get seriously ill, they go to Mexico and afterwards they brave the border to get back.  Few use the medical services here."

Elsewhere on the Central Coast a community worker who is familiar with navigating the U.S. system and has health insurance through his job reported that even he prefers to go to Mexico for care:

> Here they give you an appointment that's a long way off and it's expensive; even if you have insurance it's cheaper and faster there. And for dental care, they want to charge me $5,000 for some dental work here, and my insurance won't cover it, while in Mexico they will charge me 2,000 pesos (about $160) to replace a molar.

For some, obtaining care in Mexico has become a way to supplement U.S. insurance coverage by paying out-of-pocket in Tijuana when their Medicare coverage is insufficient.  Others who are unable to travel to Mexico entrust friends or relatives to purchase their medicine for them, including injections, so they can self-medicate.

### VIII-2.8  Public health care for the indigenous in Mexico

While the above discussion highlights the appeal of seeking medical care in Mexico for those who are willing and able to pay out of pocket, it should not be concluded that health care for the indigenous population is superior in Mexico.  Far from it.  Mexico's government-run health care system has serious deficits when it comes to meeting the needs of its indigenous peoples at all levels: institutional, cultural and interpersonal. Therefore, it's not surprising that the same aversion to accessing health care in California

also exists towards using the Mexican government's own health care service.  Repeatedly our researchers found that in Mexico public health care for the indigenous was inferior to that found in California.  Interviewees reported great difficulty obtaining appointments, extremely long waits and degrading treatment by providers in Mexico who look down on people who don't speak Spanish well.

In Tijuana, with its sizeable indigenous population, there is no interpretation service in the hospitals and clinics, unlike in California where some services do exist.  Those who don't speak Spanish must bring along a friend or relative in order to understand what the receptionists, nurses and doctors are saying.  Past efforts to provide indigenous interpreters have been sporadic and underfunded, with interpreters quitting when they were not paid.[140]

While the Mexican government has set up clinics in areas of high poverty, accessing care can prove a time-consuming and frustrating experience.  In Colonia Cañón Buena Vista, a farmworker settlement just south of Ensenada in Baja California, people described lining up at the clinic door at 4:00 a.m. so as to obtain an appointment chit at 8:00 a.m. when the clinic opened.  When there are more people than chits, the unlucky ones have to try again another day.  Those who have transportation, and can afford it, seek private doctors in nearby towns.

Nor are medical services better for the indigenous in their regions of origin.  Our research team visited the remote village of Jicayán de Tovar, a village of about 1,000 in eastern Guerrero.  We learned that the government had recently built a clinic in the village, however the clinic had neither medicine, supplies nor staff.  In the past a doctor would occasionally visit the village, but it had been six months since they had seen or heard of him.  People in need of urgent attention drive three or more hours over rugged dirt roads in this mountainous region to reach medical care.  One man described what happened to his daughter-in-law when she required an operation.  He managed to get her to town to a doctor who charged him 2,500 U.S. dollars for the surgery and subsequently was demanding 50 dollars for each monthly follow-up visit.  The man had to borrow the money and now relies on relatives working in California to pay off the debt.

Some of the less remote villages we visited did have clinics with a doctor in residence.  However, mistrust of the biomedical approach and the inability to communicate kept people away.  One Oaxacan village of just under a thousand had a clean, well-maintained clinic with a doctor available Monday through Friday.  The doctor spoke only Spanish while nearly two thirds of the local population spoke only Mixtec.  The clinic had a nurse (from a nearby town) who could interpret, yet in spite of her presence, villagers preferred their traditional healers and midwives.  Nor did pregnant women come for prenatal care, despite efforts to reach out to them.[141]  Over the previous year, this physician recorded fifteen births in the village, of which twelve were home deliveries.  Only in extreme situations, when all else fails and the situation is dire, do women come to

---

[140] Matilda Laura Velasco Ortíz, Professor, Department of Cultural Studies, Colegio de la Frontera Norte (COLEF), Tijuana.  Personal communication, May 11, 2008.
[141] This does not mean that they did not receive prenatal care from traditional midwives.

the clinic or go to the hospital in the nearest town.  A similar preference for home delivery was reported by a doctor assigned to a community of about 5,700 where 90% of the women give birth at home with local midwives.  The doctor in this area expressed deep frustration over this custom: there's a high birth rate in his area, lots of pregnancy complications and local women die every year in childbirth.[142]

At a hospital in western Oaxaca, where 80% of the patients are Mixtec-speakers, the medical director lamented having no one on staff who spoke the local language.  Nor did the hospital have a kitchen to prepare food for inpatients.  Instead patients rely on their families for meals, or the hospital staff goes out seeking food donations from local merchants to feed the patients.  The hospital director repeated the oft-heard comment that patients only come as a last resort.  First they try household remedies, go to pharmacies or turn to traditional healers.  When they arrive at the hospital it is often late in the illness or pregnancy and it is difficult to help them, especially given the language barrier.  Furthermore, there are long waits, up to three months, to see a specialist.  Even well-intentioned Mexican physicians find it difficult to provide long-term or preventive care when most patients only come when they are very sick and then don't return for follow up visits.

The observations of a U.S.-trained physician who recently traveled to Oaxaca echoed our findings.  He saw considerable mistrust between indigenous patients and physicians, noting that the physicians are usually on short-term assignments and don't speak the local language.[143]  In the city of Oaxaca, where he followed a pediatrician, there were no interpreters and instead family members were relied upon for interpretation from the indigenous language to Spanish. He noted that in Mexico, unlike the U.S., there is no law requiring that care be available in a person's own language.  Nevertheless, there are some innovative efforts underway to improve the quality of care in some indigenous communities.  He visited one such government-funded program in San Juan Ñumí, outside of the city of Tlaxiaco in western Oaxaca.  There, an herbalist from the community, a "*médico tradicional*," was paired with a western-style doctor and together they were succeeding in providing more effective care.

This dual-system approach is, unfortunately, the exception.  As Leoncio Vázquez, an indigenous activist in Fresno noted, "Encounters with the medical system in Mexico are

---

[142] Reliable data for maternal mortality rates (MMR) in Oaxaca are hard to come by.  By some estimates, an indigenous woman is nearly ten times more likely to die in childbirth in Mexico than a woman in the United States.  Some MMR estimates:

Mexico (2000-2007):                    62
Indigenous in Mexico (2003):        124+
United States (2005):                    13

See:  United Nations Commission on Human Rights: Indigenous Issues (2003), p. 16:  "The risk of dying in childbirth is more than twice as high for an indigenous woman as for a non-indigenous woman."  According to UNICEF, the MMR for Mexico (2000-2007) was 62.
http://www.unicef.org/infobycountry/mexico_statistics.html ).  In the United States, whose MMR is considered high compared to other industrialized countries, the MMR in 2005 was 13  (see:
http://www.medicalnewstoday.com/articles/80743.php  )

[143] Many of the "doctors" in the rural villages are interns (*practicantes*) with limited clinical experience.

not very positive and so they're already pre-disposed to avoid modern medical settings."[144]

### VIII-2.9  Undocumented status

Our researchers did not inquire about a person's immigration status.  Nevertheless, it was clear that our interviewees were acutely aware of anti-immigrant sentiment in the United States.  Some believed they were not entitled to care in this country and others expressed the fear of approaching any institutional setting lest it put them at risk of deportation.  An outreach worker on the North Coast who helps men gain access to medical treatment explained that simply registering them to see a health worker raises alarm bells since they fear the paperwork might be passed along to others and used to deport them.

For those who do not speak English or Spanish, the isolation and paranoia can be extreme, especially during an emergency when they are unable to understand what is happening.  A Mixtec farmworker described his experience on the morning of September 11, 2001.  Shortly after he and his companions began picking strawberries, the crew leader called them all over, told them the country was at war and sent them home, warning them to stay indoors.  The farmworker remembered how rumors flew, including that Mexico had attacked the United States and that their lives were in danger.  He spent the next two days huddled indoors, terrified and unable to learn what was happening since he could not understand the news on Spanish language radio or television.

### VIII-3  Indigenous Perspectives: disease, health & healing

### VIII-3.1  A different worldview

An indigenous person's belief system and understanding of his or her relationship to nature, society, the spirit world, and to the cosmos, all play important roles in notions of disease, health and healing.  A key feature of this worldview is the importance of maintaining equilibrium between the various forces at work in the world.  One of the most frequently expressed needs for balance is between the duality of "hot" and "cold" (concepts which do not necessarily refer to temperature).  A detailed treatment of this subject is beyond the scope of this report, however a brief discussion can shed light on the important differences between the indigenous and the western biomedical approaches to health matters, and help us understand why indigenous patients often avoid medical treatment that they find offensive, and why non-compliance is often an issue.[145]  The following excerpts are taken from a recent treatise on Mexico's indigenous communities

---

[144] Leoncio Vásquez, Interim Director, FIOB, Fresno, speaking on "Indigenous Peer-to-Peer Conference Call" facilitated by Adam Sharma, Farmworker Health Services, Inc., Oakland, CA. June 26, 2008. For more information see www.farmworkerhealth.org

[145] An interesting presentation of indigenous health care attitudes is found in a DVD prepared by Bonnie Bade, see Bade, 2008.

by Federico Navarrete Linares, a renowned Mexican scholar who specializes in Mesoamerican studies.[146] The translation is ours.

> While each indigenous society may have its own worldview, linked to its particular language, history and natural environment, these worldviews share much in common.  For example, nearly all indigenous peoples believe that the world has elements, or forces, that are either hot or cold.  Hot elements are associated with the sun, the sky, the masculine, order, light and life. Cold elements are associated with the moon, the earth, the feminine, disorder, darkness and death.  Although hot elements are considered superior to cold elements, it does not follow that the former are good and the latter are bad, since both are necessary for life.  Plant growth, for example, requires the heat and light of the sun, but also depends on the cold forces of earth and death [decomposition]. While males possess a greater quantity of hot elements, they also require cold elements to maintain health; women in the same way need hot elements.  Similarly, there are hot diseases that cause an excess of heat in the body, and cold diseases that lead to excessive temperature loss.  What's important, according to the indigenous worldview, is the balance between these opposing forces. Equilibrium is necessary for human health, for social tranquility and wellbeing, and it's important in the wider sense as well, to ensure that plants grow and life continues.

> ...In the indigenous worldview nature is not separate from society. This means that what occurs in one realm has consequences in another: a social conflict can impact the rest of the cosmos; hunting a wild animal without permission from the owner of the forest can bring harm; taking water from a spring without offerings and gifts to its guardian spirit can cause the spring to dry up.

> ...The territory an indigenous community inhabits is inseparable from the group's identity and survival; it is not seen simply as a resource to be used and exploited.

Navarrete goes on to describe how indigenous healing practices depend on an intimate knowledge of the environment and of local plants and animals.   The healer makes use of his or her knowledge of the pharmaceutical properties of plants, as well as knowing their hot and cold attributes.  For example, plants that are classified as hot are used to treat illnesses that are caused by an excess of cold elements.  In the indigenous worldview health is a condition that is achieved by balancing hot and cold elements in the body, as

---

[146] Navarrete Linares, 2008, pp. 78-85. For his description of the relationship  between the indigenous worldview and health  Navarrete cites Alfredo López Austin's *Cuerpo humano e ideología.  Las concepciones de los antiguos nahuas*, UNAM-Instituto de Investigaciones Antropológicas, 1980.

well as balancing the several souls each person carries within with the external forces that interact with these souls.  As Navarrete describes it:

> There are illnesses such as "susto" (literally: fright) that result when one of the person's internal souls leaves the body as a result of a shock.  When someone who is suffering from this condition goes to a modern doctor, it is of no help to tell the patient that such a thing doesn't exist or that the idea of *susto* is false from the perspective of modern medicine.  The person is genuinely suffering and could even die from his/her condition.[147]

A concept such as *susto* can seem completely alien to a biomedical practitioner. However, thinking of it as a post-traumatic stress disorder (PTSD) can begin to build a bridge between the indigenous and the modern worldviews.  Just as PTSD has a significant psychological and cultural component, so too does *susto*, and its effective treatment requires the intervention of a qualified practitioner:

> In this light, traditional healers are extremely important in the community as they share the patient's worldview and can prescribe the appropriate treatments for many ailments using medicinal plants, prayer, ceremonies and other forms of diagnosis to ascertain, for example, where the person's soul went as a result of *susto* and how to bring it back into the body.[148]

When a Mixtec woman who works as a medical interpreter in Fresno was asked about the hot-cold concept of illness causation, she explained:  "When it's cold you need to avoid "cold" foods such as rice.  When it's hot you should avoid foods such as mango."  When asked if medical personnel in the local hospital were aware of these sorts of things, the Mixtec interpreter replied that they simply don't discuss this with the doctor.[149]

### VIII-3.2  *Use of traditional healers in California*

Throughout California there's a web of Mexican traditional healers practicing their healing arts discretely and below the radar of official institutions.  They can be *yerberos* (herbalists), *sobadores* (massage specialists), *hueseros* (manipulators similar to chiropractors), *curanderos* (spiritual healers), or some combination thereof.  In the San Joaquin Valley, in San Diego, along the coast in Ventura County, Santa Maria, the Salinas Valley, and the North Coast, people spoke of knowing traditional healers and of seeking them out for a variety of ailments.  The treatments are familiar and non-

---

[147] Navarrete Linares, 2008, p. 83.

[148] Navarrete Linares, 2008

[149] For a popular yet perceptive and highly readable  discussion of Mexican ethno-specific conditions such as *susto, empacho, mal de ojo*, and others, see Avila and Parker, 1999.  Avila is a psychiatric RN whose own experience with Mexican folk healing allows her to bridge the divide between the western biomedical approach and traditional knowledge systems.   Another important source is the dissertation by Dr. Bonnie Bade for University of California at Riverside entitled: "Sweatbaths, Sacrifice, and Surgery: The Practice of Transnational Health Care by Mixtec Families in California," 1994

threatening, cheaper and often the outcomes are positive.  One family we interviewed in Watsonville wished to take a sick child to Mexico, but since the journey was not possible, instead they drove three hours to Santa Maria to seek the services of a traditional healer and reported that the child recovered.

A farmworker living on a quiet suburban street in a farm town on the Central Coast described a neighbor of his as a *sobador* who saw a steady stream of people entering his home, from seven in the morning till seven at night.  This *sobador*, as do other indigenous healers we learned of, charges on a sliding scale:  five, ten or fifteen dollars, whatever people can afford.[150]

Yet in spite of the many traditional healers serving the indigenous community in California, respondents feel there is a shortage of this kind of care.  Numerous individuals we interviewed expressed frustration at not having access to a traditional healer or to familiar medicinal plants.  Also missing is access to a sweat bath, or *baño de vapor*. Besides the therapeutic value of the heat and the medical herbs, sweat baths play an important role in re-establishing a spiritual connection to the earth, a connection deemed essential for health.  Women in particular miss having access to sweat baths following childbirth, as discussed below.

### VIII-3.3  Perinatal care

Indigenous women, and the activists who work with them, report a dislike, mistrust and a profound fear of the way pregnancy and childbirth are managed in the biomedical setting. Given that perinatal care is currently the most frequent encounter between the indigenous and the modern medical system, the attitudes we encountered offer valuable insights into beliefs and behaviors.  While the gynecological and obstetric care indigenous women receive in California is likely to result in far higher rates of maternal and child survival when compared to Mexico, women generally did not express appreciation for the care they received, highlighting an arena of cultural collision.

As noted earlier, indigenous women avoid prenatal care and only arrive at the clinic or hospital when they're ready to deliver.  Certainly prenatal care from the biomedical system is not something they are accustomed to in Mexico, yet women give a variety of other reasons for avoiding it in California.  Activists and culturally-attuned practitioners who work with indigenous women shared the following:

- ■ "They don't go for prenatal care so as not to lose a day's work.  To go to the clinic means losing a whole day.  They have to arrange child care for the youngest, walk to the bus stop, take the bus downtown, wait for their appointment, and then come back again.  Some communities have very

---

[150] For a journalistic account, including a short video, of a Oaxacan traditional healer working in Madera, California, see: Sack, 2008

bad bus service.  Many women work up to a few days before the baby is born, some even up to the day they deliver."

■ "We've found that nearly all the women are anemic during pregnancy. They don't want to take vitamins because the say it will cause the baby to grow too large and result in their being given a C-section."

■ Pregnant women have concerns that are not addressed by western medicine: they are very worried about how their *nervios* and *coraje* will affect the baby; even second generation young women hold to these beliefs even though they grew up in the U.S.[151]

■ Women will seek out a *sobador* (massage specialist) to relieve stress and physical discomfort related to pregnancy; it's inexpensive, convenient and comforting.

■ The contrast between the indigenous and the medical approaches to childbirth is like "heaven and earth" according to one Mixtec health outreach worker in Fresno.  She explains that indigenous women traditionally think of this time as a happy occasion; pre- and post-partum practices include hot herbal teas and massages.  "But here it's all about machines. Of course they're going to be alarmed!"  It begins during prenatal care with the need for blood tests and the ultrasound.  And during labor: "Traditionally only certain foods are consumed, and nothing cold like ice chips should be taken.  Yet when indigenous women request a sip of water, they are offered ice-chips."  And then, following birth, "They want you to bathe!  They even want you to get off the bed and walk by yourself to the bathroom."

■ Following childbirth, Mixtec women in their home communities undergo a carefully-prescribed regimen of sweat baths, under the supervision of other experienced women, and they include the use of medicinal herbs, all to aid recovery and help re-establish the body's equilibrium.  The lack of access to sweat baths on this side of the border can contribute to the women's profound sense of isolation and post-partum depression. [152]

*VIII-3.4  Coping with illness*

---

[151] These ethno-specific conditions, loosely translated as "nerves" and "anger," reveal a concern that strong emotions and heightened stress can have negative consequences for the fetus, and hence the desire to maintain emotional equilibrium during pregnancy.  While biomedical  practitioners might interpret the avoidance of prenatal care as a failure to understand the importance of maternal health during pregnancy, worries about the effects of *nervios* and *coraje* reveal indigenous women attuned to the connections between  their own health and that of their baby, but they express their concerns from within their own worldview.

[152] Respondents lamented the inability to set up sweat baths, either because  they live in apartment complexes or they feared neighbors would complain and local authorities intervene if they tried building the necessary fire pit in their backyards.  We did hear reports of people who were able to set up sweat baths on their property, including a  traditional healer in the Central Valley who lives outside of town and maintains a low profile.   For a first-hand account of a sweat bath experience, see "Alive and Well: Generating Alternatives to Biomedical Health Care by Mixtec Migrant Families in California" by Bonnie Bade in Fox and Rivera-Salgado, 2004.

Given the lack of insurance, the high cost of care, the many barriers to access, the preference for self-medication and traditional treatment, people tend to seek biomedical care only as a last resort. Following are the steps people follow when coping with illness, as described to our researchers:

1) Start with a traditional tea or home remedy at the onset.  Those unfamiliar with the appropriate remedy will seek advice from relatives and neighbors. Failing that, and if one is available, they will seek advice from a salesperson at a *Botánica*--a store selling herbs and traditional remedies.

2) Next, people will seek out Mexican medicines they know or have used in the past.  These might be available at a local Mexican grocery story or at a flea market.  People either request the medicine by name or describe their symptoms and ask the salesperson for a recommendation.  Shop keepers and flea market vendors become their de facto pharmacists.

3) If these efforts fail to provide relief, the next step is to visit the local Western-style pharmacy to purchase an over-the-counter medication recommended by a friend, neighbor, family member, or something the person has used before.

4) If a traditional healer is available, the person may seek treatment in exchange for a small fee.

5) Finally, after all avenues have been exhausted and the condition has worsened, they go to the clinic or emergency room.

As a Central Valley outreach worker commented: going to a doctor at an early stage is likely to require a series of tests which indigenous farmworkers view as an expensive waste of time.  Those who have been to doctors in Mexico prefer examinations that don't involve "a bunch of machines" and instead lead to a quick diagnosis and prescription. Since prescriptions are often antibiotics, some would just as soon skip the doctor visit and move straight to self-medication.   Antibiotics can be had at local flea markets or from someone who purchased them in Tijuana.  Injections are prized as a quick way to get results and many people are able to inject themselves or know someone who can do the injecting.

### VIII-4  Provider Perspectives

### VIII-4.1  A recent phenomenon

The appearance of Mexican indigenous patients in significant numbers caught the health care system off guard and unprepared.  Prior to the mid-1990s few providers distinguished indigenous patients from other Mexican immigrants, or had any background knowledge or training in how to deliver culturally-appropriate care.  A bilingual Family Nurse Practitioner at a community clinic in Oxnard reports only becoming aware of this distinct group around 1998, when she began to see patients who spoke little or no Spanish.  Ten years later half of her patients are Mixtec, and she and her colleagues have begun to see other indigenous groups including Zapotecs, Triquis and Amuzgos.

### VIII-4.2  Provider-patient communication gap

Even with an interpreter available to assist, providers who deal directly with indigenous patients describe the difficulty of interacting with people with very low levels of education, with limited exposure to western medicine and technology, and who hold entirely different notions of disease, its causation and its treatment.  Yet the challenges go beyond ones of language, terminology and worldviews.  Women, who account for the majority of indigenous patients, have limited knowledge of their own bodies and reproductive systems, have no vocabulary for many internal body parts, are extremely reticent about discussing matters of sex and reproduction, and are fearful of being touched by male providers.

### VIII-4.3  Reticence to speak up

Providers have noted that indigenous patients may not self-identify as indigenous or admit when they don't understand Spanish.  Providers find it frustrating when their indigenous patients profess to understand when in fact they do not.  This tendency not to admit being indigenous and to remain "invisible" has been attributed to the discrimination they have experienced in Mexico and in the U.S. at the hands of mestizos.[153]

### VIII-4.4  Lack of suitable educational material

Activists and outreach workers lament the lack of health education materials suitable for a barely literate population.  Particularly important are materials on contraception, the risks of teenage childbearing, information on prenatal care, and education about infant safety, given the dramatic differences between conditions in a remote village and those in modern urban America.  Most pamphlets produced by agencies are aimed at readers with an 8th grade education, but organizations that serve the indigenous report that women, who are most of their clients, left school after the 4th or 5th grade, and many are not literate in any language.  Pamphlets, even those featuring drawings and photos, have not proved effective, only the more time-consuming face-to-face communication has worked.  Some groups believe that informative video programs (on health matters and parenting) could be effective and could be played as DVDs in waiting rooms.  However the cost of this kind of effort has proved a constraint.

### VIII-4.5  Time, staffing and budget constraints

Caring for indigenous patients present a number of challenges from the perspective of providers, chief among them the strain it puts on already-stretched  resources.  A clinic administrator noted that while an appointment with a Spanish-only patient can take around 25 minutes, it can take 30-45 minutes to see an indigenous patient.  "There's a lot of hand holding required, it's a slow and time-consuming process," he said, noting the

---

[153] The Indigenous Community Survey found that among respondents who described a medical encounter for a serious condition, fifty-five percent said they had trouble understanding what was being said.  (71 out of 128)

extra staff time required to deal with paperwork.  Staff even have to take time to explain how to use public transportation so patients will return for follow up visits.  The administrator described how this can cause his staff to fall behind and to lengthen the patient wait times. While a solution would be to increase staffing and interpretation services, there is a shortage of family practitioners in the U.S., and a lack of qualified interpreters.  Additionally, these demands are coming at a time when clinics are facing severe budget cuts.

### VIII-4.6  Hiring interpreters

Whereas several clinic administrators expressed a desire to hire more indigenous interpreters, they described the obstacles they encountered when the candidates possessed no documents or social security numbers.  In one region, an administrator approached the Mexican Consulate, but found it was of little assistance, since it had no indigenous language resources or any connection to the indigenous immigrant community in its area.  Administrators who have sought the help of indigenous organizations for assistance and guidance in hiring interpreters described the frustration at what appeared to be conflicting agendas at work, with favoritism for those associated with the indigenous organizations emerging when there was a possibility of employment.  One health administrator likened working with indigenous leaders to the challenge of working with the Hmong refugee population, and spoke of the arduous and time-consuming effort to build bridges of understanding and trust across the cultural divide.

### VIII-4.7  Legal issues

Providers have described the quandary they face when they encounter cultural practices that are illegal in the United States.  In Section VIII-5.5 below we describe the legal problems that can emerge with underage teenage mothers, particularly where the father is a few years older and can be considered in violation of laws against statutory rape.  Our research did not collect systematic information about polygamy, but one provider reported seeing multiple cases.

### VIII-4.8  Male dominance

A number of providers express frustration at how indigenous men frequently insist on being present during a woman's medical visit, acting as interpreter and asserting control over provider-patient communication and decision-making.  Women's inferior status in Mexico persists when they come to the United States.  In many of the indigenous groups we encountered, women are expected to be submissive to men and not speak up for themselves.  Women's lack of power, combined with linguistic isolation and minimal education, prevents them from assuming control of their own bodies and can keep them trapped in abusive relationships.  Whereas perceptive providers would like to screen for domestic violence, they're reluctant to do so in the absence of culturally-appropriate intervention services.  (See Section VIII.5.6  below for additional discussion on domestic violence.)

### VIII-4.9  Building bridges

Providers serving the indigenous agree on the need to establish relationships with the indigenous communities in order to improve communication and deliver quality care. However, developing those relationships can be difficult and time-consuming, even for sympathetic providers.  With staffing shortages and budget cuts, primary care providers are stretched thin with heavy patient loads and lack the time to reach out and get to know the indigenous communities in their areas.  Nevertheless, there are a few promising initiatives that are attempting to bridge the cultural divide in innovative ways.

### VIII-5  Health concerns and needs

This discussion is drawn from interviews with key informants, including providers, community activists, members of the indigenous communities, as well as from field observations by our research team.  As such it represents the views of individuals familiar with indigenous farmworkers in California.  We have no data on the frequency of given health conditions, specific diseases or outcomes.  Data is not kept for minority Mexican language groups by county health departments.  As a result, we had no administrative information at our disposal to provide quantitative evidence of the disadvantages the indigenous face in California relative to other Mexican immigrants.

### VIII-5.1 Extreme crowding

In Section VII-4 we described the extraordinarily high rate of crowding among indigenous farmworkers.  Here we offer some first hand accounts of housing conditions encountered by our research team while conducting interviews.  We then go on to describe some of the health implications of these conditions, as expressed by providers we interviewed.

As shown in Chart VII-5, the Watsonville and Salinas regions present the highest rates of crowding:

> In Watsonville (Pájaro and Lomas) and Salinas we began interviewing families who live in garages or in small rooms without a kitchen, without a bathroom, without heat and with a single bulb for lighting.  These families had to ask permission to use the bathroom and the kitchen, and only according to a set schedule.
>
> ...
>
> We were struck by the lack of material possessions among the families from San Martín Peras.  We met families who offered us the only plastic chair they possessed.  In that house our interviewer had to conduct the interview while seated on a clothes basket and the interpreter sat on a plastic bucket.  The family sat on the floor.  On another occasion, we had to conduct the interview standing up

because they didn't have a chair, nor a table, nor a bed to
sit on.

In the crowded Ventura region, we observed the following:

> In Santa Paula and in Fillmore, in almost all the apartments
> where we conducted interviews we found several families
> or several single men living in the same apartment.  The
> families rent a room and the single men rent space on the
> living room floor.
>
> ...
>
> When Marbella was initially interviewed she only noted her
> own family and two cousins living in the household.  When
> we returned hoping to interview the cousins, we found that
> another couple and their children were moving into the
> house.  We also learned that the two cousins were living in
> the garage.

In Santa Maria we encountered the following extreme situation:

> We interviewed a woman last night who lived in an
> ordinary-looking 1930s suburban house with a detached
> garage in back.  She informed us that in addition to herself
> and her two young daughters there were another 38 people
> living at the address.  There were 19 kids, 16 solo males
> (10 living in the garage), plus 6 women and only one
> bathroom.  The men bathe in back with the garden hose.
> The woman told us she is looking for another place and
> hopes to move out soon.

And in the Bakersfield region:

> While in Taft I interviewed a woman and noted
> cockroaches moving about on the floor and on the wall
> behind her.  No one mentioned them, nor made any
> complaints about the apartment.  There are three couples
> living in the apartment.  Two couples sleep in the bedroom
> upstairs and the third couple sleeps in the living room.  The
> apartment is fairly new and appears to have working
> appliances and faucets.  The bathroom is in a poor state of
> repair.
>
> ...
>
> We realized there was fear we would discover how many
> people are living in a house, apartment, room or garage
> because people are afraid that if it's known, someone might

come to evict them, i.e. the owner, the manager, the city or
some other authority.  We were able to speak with the
owner of some apartments who told us that he's found up
to 15 people living in a single apartment, but "for security
and for their own good" he's established a rule of a
maximum of 10 per apartment.

People gave a variety of reasons for enduring such crowded conditions, including the
high cost of rent and the desire to save and send as much money as possible to their
families in Mexico.   Providers, for their part, expressed great concern over the health
implications of poor housing conditions, including:

1) *Lead exposure:*  they're seeing contamination in 4-5 year old children who
   are living in garages.[154]

2) *Infectious diseases:*  a Family Nurse Practitioner in Ventura reports that
   RSV (Respiratory Syncytial Virus Infection) is a serious bronchial
   infection in young children.  It sweeps through the community every
   winter and is exacerbated by close living conditions.  A local pediatrician
   estimates that Ventura County has several hundred cases each year that are
   serious enough to require medical attention, including some 50
   hospitalizations.  Of these, some of the children are so sick that they must
   be transferred to the pediatric intensive care unit in Santa Barbara where
   they are intubated.  The  practitioner notes that RSV affects poor and
   crowded communities disproportionately.  She describes it as a close-
   contact disease similar to tuberculosis and fears that one day TB will
   spread in a similar way through the community.

3) *Epidemiological risk:* the same provider noted that this is a non-
   immunized population; if someone gets measles, a very serious disease in
   adults, it can spread through the entire population.

4) *Poor nutrition:*  from November through January[155] there's no work and
   people are under considerable pressure to pay the rent and so they cut back
   on food; one outreach worker reported seeing families that were only
   eating eggs and beans.  Other observers have noted a high consumption of
   junk food, candy and soft drinks.

5) *Food preparation & storage*:  under crowded conditions it is difficult to
   gain access to the kitchen, which limits the ability to prepare healthy food;
   food storage space is restricted when several families share one
   refrigerator.

---

[154] See footnote 129 for other suspected sources of lead contamination.
[155]  In the ICS, this time period was identified by a majority of  informants in response to a direct question
asking for the period of no work.

6) *Reliance on unhealthy processed foods:* packaged and highly processed foods are more convenient to store and consume in highly crowded situations; additionally they are a cheaper form of calories and are favored by children who are accustomed to seeing advertisements on TV.

7) *Sanitation:* plumbing systems are not designed to handle the large number of people sharing the same facilities. One physician described seeing a lot of skin problems in children, attributing it to poor hygiene.

8) *Delayed childhood development:* several providers, all working independently and at separate facilities, report seeing large numbers of indigenous children with delayed speech and delayed overall development, even when no other medical problems are present. They attribute it to a lack of infant stimulation. They speculate that in crowded and substandard living situations infants are not placed on the floor and suffer from a lack of "tummy time." Due to a lack of space, children are not able to benefit from the important crawling phase of development, and without physical-muscular stimulation they fail to develop muscle tone. Also, with both parents away working, babies are often left in the care of older women and, with too many children to look after, nutrition is poor and infants are kept restrained for long periods of time.

9) *Family Separation:* Crowding has led neighbors and others to call Child Protective Services; this results in encounters that are frightening and confusing for indigenous parents who are at risk of losing custody of their children. Agency personnel, lacking interpreters and resources to deal with the indigenous population, also find these situations extremely frustrating and difficult to resolve in a humane manner.

10) *Domestic violence (DV):* providers in many of the regions believe DV is exacerbated by multiple families living in the same unit.

### VIII-5.2 Isolation and depression among women

Frontline providers, including nurses, outreach workers and community activists, report that post-partum depression is a serious condition among indigenous women. As a Mixtec interpreter on the Central Coast described it:

> Women will cry by themselves; they don't want to breast feed, or they don't want to stay with their partner; they just want to withdraw. I think it's because they're away from their village, they're alone and can't drive. They're often not close to a park, the husband is away and there's no transportation.

Another provider noted that the absence of traditional sweat baths and supportive communal rituals adds to the women's linguistic and cultural isolation, coming at a time

when they're already emotionally vulnerable.  Many of the mothers are also quite young (see section VIII-5.5 on teenage pregnancy below).

A clinic administrator on the Central Coast acknowledged that depression is a huge problem and that in 2007 they began screening pregnant women.  They've provided some mental health counseling, using interpreters as intermediaries, and he estimates that they were able to prevent at least ten suicides over the previous year.

A Family Nurse Practitioner in Ventura agreed that post partum depression is a serious problem that deserves more attention.  In her practice they attempt to address it in Well Baby classes where groups of eight mothers gather to meet with two outreach workers. They believe that the group setting is a culturally appropriate approach with indigenous women, instead of attempting individual mental health therapy.

In the Central Valley a community activist also agreed that post partum depression is a problem, but noted that the local health care agencies in the area make no effort to identify or address the problem.

### VIII-5.3  Mental health problems among men

Since indigenous men seldom approach clinics for help, it has been outreach workers who have noticed the problem of depression among these men who are lonely and far from home.  An unhealthy syndrome can take hold among men living on their own, be it in encampments, in crowded apartments, in garages or sheds.  They miss their families, they have unhealthy diets, there is a lack of recreation and exercise, and many turn to alcohol and drug use.  Their physical and mental health suffers and they can find themselves spiraling out of control.  A Mixtec outreach worker in San Diego reports seeing mental health problems among the men living in the canyons.  He described the men as profoundly sad and overcome with feelings of inferiority and impotence.

This sense of despair was echoed by an outreach worker at the other end of the state, on the North Coast.  He observes that newly-arrived indigenous men find it difficult to adapt, are easily exploited, and when they fail to achieve the goals they had set for themselves in coming here, the stress combined with little news from family leads to depression.  They start hanging out and drinking with friends, and their descent into alcoholism begins.

Activists report that alcohol consumption is resulting in multiple problems for the indigenous community.  They point out that alcohol consumption is culturally sanctioned, especially during fiestas, where binge drinking is common.  However, there is also considerable drinking during the week as well, yet consuming beer is not really viewed as "drinking."  Outreach workers note that driving while intoxicated is a serious problem resulting in DUI arrests, in auto accidents and in serious injury.  One of our interpreters informed us that Mixtec men in his area see nothing wrong with driving while intoxicated, even with women and children in the vehicle.  He and other indigenous activists believe there is an urgent need for education and outreach around this matter,

especially since the men are used to drinking and driving in Mexico where it is not censured.

Another condition afflicting indigenous farmworkers may be PTSD, or Post Traumatic Stress Disorder.  A mestizo outreach worker who comes into daily contact with Zapotec men searching for work, describes cases of severely traumatized men who are still suffering from the violence and abuse they experienced while crossing the border.  It is affecting their daily lives and the outreach worker believes they urgently need someone to talk to about it.  However, there are no Zapotec interpreters in the area.

### VIII-5.4  HIV/AIDS

While our study did not gather information on these conditions, interviews with providers and outreach workers revealed that there is considerable fear and misinformation regarding the disease, together with a strong resistance to the use of condoms.

Outreach workers in the Central Valley described indigenous men who were under the impression that contact with pesticides is what could lead to HIV/AIDS.   Others believed they could protect themselves by rubbing their penis with lemon following sexual relations.  And men who had contracted a venereal disease reported washing their penises with bleach.  Even those who were diagnosed with HIV described using bleach on their penises.

Efforts to encourage protective behavior have proved frustrating, these outreach workers report: "We have difficulty persuading our clients to use condoms, even when we provide them.  Men just don't want them, and that's it."

### VIII-5.5  Phenomenon of teenage pregnancy

All the providers we interviewed remarked on the very early age of pregnancy within this population.  The observation is supported by comparing the percentages displayed in Chart VIII-3.[156]   A quick examination shows that the median age for birth of first child for all California mothers is in the 20 to 24 year-old range, while for the indigenous women it is in the 15 to 19 year-old range.  In fact, for all of California, less than a quarter (24%) of the mothers were 19 or less at the time of birth of their first child, while for the indigenous mothers, more than half (56%) were 19 years old or less.

---

[156] This graph displays, first: the age of the 137 mothers from the Indigenous Community Survey (ICS), by different age groups, and second: the age of all California mothers for different age groups from CHIS data. The sample size in the CHIS for these women is approximately 15,000.  For details see: http://www.chis.ucla.edu/methodology.html



This early age of marriage and childbearing is deemed culturally acceptable within indigenous communities, and Mexican physicians serving in Oaxacan villages report that it is not unusual for young girls to give birth to their first child at age fourteen.  Women's health experts, however, warn that giving birth at such a young age can result in premature births and low birth weights, endanger the young mothers' health, and increase their risk for malnutrition, high blood pressure and anemia. Nevertheless, the girls often go on to bear a second child while still at a very young age, compounding health risks for themselves and their children.

What is culturally acceptable in their home context can place the indigenous on a collision course with norms, institutions and laws in the United States.  In the U.S. there are serious legal issues associated with being an underage teenage mother, especially if the father is a few years older and the girl is in the United States without her own parents nearby.  One provider has learned that in some indigenous communities a girl of 13 is considered ready to go out into the world, and that girls aged 13 and 14 are coming across the border, without a parent or close relatives, in order to look for work.[157]  This provider went on to describe what can happen when one of these underage and unaccompanied girls becomes pregnant by a man even just a few years older than her.  She told of a hospital where the nurses thought it their duty to call in Child Protective Services.  This has only served to compound the problem: the father is arrested and jailed, while the

---

[157] A Mexican regional newspaper *Imagen de Zacatecas*, reported an increasing number of unaccompanied minors crossing the border to the U.S., noting that in 2008 more than 19,000 of these unaccompanied children and  youth were deported to Mexico. It listed Oaxaca and Guerrero among the principal states of origin.  August 25, 2009. http://www.imagenzac.com.mx/migrantes/daran-apoyo-a-ninos-migrantes-deportados

young girl ends up frightened and alone in a strange country, with a new baby, unable to speak English or Spanish, and with no means of support.

Health workers describe a profound and unmet need for education around sexuality, the risks of teenage pregnancy, birth control and U.S. laws.  However, efforts to reach out to educate the community on these matters have encountered deep-seated cultural resistance.  One outreach worker, already sensitive to the reluctance Latino parents have towards discussing sexuality with their teens, reported making absolutely no headway with indigenous groups for whom the topic of sexuality is simply a taboo topic, and bearing children at a young age an accepted norm.

### VIII-5.6   Domestic violence

Outreach workers and health providers consider this a serious problem that is both hard to get at and has not yet been addressed.  It is a problem whose roots lie deep within indigenous communities and Mexican society where women have few rights and where violence against women is accepted as "the cross women must bear."

Activists working in Mexico report that while family violence is gradually being addressed in urban areas, it remains high within indigenous communities where, according to one estimate, it affects between 30 and 40 percent of adult women.[158] While we have no data regarding its prevalence in California, there is no question that this practice has crossed the border, and that it endures within indigenous households and causes considerable pain and suffering.

Paramount among the barriers to addressing this problem in California is the lack of a culturally-appropriate strategy.  Health workers encounter multiple cases of women who are victims of abuse by their partners, but find the women are unwilling to press charges against their abusers for fear of finding themselves in an even worse predicament when they are ostracized by both family and community.  An outreach worker described the case of an indigenous woman on the Central Coast:  she was unusual in that she sought help from a community organization and agreed to go into a shelter in order to escape her abuser.  However, once her time was up at the shelter and she had to move out, her entire community rejected her.

Consequently indigenous women who speak no English, and often only limited Spanish, are left with no alternatives but to remain prisoners of abuse.  A Central Valley service provider described the women victims she encountered as neither able to go to the police, nor to leave their husbands, because there simply was no place for them to go.

Some health providers have talked of screening their patients for domestic violence.  However, in the absence of culturally-appropriate programs and services, they see little point.  On the Central Coast one group has organized informational meetings to address a multitude of topics, including sexual assault and domestic violence.  The activist

---

[158] See the Family Violence Prevention Fund:
http://endabuse.org/section/programs/global_prevention/_project_context

spearheading this group reports that while the meetings are well-attended, there are many in the indigenous community who don't want to have anything to do with the organization out of fear that their women will become "uppity."  At present, providers and activists wishing to help indigenous women are constrained by the lack of appropriate counseling services, the lack of safe housing for those wishing to escape their abusers, and the inertia of a community that does not consider it a problem.

### *Afterword: Comparing Today and 20 Years Ago:*
#### *The Indigenous settle but harsh conditions remain.*

The migration of indigenous Mexicans to California began during the Bracero Program (1942-1965). It re-emerged after 1970, fueled in part by the recruitment of southern indigenous workers for the winter vegetable industry in Northwest Mexico, which grew rapidly in the 1960s due to the completion of irrigation projects in Sinaloa and Sonora and the displacement of winter vegetables from Cuba after the revolution. Stage migration to the United States via Northwest Mexico was the principal route through which individual village networks from southern Mexico came to migrate to the United States. Of course, once such migration was established, subsequent migration occurred directly from the sending village—and neighboring villages—to the U.S. destination. Starting in 1989, a project at the California Institute for Rural Studies (CIRS), funded by the Ford Foundation, began to research the extent of this migration and the living and working conditions of the migrants.[159] This research led to a dialogue with California Rural Legal Assistance, which created a program of indigenous outreach workers to assist the indigenous farmworkers in their own languages. It also led to an effort to identify and train interpreters for court proceedings. Finally, it provided assistance to the incipient organizational efforts of the migrants, helping them to gain access to institutional resources and philanthropic funding.   The current study, the IFS, has furthered these earlier efforts.

How has this population of migrants changed—with respect to their numbers and the working and living conditions they face—in the two decades that have elapsed? The earlier study focused on the Mixtecos, since they were the dominant group, though some data were gathered on other language groups. The current study shows that Mixtecos are still the dominant indigenous group working in rural California, accounting for an estimated 53 percent of indigenous Mexican farmworkers.[160]  However, it also shows that there are many other indigenous groups—speaking a total of 23 languages—including a sizeable Zapoteco population that accounts for 26 percent of those identified, as well as a significant Triqui presence of almost 10 percent. Though it was well known that there was a large Zapoteco population in urban Los Angeles, their presence in California agriculture was found to be small by the canvassers in 1991. And though the earlier studies found a few Triqui villages, at that time most of the migrant Triquis were working in Baja California, as they had not yet moved up into California to a significant degree in 1991.

In 1994, Runsten and Kearney, based on the 1991 canvass of many rural California regions, counted about 7,000 Oaxacan immigrants in 47 California towns from 201 Oaxacan villages.  The canvass allowed them to make an estimate of about 21,000

---

[159] Zabin, Carol, (Coordinator). 1992. *Migración Oaxaqueña a los Campos Agrícolas de California: Un Diálogo*. Current Issue Brief, 2. La Jolla: Center for U.S.-Mexican Studies. Zabin, et al. 1993. Runsten and Kearney 1994.

[160] Note that the current study, though seeking to encompass all indigenous immigrants from Mexico, still omits indigenous immigrant workers from Guatemala or other Latin American countries.

Mixteco farmworkers in California in 1991, along with 5,500 children, for a total of 26,000 Mixtecos in rural California.

In the current IFS study, we estimated that there were 53,600 indigenous immigrant farmworkers from the 342 towns where we actually collected population estimates from people who originated in these towns.  In addition, indigenous informants identified the names of 156 other indigenous villages with a presence in California agriculture, however these towns were identified without estimates of population and so they were left out of our state-wide population estimate.  Moreover, by comparing the hometown lists gathered in 1991 and 2008, we discovered another 100 towns that were found in 1991 but missed in 2008 entirely.   In total, then, there were over 250 towns that we knew had a presence in rural California but for which we did not have estimates.  This led us to conclude that our estimate based on the 342 towns for which we did have estimates could only be considered a partial estimate of the total population.
As a consequence, we turned to the twenty year old National Agricultural Workers Survey (NAWS) of the U.S. department of Labor to make estimates of the total population. Our resulting point estimates from the NAWS for indigenous farmworkers were 31,800 in the 1991-95 period and 117,850 for the 2004-2008 period (See Appendix III for details).  These are very consistent with the estimates from the canvassing done in 1991 by the CIRS and the count made in 2008 by the current IFS research.   The estimates confirm a rapid growth over these two decades.

There has also been a clear increase in the proportions of women and children in this population—from 17 and 22 percent, respectively, in 1991, to 25 and 35 percent in 2008—which would be expected as the population becomes more settled in California. Including the children, we estimate that there are at least 165,000 indigenous immigrants in rural California, originating in about 600 Mexican towns and villages.   Comparing the data gathered in 1991 and in 2008 confirms the anecdotal evidence that U.S.-bound migration has spread to hundreds more indigenous villages, involving many more language groups.

Turning to wages and working conditions in California agriculture, the earlier studies found that the indigenous had more short-term jobs, were more likely to migrate for work, were more likely to experience non-payment or underpayment of wages, and were subject to more side payments—such as paying for rides or tools—than were mestizo Mexican farmworkers. This appears to have changed little, as agricultural labor market conditions deteriorated in the 1980s and have remained depressed.

- In 1991, the indigenous workers interviewed reported being paid less than the minimum wage in 25% of their jobs during the prior year, and 47% had at least one job that paid less than the minimum.  In 2008, 33% were being paid less than the minimum wage in their current job. Although the minimum wage has risen, the respect for it has not.

- In both 2008 and in 1991, the indigenous were found to be facing harsh working conditions, such as being required to pay for rides to work.  In 1991, 28% of the

indigenous said they had to pay for a ride to work from their employer as a condition of their job.  In 2008, 25% paid for such a ride

- In 1991, 26% of the indigenous surveyed said they had not been paid in at least one job. In 2008, of the indigenous surveyed who mentioned a legal complaint, 27% cited non-payment or underpayment of wages.

The indigenous farmworkers are still occupying the jobs at the bottom of the labor market, the short-term tasks or the most labor-intensive tasks, such as harvesting, hoeing, pruning, and thinning. Their increased presence has manifested itself in a spreading out across the geography of California agriculture, occupying these tasks in more and more areas. For example, while the indigenous were a small part of the work force in Watsonville strawberries 20 years ago, now the indigenous are the dominant labor force there, just as they were already the dominant group in Santa Maria strawberries in the earlier period. Their presence in strawberries has no doubt made possible the continual expansion of California strawberry acreage in recent decades. The crops that they work in—grapes, strawberries, citrus, vegetables, tomatoes, tree fruit—are the very same crops that have been seeking a constantly replenished labor force for many decades.

**Bibliography**

Alcalá, E. y T. Reyes Couturier. Migrantes Mixtecos: El Proceso Migratorio de la Mixteca Baja. México: INAH, 1994.

Aguilar Rivera, José Antonio "El Fracaso Multicultural de Oaxaca,"  Oaxaca: 2008, http://www.nexos.com.mx/?P=leerarticulo&Article=128

Avila, Elena, and Joy Parker. *Woman Who Glows in the Dark.* New York: Tarcher/Putnam, 1999.

Bacon, David. *Illegal People: How Globalization Creates Migration and Criminalizes Immigrants.* Beacon Press, 2008.

Bade, Bonnie. *Mixtec Health Care in California.* Berkeley, CA: CPAC, 1993.

Bade, Bonnie, Dissertation, "Sweatbaths, Sacrifice, and Surgery: The Practice of Transnational Health Care by Mixtec Families in California." Riverside: University of California at Riverside, 1994

Bade, Bonnie Sweatbaths, Sacrifice, and Surgery: The Transmedical Health Care of Mixtec Migrant Families in California, Doctoral Dissertation, Riverside: University of California, 1994.

Bade, Bonnie. "Contemporary Mixtec Medicine: Emotional and Spiritual Approaches." *Cloth and Culture* Grace Johnson and Douglas Sharon eds. San Diego Museum Papers No. 32. 1994.

Bade, Bonnie. "Contemporary Mixtec Medicine: Emotional and Spiritual Approaches." Unpublished, 1995.

Bade, Bonnie "Is There a Doctor in the Field? Underlying Conditions Affecting Access to Health Care for California Farmworkers and their Families" California Policy Research Center, University of California Office of the President, California Program on Access to Care 2000.

Bade, Bonnie. "Alive and Well: Generating Alternatives to Biomedical Health Care by Mixtec Migrant Families in California." In *Indigenous Mexican Migrants in the United States*, edited by Jonathan Fox and Gaspar Rivera-Salgado, 205-247. La Jolla: Center for U.S.-Mexican Studies and Center for Comparative Immigration Studies, University of California, San Diego, 2004.

Bade, Bonnie  "La practica de la medicina transcultural de los migrantes mixtecos en California," *La ruta mixteca: el impacto etno-politico de la migracion transnacional en*

*las poblaciones indigenas de Mexico*, Stefano Varese, ed., Mexico: Consejo Nacional para la Cultura y las Artes 2005.

Bade, Bonnie Mixtec Medicine for Health Service Providers DVD, Report for The California Endowment 2008.

Besserer, Federico. *Topografías Transnacionales.* México: Universidad Autónoma Metropolitana, 2004.

Besserer, Federico, y Michael Kearney. *San Juan Mixtepec: Una Comunidad Transnacional.* México: Universidad Autónoma Metropolitana, 2006.

Borah, Woodrow Wilson. *New Spain's Century of Depression.* Berkeley: University of California Press, 1951. 58 pp.

Caballero, Juan Julian. *Bases para la Escritura de Tu'un Savi.* Oaxaca: Academia de la Lengua Mexicana, 2007.

Clark Alfaro, Victor. "Los Mixtecos en la Frontera (Baja California)." *Cuadernos Sociales* 4, n° 10 (1989).

Cohen, Jeffrey H. *Cooperation and Community; Economy and Society in Oaxaca.* Austin: University of Texas Press, 2000.

Comisión Nacional para el Desarrollo de los Pueblos Indígenas, "Indicadores Sociodemográficos De La Población Indígena 2000-2005," (powerpoint) September, 2006

Cook, Sherburne, and Woodrow Borah. *Essays in Population History: Mexico and the Caribbean.* Vol. One. Berkeley: University of California Press, 1971.

Cornelius, Wayne A., and et al. *Migration from the Mexican Mixteca: a transnational community in Oaxaca and California.* La Jolla: Center for Comparative Immigration Studies, University of California, San Diego, 2009.

Edinger, Steven T. *The Road from Mixtepec.* Fresno: Asociación Cívica Benito Juárez, 1996.

Eisendstadt, Todd A., and Cathryn Thorup. *Caring Capacity versus Carrying Capacity: Community Responses to Mexican Immigration in San Diego's North County.* La Jolla: Center for U.S.-Mexican Studies, University of California, San Diego, 1994.

Fernández, Patricia, Juan Enrique García, and Diana Esther Ávila. "Estimaciones de la población indígena en México." *La situación domográfica de México, 2002.* CONAPO. http://www.conapo.gob.mx/publicaciones/sdm/sdm2002/13.pdf (accessed September 25, 2009).

Fox, Jonathan, and Gaspar Rivera-Salgado, . *Indigenous Mexican Migrants in the United States.* La Jolla: Center for U.S.-Mexican Studies and the Center for Comparative Immigration Studies at the University of California, San Diego, 2004.

Gabbard Susan, Edward Kissam, James Glasnapp, et al. "Identifying Indigenous Mexicans and Central Americans in Survey Research*," Meetings of the American Association of Public Opinion Research*, New Orleans:16 May 2008

Gabbard, Susan, Edward Kissam, and Philip Martin. "The Impact of Migrant Travel Patterns on the Undercount of Hispanic Farm Workers." *Proceedings of the Bureau of the Census Research Conference on Undercounted Ethnic Populations.* Richmond, Virginia: 1993.

Garduno, Everardo, Patricia Moran, and Efraín García. *Mixtecos en Baja California: el caso de San Quintín.* Mexicali: Universidad Autónoma de Baja California, 1989.

Gil, Rocío. *Fronteras de Pertenencia (Santa María Tindú).* México: Universidad Autónoma Metropolitana, 2006.

Handley, Margaret A., and et.al. "Globalization, Binational Communities, and Imported Food Risks: Results of an Outbreak Investigation of Lead Poisoning in Monterey County, California." *American Journal of Public Health* 97, no. 5 (May 2007): 900-906.

Handley, Margaret A., and James Grieshop. "Globalized migration and transnational epidemiology." *International Journal of Epidemiology* 36, no. 6 (2007): 1205-1206.

Hirabayashi, Lane Ryo. *Cultural Capital: Mountain Zapotec Migrant Associations in Mexico City.* Tucson: University of Arizona Press, 1993.

Jacobs, Ilene, and Edward Kissam. "Census 2000 Undercount of Immigrants and Farmworkers in Rural California Communities." Report to the California Endowment, August., 2001.

Kearney, Michael "Integration of the Mixteca and the Western U.S.-Mexico Region via Migratory Wage Labor, Regional Impacts of U.S.-Mexican Relations," *Monograph Series no. 16.* Center for U.S.-Mexican Studies, San Diego: University of California 1986.

Kearney, Michael, and Federico Besserer. "Oaxacan Municipal Governance in Transnational Context." In *Indigenous Mexican Migrants in the United States*, edited by Jonathan Fox and Gaspar Rivera-Salgado, 449-466. La Jolla: Center for U.S.-Mexican Studies and the Center for Comparative Immigration Studies at the University of California, San Diego, 2004.

Kearney, Michael and Carole Nagengast Anthropological Perspectives on Transnational Communities in Rural California" Davis, Calif: California Institute for Rural Studies 1989.

Kiy, Richard and Chris Woodruff, (eds.) *The Ties that Bind.* San Diego: Lynne Rienner, 2005

Larson, Alice C. *Migrant and Seasonal Farmworker Enumeration Profiles Study-California.* Washington, D.C.: Migrant Health Program, Bureau of Primary Health Care, Health Resources and Services Administration, Department of Health and Human Services, Sept. 2000.

Lewis, Jessa, and David Runsten. "Is Fair Trade-Organic Coffee Sustainable in the Face of Migration? Evidence from a Oaxacan Community ," *Globalizations*, 5:2, pp. 275 — 290, 2008

Lomnitz, Larissa. *Como Sobreviven los Marginados.* México: Editorial Siglo XXI, 1989.

Lopez, Felipe, and David Runsten. "Mixtecs and Zapotecs Working in California: Rural and Urban Experiences." In Jonathan Fox and Gaspar Rivera-Salgado, (eds.), *Indigenous Mexican Migrants in the United States.* La Jolla: Center for U.S.-Mexican Studies, University of California, San Diego, 2004.

Martinez, Konane, David Runsten, and Alejandrina Ricardez. "Salir Adelante: Recent Mexican Immigration in San Diego County." In Richard Kiy and Chris Woodruff, (eds.) *The Ties that Bind.* San Diego: Lynne Rienner, 2005

Massey, Douglas S., Luin Goldring, and Jorge Durand. "Continuities in Transnational Migration: An Analysis of Nineteen Mexican Communities." *American Journal of Sociology* 99, no. 6 (May 1994): 1492-1533.

Melville, Elinor G.K.  *A Plague of Sheep: Environmental Consequences of the Conquest of Mexico*, London: Cambridge University Press, 1994.

Mines, Richard. *Data on Crops, Employment and Farmworker Demographics: A resouce for California Rural Legal Assistance.* San Francisco: California Rural Legal Assistance, February 2006.

Mines, Richard, and Ricardo Azaldúa. "New Migrants vs. Old Migrants: Alternative Labor Market Structures in the California Citrus Industry." La Jolla: Program in U.S. Mexican Studies, University of California, San Diego, Monograph no. 9, 1982.

Navarrete Linares, Federico. *Los pueblos indígenas de México.* México: Comisión Nacional para el Desarrollo de los Pueblos Indígenas, 2008. http://www.cdi.gob.mx

Nichols, Sandra L. *Santos, Duraznos y Vino. Migrantes mexicanos y la transformación de Los Haro, Zacatecas y Napa, California.* México: Universidad Autónoma de Zacatecas, 2006.

Oliver Ruvacalba, Daniela, y C. Torres Robles. *Desarrollo y Bienestar en San Juan Mixtepec.* Mexico: Universidad Autónoma Metropolitana, 2006.

Paris Pombo, María Dolores. *Conformación de los Circuitos Migratorios de la Región Triqui Baja a California.* Oaxaca: Instituto Welte, 2004.
Posadas Segura, Florencio. *Movimientos Sociales de los Trabajadores Agrícolas Asalariados en el Noroeste de México 1970-1995.* Culiacán: Universidad Autónoma de Sinaloa, 2005.

Rivera-Salgado, Gaspar, and Luis Escala Rabadán. "Collective Identity and Organizational Strategies of Indigenous and Mestizo Mexican Migrants." In *Indigenous Mexican Migrants in the United States*, edited by Jonathan Fox and Gaspar Rivera-Salgado, 145-178. La Jolla: Center for U.S.-Mexican Studies and the Cetner for Comparative Immigration Studies at the University of California, San Diego, 2004.

Runsten, David, and Michael Kearney. *A Survey of Oaxacan Village Networks in California Agriculture.* Davis, CA: California Institute for Rural Studies, 1994.

Skoufias, Emmanuel, Trine Lunde, Harry Anthony Patrinos, et al, *Institutional effects as determinants of learning outcomes : exploring state variations in Mexico*, Washington, D.C.: World Bank Working Paper, 2007

Sack, Kevin. "Illegal Farm Workers Get Health Care in Shadows," *New York Times*, May 10, 2008.  Link:
http://www.nytimes.com/2008/05/10/us/10migrant.html?scp=1&sq=curandera%20central%20valley%20california&st=cse

Smith, Robert. *Mexican New York: Transnational Lives.* Berkeley: University of California Press, 2005.

Smith, Robert, "Los Ausentes Siempre Presentes," Doctoral Thesis, New York: Columbia University, 1994.

Stephen, Lynn. *Transborder Lives.* Durham, N.C.: Duke University Press, 2007.

Terraciano, Kevin, "The Colonial Mixtec Community," *Hispanic American Historical Review* 80:1, 2000  1-42

Varese, Stefano, and Sylvia Escárcega. *La Ruta Mixteca: el impacto etnopolítico de la migración trasnacional en los pueblos indígenas de México.* México, D.F.: Universidad Autónoma de México, 2004.

Velasco Ortiz, Laura. *Mixtec Transnational Identity.* Tucson: University of Arizona Press, 2005.

Velásquez C., María Cristina. "Migrant Communities, Gender, and Political Power in Oaxaca." In *Indigenous Mexican Migrants in the United States*, edited by Jonathan Fox and Gaspar Rivera-Salgado, 483-494. La Jolla: Center for U.S.-Mexican Studies and the Center for Comparative Immigration Studies at the University of California, San Diego, 2004.

Villarejo, Don, M. Schenker, A. Joyner, and A. Parnell. "Unsafe at home: the health consequences of sub-standard farm labor housing." Unpublished.

Wolf, Eric. "Closed Corporate Communities in Mesoamerica and Java." *Southwestern Journal of Anthropology* 13 (1957): 1-18.

Zabin, Carol, Michael Kearney, Anna Garcia, David Runsten, and Carole Nagengast. *Mixtec Migrants in California Agriculture: A New Cycle of Poverty.* Davis, CA: California Institute for Rural Studies, 1993.

Zabin, Carol, (Coordinator). 1992. *Migración Oaxaqueña a los Campos Agrícolas de California:  Un Diálogo.* Current Issue Brief, 2. La Jolla: Center for U.S.-Mexican Studies

**Appendix 1-Sources of Data for the Indigenous Farmworker Study (IFS) project**

1.      Sources outside the IFS:

One source used extensively was the Mexican Census that is found at this website: (http://www.inegi.org.mx/est/contenidos/espanol/sistemas/conteo2005/localidad/iter/default.asp?c=9448) The Census allowed us to check the validity of the towns of origin that we acquired in the Hometown Count done in late 2007.  In addition to checking the veracity of the places, the Census allowed us to verify the population, education level, proportion indigenous speakers and many other variables about the hometown.   We also used numbers from the census as a parameter in estimating population of settlers from each network.   The methods for this estimate are described below.   The U.S. Census was used for comparative numbers regarding the issue of crowding in housing.

Next we used a wealth of anthropological and historical literature about Oaxaca and Mexican indigenous immigration that is found in the bibliography, below.  This literature was written by both U.S. and Mexican scholars.   The literature was used particularly in the chapters on history (Section II) and in the health care section (VIII).  In both cases original data collected by the IFS was combined with literature sources to paint as complete a picture as possible.

In addition, we used existing surveys for comparative purposes.   The California Health Interview Survey (CHIS) was used as a comparison data set for the use of medical care and coverage of health insurance.  With this benchmark, we could compare data we obtained for indigenous farmworkers with Californians in general.

We also used the National Agricultural Workers Survey (NAWS) that allowed us to compare a proxy for indigenous farmworkers with non-indigenous farmworkers.   We chose people who originate in a few southern states to represent the indigenous farmworker population because we know that a large proportion of these southerners are indigenous while the vast majority of people from the rest of Mexico are not indigenous but rather mestizo (non-indigenous) people.  Farmworkers from the states of Campeche, Chiapas, Guerrero, Oaxaca, Puebla, Tabasco, Veracruz, and Yucatan were considered a proxy for indigenous.  All others (Rest of Mexico) were used as a proxy for non-indigenous.   The NAWS asks people to identify their racial origin.  Of those that respond with a racial category, 56% of Southerners and 11% of people from the rest of Mexico respond that they are indigenous.  Although this self-identification variable may have validity issues, the fact that five times as many in the south self identify as indigenous as compared to the rest of Mexico, in our view justifies the use of southerners as a proxy for the indigenous.  We recognize that the comparisons we make are diluted since neither the South nor the Rest of Mexico are purely indigenous and mestizo respectively.   Comparisons were used in chapters on income and assets, on living conditions, on health care access among other places in this paper.  It is likely that the contrasts shown would be even starker if somehow a 'pure' indigenous population could be compared to 'pure' non-indigenous one.

2.      Indigenous Farmworker Study Sources:

As discussed in the paper, the indigenous communities are difficult to study because of the mistrust of outsiders.  In light of these challenges, the IFS undertook a gradual process of building trust with the communities and devised a stepwise method of data collection.  The first step was to do a count of the sending towns in the universe.  A second step was to follow up with key informant in-depth interviews with leaders of a few dozen networks.  Following this we visited the hometowns and daughter border settlements in Mexico to win the trust of town authorities.   Next, we conducted a sit-down survey with about 40 members in each of 9 representative communities.   And, finally we did interviews with service providers to acquire their point of view.   Below, we detail the methods used in each step.

   a.      **The Hometown Count**

First we did a census-like count of hometowns of Mexican indigenous workers in California agriculture.  We trained 6 indigenous-speaking California Rural Legal Assistant Community Workers to carry out the census.  In addition, we trained 25 other indigenous speakers of several languages to help with the count.  These others were also service workers for other agencies.  They were instructed to collect information only for hometowns where an indigenous language was spoken and where some members of the community were farm workers in California.  The interviewers went to social service agencies, parks, restaurants, churches, community centers, schools and other public places to find indigenous workers.   Each interviewer was limited to doing one interview (count) per hometown.  Since people from the same town were questioned by different interviewers some towns had more than one informant.  The Hometown County collected information on the location and language of the hometown, the 3 major settlement areas in California and the name of a key informant from that town.   In addition, the respondent was asked to identify three other indigenous Mexican towns with a presence in rural California.   We identified networks originating in 347 Mexican localities across California, which included population estimates to identify the size and distribution of the universe in California.   In addition, we collected the names of another 151 towns where we did not get population estimates.

The interviewers worked in most of the major settlement areas including the areas near San Diego, Ventura, Santa Maria, Salinas, Santa Rosa, Bakersfield, Arvin-Lamont, Taft, Visalia, Fresno, Madera and Merced.  A discussion of the population estimate for 342 of these Mexican towns is included below.

   b.      **Community Sample**- **The Survey of Key Informants (SKI)**

Our next activity was to do interviews with community representatives from 67 sending towns, in order to get more in-depth information from which we could narrow our search for representative case study communities and deepen our understanding of indigenous farmworker migration.  In the winter and spring of 2007-2008, the IFS chose 67 representative towns including the major language groups, places of origin and

110

destinations in California and did a ***Survey of Key Informants*** with a representative (or two) of each community.   They were done in all the major settlement areas of rural California.   For these interviews, the interviews were conducted by a lead interviewer (i.e. Rick Mines, Sandra Nichols and Anna Garcia) accompanied by an indigenous-speaking co-interviewer.   The survey gathered community level data from the community leaders about jobs, U.S. and Mexican migration destinations (including the periods of outflows), and use of services by the network and the importance of community institutions.

### c.      Choice of Communities for the case studies and visits to Mexico.

The next step was for the three lead interviewers (Mines, Nichols and Garcia) to visit first the border settlement areas and then the hometowns of prospective case study areas. Working from the list of the 67 towns for which deeper data were available from the Survey of Key Informants, the IFS staff selected 15 promising towns that were representative of the major sending and receiving areas.   The staff used various factors to choose representative towns.  The towns were chosen to include new, intermediate and settled communities.  They included a variety of sending areas and included all the different receiving areas and crop types in California.

The three lead interviewers divided up the locations to visit in Baja California, Michoacán, Guerrero and Oaxaca.  In each case, they attempted to get permission from the hometown authorities to conduct a survey of their *paisanos* in California.  In 9 of the towns, representing two states (Oaxaca and Guerrero), four languages (Zapoteco, Mixteco, Triqui and Chatino), and a distribution across all the California receiving areas, a rapport was established with the authorities and community members.  These nine towns were chosen for the final survey.

### d.      The Indigenous Communities Survey (ICS)

From July to December, 2008, a detailed sit-down survey in the nine communities was carried out.   The survey gathered information about demography of the family, migration history of the respondent, housing arrangements, employment conditions and health care utilization.  The survey used universe lists (as best as could be obtained) of all people from the town living in California agricultural areas.   Then, a selection technique was instituted for each town to include representative proportions of men and women, of old and young, of the unmarried, and of people with spouses and families in Mexico and those with their families in the United States.   This procedure guarantees a representative distribution of interviewees.  We did an average of over 40 interviews per community and collected 400 interviews in total.

*Selection of Interviewees:*

The selection process of the interviewees was originally planned as a random process but in practice this proved impossible to achieve.   The suspicion in the community allowed only for a systematic representative sample but not a random selection process.  First, we

collected for each of the nine towns (and for other towns not in the final selection) universe lists of all the households in California from each town.  These lists were collected both in Mexico and California by a constant gathering and checking of names on the list by the interviewers.  The universe list included gender, age, and location of spouse, and town of residence in California.

The interviewees were given detailed instructions about how to use the interview list. They were allowed to snowball (in a limited way) through the list by obtaining the recommendation of one interviewee to gain access to the next interviewee.  There were systematic restrictions and guidelines to this method.  The interviewers were required to not go beyond 5 referrals from one starting (or referral) point.  Afterwards, they had to return to the list and start over again.  All interviewees, of course, were required to have been raised in the hometown (one of the nine) which was the focus of the interviewer. Interviewers focused on interviewees of one town only until they finished all the interviews from that town.  All interviewees had to be 16 years of age or older.   No two interviewees could be from the same nuclear family.  They could be adult siblings but not from the same family budgetary unit.  Since there were at times families from the same village living together at the same address, the interviewers had to be extremely careful not to interview two people from the same budgetary unit at a given address.  Recall that at times siblings each with their own family and budgetary unit lived at the same address. These siblings could both be eligible for the survey if they met the target criteria explained below.

In order to assure a representative selection from each community, a detailed Criteria Target Chart was established for each community.   The lead interviewers (Mines, Nichols, and Garcia) managed these charts so that a representative sample could be guaranteed.   Overlapping targets were designed for each community so that the proper proportion of old and young, men and women and unaccompanied and accompanied spouses and single interviewees were included.  The proportions were calculated from the universe list for each community.  The interviewees had to constantly refer back to their Criteria Target Chart to make sure that the targets were achieved for each community.

| **Target Criteria Chart**: Community of 200 with a sample of 50. | | |
|---|---|---|
| **Numbers:   Criteria 1a y 1b total 100% (married, place of spouse)** | | |
| | Women | Men |
| Married with spouse in home | 20 | 12 |
| Married with spouse in hometown | 1 | 7 |
| Single living with parent | 1 | 4 |
| Single and independent | 4 | 1 |
| total | 25 | 25 |
| **Criteria 2  total 100% (age)** | | |
| 16-24 | 10 | |
| 25-39 | 30 | |
| 40+ | 10 | |
| total | 50 | |

You can see in the chart above that 50 interviewees will be chosen for this town.  Half will be women and half men.  Among the women, 20 will be living with their husbands

in the United States, one will have her husband in the Mexican hometown, one will be living with her father, and four will be living independently in California.   For the men, more will be men whose wives are in Mexico. Overall, ten will be in the youngest category, 30 in the middle age category and 10 in the oldest age category.   The supervisors kept a strict control so that the interviewers stayed faithful to their Target Criteria Charts.   Depending on the universe list of the hometown the criteria showed slight variations in categories.

It should be noted that a detailed coding scheme was created to allow the data analyst to avoid double counting any individual.  At the time of analysis, a special data set was created with 345 addresses (encompassing 400 households) and a review of each individual on the lists was undertaken to assure that no duplication occurred.

     e.    **Provider Interviews**

Finally, during the winter of 2008-2009 and spring of 2009, we conducted provider interviews in seven of the indigenous settlement areas and some at the California State level.   In total, 47 interviews were done with doctors, nurses, community workers, health advocates, administrators of programs, and directors of agencies.   The protocols were administered in an open ended manner.  However, the background of the interviewee and the experiences and attitudes were recorded.  Special attention was given to the challenges and successes achieved by the interviewees with their indigenous clients.

**Appendix II.  The Network Approach to data gathering and Analysis**

In Section III in the paper above, we introduced the Network Approach in some detail and described some of the traits as they apply to our nine case study communities. Below, we provide a detailed juxtaposition of the nine communities so that providers and community leaders can be armed with evaluation methods for distinguishing among hometown networks.

>   *A.        A Systematic Comparison of Nine Communities*

Again, the migration traits of immigrant networks are closely related to the age of the network (median year of arrival) but other factors are equally important.   We have grouped these other factors into four main issues.  Listed in Table B-1, these are: time spent in the United States, whether nuclear family is in the Mexico, cultural assimilation back in Mexico to the larger society, and assets held in California.

For each factor, we have devised measures of 'network maturity' that we can use in comparing the nine hometown networks with precision.  By explaining how these nine communities compare across these factors, we hope to communicate to the reader how to apply the same principals of examination to any of the large universe of hundreds of these hometown networks that one confronts in California.

| Table B-1.   Ways to Compare Indigenous Immigrant Networks | |
|---|---|
| *Time spent in the US* | |
| median age | Percent of adult life spent in Mexico |
| *Whether the nuclear family is in Mexico* | |
| percent of all children resident in Mexico | percent who are married and accompanied by spouse |
| *Cultural assimilation back in Mexico* | |
| percent who speak native language to children | Average Years of School 18 to 25 years old |
| *Asset  Held in California* | |
| Percent who own Car in the US | |

Each measure will be probed by comparing communities in the section below.  But first, let us look at the relative importance of the age of the network.  It is true that the date of arrival of most of the people (median year of arrival) from each town is crucial in figuring out how easily its people may adapt to U.S. institutions and how amenable they may be to self-help efforts by community leaders.  However, the other factors outlined in Table 2 above are also vital determinants of the adaptive capacity of communities.

In Chart B-1, we simply give you an overview of how these other factors can have huge impacts as well.  We have standardized the other seven factors shown in Table 2 relating to time spent in California, ties to the home community, assimilation in Mexico and assets in California into one summary measure.   The horizontal axis in Chart B-1 simply shows the median year of arrival of people living in California from each of the nine communities.  Cuevas has the oldest settlement (median 1992) while Candelaria the newest (median 2004).   The vertical axis measures how well adapted the communities are with respect to the other seven factors summed up into one measure.  A higher

number on the vertical axis simply means that the community is more adapted, while a lower number means it is less adapted.[161]  In this way, Tepos (at 10) is the most adapted regarding these seven factors while Loxicha (at -8) is the least adapted community.   This chart is meant to show, in an overall way, that time of arrival is important but not necessarily decisive regarding how "settled" the communities are.  We need to look at other factors as well.



In general, there is an association of time in the country and the other factors on Chart B-1—namely, the earlier the bulk of the community arrived the more "settled" it is.  However, two communities stand out as being "out of synch" with the chart—Piñas and Candelaria.

Despite the fact that San Juan Piñas is an early-arriving community (1995), it appears low on the standardized measure of settlement ('-2' on Chart B-1).  Like other early arriving communities, the median age of the adults in the community is relatively high (33 years of age).   People have been coming a long time.  But, despite its longevity, the community has not matured into a typical long term settled pattern like Tepos or Cuevas. The majority of the people have not brought their spouses and children; and the

---

[161] For each of the seven factors, the communities were compared in a standardized manner.  The higher the median age, the lower the percent of time spent in Mexico, the lower the percent of children resident in Mexico, the higher the percent of residing-together spouses, the lower the percent of native language speaking, the higher the level of education and the higher the percentage of car ownership were all scored as showing a more adapted community.   The mean for each measure is zero so that the average community scores zero.  Each of the seven factors was given an equal weight and the seven were summed to create the "degree of settlement" measure.

immigrants go back and forth to Mexico frequently from Piñas.  We do not know why the community did not put down deeper roots.  Perhaps the relatively low educational level of the town, limited Spanish fluency and its remoteness from the main highways leading out of Oaxaca are partial explanations.

Candelaria is the most recently arrived community.    It has the youngest population (median 27) and its adult members have spent 75 percent of their adult lives (since 12 years old) in Mexico.  Yet, it shows the capacity to adapt and mature as a settlement community.  It has the highest educational level in the sample and most people (two-thirds) speak Spanish to their children.

         *B.      A Detailed Review of Four Points of Comparison:*

Reviewing the standardized measure showing overall comparisons provide some insights into how to evaluate communities with which one is working.  A detailed review of the four main points of comparison (mentioned in Table B-1, above) adds additional insights.  The vast gaps among communities in these measures reminds us that we need to pay attention to them.

The first factor to evaluate is time spent in the United States.   The nine communities vary enormously regarding the age of the adults in the community from a median age of 25 for Loxicha to 36 for Tepos.[162]



Source: Indigenous Community Survey-394 Individuals

Furthermore, the time spent in Mexico before coming to the United States varies greatly across the hometown networks.  Since people often leave their villages to go to work at age 12, we made the calculation of the adult period starting at this age.  In Chart B-2, above, one can see the wide variation in percent of time spent in Mexico since age 12.  In the more settled communities, where people left Mexico long ago, the percent can be

---

[162] The median ages were taken from universe lists collected by informants for the whole adult community in California.  Calculations from the ICS corroborated these numbers.

as low as 27 percent (Cuevas) while in the communities where most people have come only recently the percentage is as high as 75 percent (Candelaria).

The second factor to be considered in evaluating these networks is how closely the individuals are still connected to the nuclear family in the home village.   There are high percentages of solo residents (most are men) unaccompanied by spouses or parents in these U.S. settlement communities.  Across all the communities, about 40% are solos: about half of these solos are single people with their parents back home and the other half are married people with their spouses in the hometown.  However, the percent of these solos varies greatly across the communities.   The settled communities (Tepos and Cuevas) have less than a quarter solos while Loxicha has 80 percent solos.[163]

Perhaps the best way to see how the separation from families varies across communities is to look at the percent of all the settlers' minor children who are currently living in Mexico.  As can be seen in Chart B-3, except for Tepos and Cuevas, whose members have no minor children living in Mexico, all the others have a high percentage living abroad.  Three of them (Loxicha, Jicayan and Cerro) have over 60% living abroad.  This crucial factor is one that must be probed and understood for every community with which one is working.



**Chart B-3. Percent of Household Children (under 18) Born in Mexico**

Source:  Indigenous Community Survey - 788 Children

There are many couples living here in the newer networks who have all their children abroad.  But in addition, four of these communities have families with children living in both places.   Among these four relatively newcomer communities (Venado, Jicayan, Candelaria and Peras), there are 31 families with some children living in Mexico and some in California.[164]  By and large, the families have left behind their older children to

---

[163] Recall that Candelaria has a high proportion (74%) of men who have brought their wives despite the recent arrival of the community.
[164] These 31 families have 81 minor children in Mexico and 77 in the United States.

stay in Mexico (median age back home is 9) while they have continued to have children after arriving in California (median age here is 3).



**Chart B-4.  Average Years of School for 18 to 25 year Old - 9 Home Towns Networks**

Source: Indigenous Community Survey - 319 Individuals

The third factor to consider in evaluating hometown networks is the assimilation of the hometowns into Mexican culture.  The amount of average schooling varies greatly across communities.   Though schooling has improved in recent years (see Section IV), it still remains quite low in all the towns.   However, the variation is remarkable.  If we look only at young people 18 to 25, who have had a reasonable chance to obtain an education in recent times, we find that in Jicayán, perhaps the most remote town, the average schooling is only 4 years, while in Tepos the average is almost 10 years (see Chart B-4, above).



**Chart B-5.  Percent speak only Native Language to Spouse, Children by Home Town**

Source: Indigenous Community Survey - 324 respondents

Also, crucial to take note of is the propensity to speak the native language in the home.  It is, unfortunately, a measure of how remote and isolated the hometown is from the greater Mexican culture.   Again, one can see from Chart B-5 (above) a huge variation across the communities with, in general, the networks more settled in California speaking less of the native language with their family while the newer networks speak more.   Across all the networks the majority speak their native language to their wives.  However, the percentage that speak it to their children varies from 21% for the Tepos parents to 80% for the parents from Piñas (Mixteco) and Loxicha (Zapoteco).

The final factor to keep in mind in evaluating networks is the assets held in the United States for community members.  As will be discussed in Section VII, there is an extremely low level of home ownership in the United States across the whole indigenous population.  The few owned homes are almost all in the two very settled communities of Tepos and Cerro.   A better way to distinguish asset ownership among the communities is with respect to cars.  Overall, about 50 percent of the households had cars or trucks.  But as with all the other factors, the variation is extreme (Chart B-6).   In the Loxicha community only 20 percent have cars while in Tepos 77 percent do.



This lengthy review of distinguishing factors among communities reminds us of the diverse experiences confronted by each of the hundreds of indigenous hometown networks coming to California.  Knowing (or learning) some or many of these basic features about the communities with which one is working will enhance the ability to organize and serve them.

**Appendix III. Population Estimates**

      1.      Estimates from the Count of Hometown Networks:

In order to estimate the population of indigenous villagers in California, we used all of the data available to us. First, we organized all of the indigenous villages by state and region in Mexico. This allowed us to identify different language groups and ethnicities. Second, we added the recent Mexican population census data for each village, in order to give us a check on migrants' population estimates. A village with 30 people would be unlikely to have 500 migrants in California. Third, we added all of the information that had been collected from key informants on each village's migrants in California, their numbers and whereabouts, whether from the initial Hometown Count or from the subsequent Survey of Key Informants.

In order to develop an approach to estimating the numbers of migrants from each village, we conducted a detailed analysis of the nine villages where universe lists of migrants had been created. These lists provided information on the numbers and locations of adult migrants, as well as of spouses. By comparing these counts to the earlier estimates made by informants in the Hometown Count or the Survey of Key Informants, we were able to develop rules of thumb for adjusting such estimates that we applied to all the towns.

It should be noted that neither the Hometown Count, the Survey of Key Informants, nor the detailed lists from the nine villages provided reasonable estimates of the numbers of children. Instead, we used the household survey results from the nine villages to develop a single estimate of the number of children per couple in California, which we then applied across the board to all villages. This number was 1.326 children per couple. Although there were a few children accompanying solo men or women, their numbers were insignificant.  This number of children may appear low, but it demonstrates the degree to which children are left in the Mexican villages until they are old enough to work, as well as the high proportion of men without children that are present in these households.

We then proceeded to examine the various estimates of migrant numbers for each of the 342 villages for which we had at least one such estimate. For each village, we developed an estimate of total adults in California and then apportioned it over the different California regions. While some villages had several different estimates, many had only one. The unevenness of these data required us to make bold assumptions at times, but we always erred on the conservative side. We likely underestimated the true numbers of the rural Mexican indigenous population in California.

Furthermore, we had available to us the results of an earlier census of Mixtec migrants from the state of Oaxaca in rural California that had been conducted in 1991 (Runsten and Kearney 1994). This study included 101 villages where migrants were identified in California in 1991 but that were not found in this more recent survey. Of these 101 villages, we had data in 1991 on 94 of them: 42 had only single men, 12 had adult men and women, and 40 had men, women, and children living in California.  Since we have

no information about whether these villages continue to have migrants in California—they could have moved to other states, for example—we did not include them in our estimates. In addition, the Hometown Count found 156 towns with a presence in rural California for which we did not collect population estimates.  The known existence of these 257 other villages from the past and current study suggests strongly that there are a significant numbers of indigenous villages that we did not count in this survey, and which likely account for much of the difference between our population count and our higher population estimates.   The full population estimates were based on calculations from the NAWS data.   The assumptions are explained in the text of Section II.

    2.  NAWS' Estimates of Total Population:

The NAWS data allow us some check on the range of indigenous Mexican farmworkers in California.  We start with the total number of Mexicans in California agriculture (about 95% of the total of all farmworkers).   We employ an approximate number from two independent estimations of the population of 700,000.[165]   Then we take the proportion of southern Mexicans in the NAWS over time to check the rising share of indigenous.  In the early 1990s, the proportion was about 7% while in recent years it has been about 29%.   The NAWS asks a question of the respondents regarding racial identification.  For the southerners, of those that identify a racial category about 55% say that they are indigenous.  We suspect that this is an underestimate since some indigenous people fear discrimination and therefore intentionally hide their identity from interviewers.  In addition, we also identified some California farmworkers that come from non-southern states such as the Purepecha of Michoacan and the Huicholes of Nayarit.   For this reason we expand our estimate up by 5% to accommodate non-Southern Mexicans and those timid about self-identifying as indigenous.   Then, we put a range of plus or minus 10% around our estimate.   Finally, we take the top and bottom estimated numbers over two 5 year (early and recent) periods—1991 to 1995 and 2004 to 2008—to get our ranges.   We get these conservative ranges for the indigenous population of Mexican farmworkers in California for these two time periods.

| Estimated range | Period |
|---|---|
| 31,201 to 52, 063 | 1991 to 1995 |
| 87,346 to 153.997 | 2004 to 2008 |

---

[165] See Alice Larson, Migrant and Seasonal Farmworker Enumeration Profiles Study California, Migrant Health Program, Bureau of Primary Health Care, 2000, p.16, and Richard Mines, Data on Crops, Employment and Farmworker Demographics: A resource for California Rural Legal Assistance, February, 2006, California Rural Legal Assistance, , p. 23

**Appendix IV.   Languages in California**

The languages below were identified by interviewers as being spoken in rural California in 2007.   The list is only partial because all languages were not found.  However, these are probably the major indigenous Mexican languages spoken.

| | List of Indigenous Mexican Languages Spoken in California<br>Count of Hometown Networks (2007)) | |
|---|---|---|
| | **Language** | **State of Origin** |
| 1 | Aleto Cora | Nayarit, Durango |
| 2 | Amuzgo | Guerrero, Oaxaca |
| 3 | Chatino | Oaxaca |
| 4 | Chinanteco | Oaxaca, Veracruz |
| 5 | Chol | Chiapas, Tabasco, Campeche |
| 6 | Chontal | Oaxaca |
| 7 | Huichol | Nayarit, Durango, Jalisco |
| 8 | Maya | Yucatan, Quintana Roo, Campeche |
| 9 | Mazateco | Oaxaca, Puebla, Veracruz |
| 10 | Mixe | Oaxaca |
| 11 | *Mixteco* | Oaxaca, Guerrero, Puebla |
| 12 | Nahuatl | Puebla, Hidalgo, Veracruz, San Luis Potosí, Oaxaca, Colima, Durango, Guerrero, Jalisco, Michoacán, Morelos, Nayarit, Tabasco, Tlaxcala, Estado de México, Distrito Federal |
| 13 | Otomi | Hidalgo, Puebla, Veracruz, Queretaro, Michoacan, Tlaxcala, Estado de México, Guanajuato |
| 14 | Purépecha | Michoacán |
| 15 | Tacuate | Oaxaca |
| 16 | Taraumara | Chihuahua |
| 17 | Tlapaneco | Guerrero |
| 18 | Tojolabal | Chiapas |
| 19 | *Triqui* | Oaxaca |
| 20 | Tzetal | Chiapas, Tabasco |
| 21 | Tzotzil | Chiapas |
| 22 | *Zapoteco* | Oaxaca |
| 23 | Zoque | Chiapas, Oaxaca |

122

**Appendix V**

**Interviews with service and public employee workers and with community representatives.**

During the years 2007 to 2009, we gathered crucial information from many individuals who work directly with indigenous Mexican farmworkers.  We apologize if we have forgotten someone who spoke with us but is not included here.  We are grateful for the time all respondents gave to our project.

| Name | Organization & Position |
|---|---|
| Antonio Cortes | United Farm Workers of America & Santa Maria Tindú Home Town Association |
| Estela Galvan | Pan Valley Institute, American Friends Service Committee- Program organizer |
| Nayamin Martinez | Centro Binacional para el Desarrollo Indígena Oaxaqueño |
| Father Mike McAndrew | Director, Campesino Ministry, Diocese of Fresno |
| Graciela Martinez | Proyecto Campesino, AFSC-Program Director |
| Hector Hernandez | Union Popular Benito Juarez, Bakersfield |
| Fausto Sanchez | California Rural Legal Assistance |
| Elva Leal | Vista Community Clinic; Project Coordinator |
| Carlos O'Bryan-Becerra, MD | Ventura County Hospital, MD |
| Srimati Sen Maiti | Oxnard Clinic; OB-GYN nurse |
| Sonia Kroth | Ventura Human Services; Community Relations Manager |
| Joe Mendoza | Ventura Office of Education, Director Special Populations |
| Bonnie Bouley | Ventura County Medical; RN |
| Deborah O'Malia | Oxnard Fire Dept.; Disaster preparedness |
| Sandy Young | Las Islas Family Medical Group, Ventura County, FNP |
| Geeta Maker Clark, MD | Magnolia Family Health Center; MD |
| Naomi Valdes | Oxnard School District; Director Family Centers |
| Tony Alatorre | Clinicas del Camino; Administrator |
| Arcenio Lopez | Mixteco/Indigena Community Organizing Project |
| Elizabeth Gomez | Oxnard Clinic; health worker/translator |
| Susan Haverland | Mixteco/Indigena Community Organizing Project |
| Mary Jacka | California Rural Legal Assistance |
| Evelyn Vargas | Poder Popular Coordinator, Greenfield |
| Lucy Ramos | Clinicas Salud del Valle, Greenfield |
| David Dobrowski | First5 Monterey County,  Evaluation officer |
| Sandra Orozco | HIA-Monterey regional coordinator |
| Asa Bradman | UC Berkeley; Chamacos Project |
| Dr. Max Cuevas | Clinicas Salud del Valle |
| Joe Grebmeier | Chief of Police, Greenfield |

| Name | Organization & Position |
|---|---|
| Herlindo Cruz | Community leader, Pajaro |
| Sister Rosa Dolores | Casa de la Cultura, Pajaro |
| Adam Sanders | Coutny Probation Officer, Hollister |
| Wendy Wiley | Occidental Health Center; Physicians' Assistant |
| Carlos Lopez | Graton Day Labor Center; Outreach Coordinator |
| Davin Cardenas | Graton Day Labor Center; Outreach Coordinator |
| Elia Solar | Petaluma Health Center; Eligibility Worker |
| Abraham Solar | St. Vincent De Paul, Petaluma; Pastoral outreach |
| Marilyn Mochell & Tatiana Vizcaino-Steward | Healthy House, Merced |
| Juana Cervantes | Mixteco translator at Merced Medical Group |
| Laura Chavez | Health Educator, Community Medical Centers, Yolo County |
| Moira Kenney | First 5 Association of California; Statewide Program Director |

# CERTIFICATE OF SERVICE

Case Name:   **Cedar Point Nursery v. William**          No.     **1:16-cv-00185-LJO-BAM**
             **B. Gould IV, et al.**

I hereby certify that on <u>March 9, 2016,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>March 9, 2016,</u> at Sacramento, California.


Tracie L. Campbell
Declarant                                          Signature

SA2016100631
POS to RJN.doc