1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CEDAR POINT NURSERY and FOWLER PACKING CO.,**<br><br>        **Plaintiffs,**<br><br>        **v.**<br><br>**WILLIAM B. GOULD IV,** *et al.,*<br><br>        **Defendants.** | **1:16-cv-00185-LJO-BAM**<br><br>**MEMORANDUM DECISION AND ORDER DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION AND REQUESTING SUPPLEMENTAL BRIEFING [Doc. 4]** |

## I. INTRODUCTION

Plaintiffs Cedar Point Nursery and Fowler Packing Company ("Plaintiffs") allege that Cal. Code Regs. tit. 8, § 20900(e) (the "Access Regulation"), a regulation promulgated by California's Agricultural Labor Relations Board ("ALRB") allowing union organizers access to worksites, is unconstitutional as applied to them. Plaintiffs argue that the Access Regulation allows third parties to take their property without providing just compensation, in violation of the Fifth Amendment, and permits unlawful seizure of their property rights, in violation of the Fourth Amendment.

As set forth below, the Court finds that Plaintiffs have not shown a substantial likelihood of success on their Fifth Amendment claim. Plaintiffs present a stronger legal argument in support of their Fourth Amendment claim. However, the record needs to be developed further before the Court can either evaluate the merits of this argument or balance the equities involved.

## II. THE ACCESS REGULATION

The Access Regulation provides that "the rights of employees under [California] Labor Code

1   Section 1152" include "the right of access by union organizers to the premises of an agricultural

2   employer for the purpose of meeting and talking with employees and soliciting their support." Cal. Code

3   Regs. tit. 8, § 20900(e). The right is subject to several constraints. For example, a labor organization

4   must provide notice to the ALRB and the employer of its intent to appear onsite. § 20900(e)(1)(B). No

5   organization may appear for more than four thirty-day periods in any calendar year. § 20900(e)(1)(A)-

6   (B). Organizers may enter an employer's property "for a total period of one hour before the start of work

7   and one hour after the completion of work" and for "a single period not to exceed one hour during the

8   working day for the purpose of meeting and talking with employees during their lunch period." §

9   20900(e)(3). Access is limited to a certain number of organizers (depending on the number of

10  employees) and organizers are not allowed to engage in "conduct disruptive of the employer's property

11  or agricultural operations, including injury to crops or machinery or interference with the process of

12  boarding buses." § 20900(e)(4).

13  ### III. <u>FACTUAL BACKGROUND</u>

14          Plaintiff Cedar Point Nursery ("Cedar Point") is located in Dorris, California. Compl. for

15  Declaratory and Injunctive Relief ("Compl."), Doc. 1, ¶ 8. Cedar Point employs more than 400 seasonal

16  employees, who are housed off-site. *Id.* ¶¶ 26-27. Cedar Point alleges that United Farm Workers

17  ("UFW") members entered their property at 5:00 A.M. on October 29, 2015, "without any prior notice

18  of intent to access the property" and "disrupted work by moving through the trim sheds with bullhorns,

19  distracting and intimidating workers." *Id.* ¶ 30. Sometime after this event, UFW served notice of their

20  intent to take access. *Id.* ¶ 32. Cedar Point lodged a complaint against the UFW with the ALRB

21  regarding UFW's failure to provide notice prior to the October 29 incident. *Id.* ¶ 34. The UFW has also

22  filed a charge with the ALRB against Cedar Point, alleging that Cedar Point has committed unfair labor

23  practices. *Id.*

24          Plaintiff Fowler Packing Company ("Fowler") is a California corporation, headquartered in

25  Fresno, California. *Id.* ¶ 9. Fowler describes itself as "one of the largest shippers in the fresh produce

1    business." *Id.* Fowler's employees do not live on their property. *Id.* ¶ 37. The UFW brought charges

2    before the ALRB against Fowler, based on alleged violations of the Access Regulation, in July 2015. *Id.*

3    ¶ 38. It withdrew these charges in January 2016. *Id.* ¶ 39. Fowler alleges that, "[a]bsent the challenged

4    regulation, Fowler would oppose union access and exercise its right to exclude trespassers from its

5    property." *Id.*¶ 40.

6         Both companies allege they "have reason to believe that the access regulation will be applied

7    against them in the future" and "the only proper and possible remedy . . . is declaratory and injunctive

8    relief." *Id.* ¶ 57. They state that the Access Regulation should not apply to them because "such access is

9    unnecessary given the alternative means of communication available [to union organizers]." *Id.* ¶ 64.

10                              **IV. <u>PROCEDURAL HISTORY</u>**

11        Plaintiffs filed their complaint against individual members of the ALRB on February 10, 2016.

12    Compl. at 11. Plaintiffs argue that the Access Regulation amounts to both a "taking" in violation of the

13    Fifth Amendment of the Constitution, and an unlawful seizure of their private property in violation of

14    the Fourth Amendment. *Id.* ¶¶ 58, 64. Plaintiffs seek a declaratory judgment stating that the Access

15    Regulation is unconstitutional as applied to them and an order enjoining the ALRB from enforcing the

16    regulation against them. *Id.* at 10:16-19.

17        On February 16, 2016, Plaintiffs filed a motion for preliminary injunction seeking to enjoin the

18    ALRB from enforcing the Access Regulation on their properties. Proposed Order Granting Prelim. Inj.,

19    Doc. 4-4.[1] The government filed an opposition on March 9, 2016. Mem. of P. & A. in Opp'n to Pls.'

20    Mot. for Prelim. Inj. ("Opposition"), Doc. 7. Plaintiffs filed their reply on March 16, 2016. Reply in

21    Supp. of Pls.' Mot. for Prelim. Inj. ("Reply"), Doc 9. The matter was taken under submission on the

22    papers pursuant to Local Rule 230(g). Doc. 10.

23    _____

24    [1] While some of the parties' arguments suggest that Plaintiffs are raising a facial challenge, it is clear from the remedies sought by the Complaint and their request for preliminary injunction that Plaintiffs bring a challenge to the Access Regulation as it is applied to them. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) ("[A] claim can have characteristics of

25    as-applied and facial challenges: it can challenge more than just the plaintiff's particular case without seeking to strike the law in all its applications.").

## V. STANDARD OF DECISION

A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 552 U.S. 674, 128 (2008). As such, the Court may only grant such relief "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat'l Res. Def. Council, Inc*., 129 S. Ct. 365, 375 (2008). To prevail, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm absent a preliminary injunction; (3) that the balance of equities tips in the moving party's favor; and (4) that an injunction is in the public interest. *Id.* at 374. In considering the four factors, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id*. at 376 (quoting *Amoco Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987)); *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell–Jolly*, 572 F.3d 644, 651 (9th Cir. 2009).

"[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc*., 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). "Serious questions" in the context of preliminary injunctive relief are those that are "substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (citation and internal quotation marks omitted). They do not need to "promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Id*. (citation and internal quotation marks omitted).

## VI. ANALYSIS

### A. Takings Claims

#### 1. Ripeness

Defendants ("ALRB Members" or "the government") argue that Plaintiffs' takings claims are

1    unripe under *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172

2    (1985). Opposition at 10, n. 3. *Williamson* imposes two requirements that must be satisfied before a

3    takings claim may be heard in federal court: (1) "the government entity charged with implementing the

4    regulations [must have] reached a final decision regarding the application of the regulations to the

5    property at issue," and (2) the plaintiff must have been denied compensation by the state. 473 U.S. at

6    194-95. As Plaintiffs point out, these requirements are prudential, not jurisdictional, in nature.

7    *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1117 (9th Cir. 2010). "Prudential considerations of

8    ripeness are discretionary." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1142 (9th Cir.

9    2000).

10          The parties do not seem to dispute that the first element is met. Therefore, the Court will assume

11    without deciding that satisfaction of this element is undisputed.

12          Plaintiffs argue that the second *Williamson* requirement (referred to as the "exhaustion"

13    requirement) does not apply to their case. Mem. of P. & A. in Supp. of Pls.' Mot. for Prelim. Inj.

14    ("MPI"), Doc. 4-1 at 8. They argue that the exhaustion requirement only applies when a petitioner seeks

15    relief under the "just compensation clause," which they do not. *Id.* This argument is a red herring. The

16    cases Plaintiffs cite to support their position that they should be permitted to bypass the exhaustion

17    requirement all involved only facial challenges. *San Remo Hotel, L.P. v. City & Cty. of San Francisco,

18    Cal.*, 545 U.S. 323, 345-46 (2005) ("Petitioners therefore could have raised most of their *facial* takings

19    challenges, which by their nature requested relief distinct from the provision of 'just compensation,'

20    directly in federal court.") (emphasis added); *Cty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159,

21    165 (3d Cir. 2006) (holding that a "facial Fifth Amendment Just Compensation Takings claim need not

22    comply with the finality rule"); *Levin v. City & Cty. of San Francisco*, 71 F. Supp. 3d 1072, 1074 (N.D.

23    Cal. 2014) (holding that plaintiffs in facial challenge case need not seek compensation in state court).

24    Therefore, the fact that Plaintiffs do not seek damages does not mean that they are not subject to the

25    exhaustion requirement. Rather, it is the scope of the constitutional challenge that is relevant.  "[A]s

5

applied challenges require[] *Williamson* exhaustion," while facial challenges "sometimes" do and sometimes do not. *Guggenheim*, 638 F.3d at 1117 (citing *Sinclair Oil Corp. v. Cty. of Santa Barbara*, 96 F.3d 401, 405 (9th Cir. 1996)). Plaintiffs here bring only as applied claims. Compl. 10:16-19; MPI at 15. Therefore, they are subject to both elements of *Williamson*. *Guggenheim*, 638 F.3d at 1117.

A plaintiff may fulfill the second *Williamson* prong by showing that "recourse to the state courts would be futile." *Hacienda Valley Mobile Estates v. City of Morgan Hill*, 353 F.3d 651, 655 (9th Cir. 2003). Futility exists where a state court has "specifically heard the cause of action at issue and denied it." *Id.* at 659 (citing *Austin v. City & Cty. of Honolulu*, 840 F.2d 678, 681 (9th Cir. 1988)).  Plaintiffs argue that they meet this requirement because in *Agric. Labor Relations Bd. v. Superior Court*, 16 Cal. 3d 392, 411 (1976) ("*ALRB v. SC*"), the California Supreme Court found that the Access Regulation does not constitute a taking under either the California or U.S. Constitutions. MPI at 9-10. The ALRB Members did not address this issue in their Opposition. The Court agrees with Plaintiffs that *ALRB v. SC* forecloses their ability to recover in state court. *Id.* For this reason, and in light of the prudential nature of the *Williamson* factors, the Plaintiffs takings claims are ripe for decision.

### 2.   Likelihood of Success on the Merits

Plaintiffs claim that they are likely to succeed on their takings claims because the Access Regulation allows a physical invasion of their property rights and should be recognized as a *per se* (or "categorical") taking under Fifth Amendment jurisprudence. MPI at 6.

### a.   Legal Background

There are "two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005).. The first is where a government "requires an owner to suffer a permanent physical invasion of her property— however minor." *Id.* (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982)). The second applies to regulations that "completely deprive an owner of 'all economically beneficial use'

1  of her property." *Id.* (quoting *Lucas v. S. Carolina Coastal Council,* 505 U.S. 1003, 1019 (1992)).[2]

2  Aside from these two "relatively narrow categories," regulatory takings challenges are governed by the

3  balancing test set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978). *Id.* Thus,

4  there is an important distinction between "a permanent physical occupation, a physical invasion short of

5  an occupation, and a regulation that merely restricts the use of property." *Loretto*, 458 U.S. at 441.

6  ### b.      The Access Regulation As Applied to Plaintiffs

7  Plaintiffs argue that the Access Regulation constitutes a *per se*/categorical physical taking

8  because it infringes on their right to exclude strangers from their property. MPI at 6-7. Defendants argue

9  that because it does not authorize a permanent physical occupation, it is subject to a *Penn Central*

10  balancing test. Opposition at 7. Because Plaintiffs do not explain how they are likely to prevail under

11  *Penn Central*, the government claims that they are not likely to succeed on this issue. *Id.* at 7-8.

12  As the government identifies, the plain language of the Access Regulation does not suggest that

13  Plaintiffs will be subject to a "permanent physical occupation" in a manner that has been recognized by

14  the Supreme Court. Opposition at 9. To the extent that it requires owners to allow access to those they

15  want to exclude, such access is limited to certain times and locations. *See* § 20900(e)(3)-(4).[3] These

16  limitations ensure that any occupation allowed under the Access Regulation is far from permanent.

17  Plaintiffs attempt to escape the reach of *Penn Central* by analogizing their case to other takings

18  cases. First, Plaintiffs cite to the Supreme Court's holding in *Kaiser Aetna v. United States*, 444 U.S.

19  164 (1979), for the prospect that a taking can occur when the government creates an easement. MPI at 7.

20  Plaintiffs are correct that the creation of an easement *may* amount to a taking, but they go too far by

21  equating this action with a categorical taking. *Kaiser Aetna* recognized that a public right of access to an

22

23  [2] Plaintiffs do not argue that this category applies to them.

24  [3]  As discussed above, organizations are limited to four thirty-day periods in any calendar year, § 20900(e)(1)(A)-(B) during
25  which they may enter an employer's property "for a total period of one hour before the start of work and one hour after the
completion of work" and for "a single period not to exceed one hour during the working day for the purpose of meeting and
talking with employees during their lunch period." § 20900(e)(3).

1   improved pond went "so far beyond ordinary regulation or improvement for navigation as to amount to a

2   taking under the logic of *Pennsylvania Coal Co. v. Mahon* []." *Id.* at 178.  *Pennsylvania Coal* articulated

3   the "general rule" that "while property may be regulated to a certain extent, if regulation goes too far it

4   will be recognized as a taking." 260 U.S. 393, 415 (1922).[4]  This reference makes it clear that even

5   though *Kaiser Aetna* dealt with a type of physical invasion, the fact that it occurred was not dispositive

6   as to whether it amounted to a taking. 444 U.S. at 178 (noting that "more than one factor" lead to its

7   conclusion). For example, it was significant that the public right of access caused the property owners

8   serious economic harm. *Id.* at 180. ("This is not a case in which the Government is exercising its

9   regulatory power in a manner that will cause an insubstantial devaluation of petitioners' private property;

10  rather, the imposition of the navigational servitude in this context will result in an actual physical

11  invasion of the privately owned marina."). The Supreme Court later clarified this distinction in *Loretto*,

12  where it described that the easement at issue in *Kaiser Aetna*, "not being a permanent occupation of

13  land, was not considered a taking *per se*." 458 U.S. at 433. Thus, even if the Access Regulation could be

14  read as allowing a continuing intrusion similar to the easement in *Kaiser Aetna*, Plaintiffs would still not

15  have demonstrated a categorical taking.

16         Plaintiffs next point to the Supreme Court's decisions in *United States v. Causby*, 328 U.S. 256

17  (1946), and *Arkansas Game & Fish Comm'n v. United States*, 133 S. Ct. 511 (2012), for the prospect

18  that temporary invasions can amount to permanent occupations. Reply at 2-3. In *Causby*, the Supreme

19  Court found that airplane flights over private land may constitute a taking if they are "so low and so

20  frequent as to be a direct and immediate interference with the enjoyment and use of the land." 328 U.S.

21  at 266. In doing so, the *Causby* Court emphasized that the Government had caused "as complete a loss

22  as if the government had entered upon the surface of the land and taken exclusive possession of it." *Id.*

23  _____

24  [4] In that case, the Supreme Court considered a Pennsylvania law that prohibited mining coal in a manner that would cause
    subsidence of residential properties. *Id.* at 412- 413. Pennsylvania's highest court had admitted that the law "destroy[ed]
    previously existing rights of property and contract." *Id.* at 413. In contrast, the Supreme Court found that the law provided
25  only a limited benefit to the public. *Id.* at 414. Thus, its ultimate conclusion that the law was unconstitutional was the result
    of an analysis that weighed the public and private interests involved. *Id.* at 416.

at 261. In other words, the action at issue in *Causby* was seen as akin to an exercise of eminent domain. Here, as Plaintiffs concede, the government's infringement on their property rights is far less severe and far less frequent.

Further, the Supreme Court has more recently confirmed that while temporary intrusions *may* be compensable, under current jurisprudence they are treated separately from those that fall on the other side the "bright line" of permanent physical occupation. *Arkansas Game & Fish Comm'n v.*, 133 S. Ct. at 518. In *Arkansas*, the issue before the Court was whether temporary flooding *might* be considered a taking. *Id.* Notably, the *Arkansas* Court did *not* treat temporary flooding as a permanent physical occupation. *Id.* Rather, it found that "[f]looding cases, like other takings cases, should be assessed with reference to the 'particular circumstances of each case,' and not by resorting to blanket exclusionary rules." *Id.* at 521. The *Arkansas* Court also reiterated the holding in *Loretto* that "temporary limitations are subject to a more complex balancing process to determine whether they are a taking." *Id.* at 521 (quoting *Loretto*, 458 U.S. at 436, n. 12). Thus, these cases do not stand for the proposition that temporary intrusions may be treated as equivalent to permanent physical occupations.

Plaintiffs' reliance on *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987), and *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1360 (Fed. Cir. 2012), is also misplaced. In *Nollan*, the California Coastal Commission sought to require owners to grant the state a public easement across their property, as a condition of receiving a building permit. *Id.* at 828. In coming to the conclusion that a "permanent physical occupation" had occurred, the Court described the physical invasion as one "where individuals are given a *permanent and continuous* right to pass to and fro, so that the real property may *continuously* be traversed, even though no particular individual is permitted to station himself permanently upon the premises." *Id.* at 832 (emphasis added). In other words, the *Nollan* easement was "a classic right-of-way easement." *Id.* at 832 n.1. While Plaintiffs liken the Access Regulation to some sort of easement, they do not show that it would allow the public to access their property in a permanent and continuous manner for whatever reason, as in *Nollan.* In an attempt to tie

1  their case *Nollan*, Plaintiffs speculate that the Supreme Court would have come to the same conclusion

2  if the *Nollan* easement "had been limited to daylight hours or certain months of the year, because it

3  would continue in perpetuity." Reply at 3. Plaintiffs provide no authority for extending this theory,

4  however, and the Court finds it unpersuasive. The difference is that it is not necessarily permanent,

5  depending on what kind of business is conducted at the location, is limited, and is for a very specific

6  reason.

7          Similarly, in *Otay Mesa*, the Federal Circuit found that the U.S. Border Patrol had a "blanket

8  easement to install, maintain, and service sensors" on private property. 670 F.3d at 1365. As was the

9  case in *Nollan*, there is a critical difference between a "blanket easement" and the limited access allowed

10 to union organizers by the Access Regulation. Thus, the fact that the Access Regulation is itself a

11 permanent law does not mean that its application to the Plaintiffs will be permanent. Therefore it does

12 not provide a basis for a categorical taking claim. To find otherwise would render any law providing any

13 measure of access a permanent taking. This is plainly not consistent with the takings jurisprudence.

14         Finally, Plaintiffs have not shown that the Access Regulation has been applied to them in such a

15 way that they have suffered a "permanent physical occupation." To the contrary, the testimony of

16 Plaintiffs' executives demonstrates that union organizers have entered their property on only one

17 occasion. Decl. of Mike Fahner ("Fahner Decl."), Doc. 4-3, ¶ 11. Nor do they claim that the Access

18 Regulation deprives them of "all economically beneficial use" of their properties. Thus, Plaintiffs have

19 not shown that they have suffered, or will suffer, a categorical taking. Thus, to succeed on their takings

20 claim, Plaintiffs must show that "justice and fairness" require that the government compensate them for

21 whatever economic injuries the Access Regulation causes them. *Penn Central*, 438 U.S. at 124.

22 Plaintiffs have not set forth such arguments in their papers. Thus, they have not met the heavy burden of

23 showing that there is a substantial likelihood that they will succeed on this claim. Therefore, the Court

24 DENIES Plaintiffs' motion for preliminary injunction as to their Fifth Amendment claim.

25

1  **B.**  **Fourth Amendment Claim**

2       Plaintiffs argue that they are likely to succeed on the merits of their Fourth Amendment claim on

3  the basis that the Access Regulation unreasonably interferes with their possessory rights. MPI at 11-12.

4       **1.**  **Legal Background**

5       The Fourth Amendment provides that the "right of the people to be secure in their persons,

6  houses, papers and effects, against unreasonable searches and seizures, shall not be violated." U.S.

7  Const. amend. IV. The Supreme Court recognizes that this protection extends to possessory as well as

8  privacy interests. *Soldal v. Cook Cty., Ill*., 506 U.S. 56, 62 (1992) ("[O]ur cases unmistakably hold that

9  the Amendment protects property as well as privacy."). "A 'seizure' of property occurs when there is

10  some meaningful interference with an individual's possessory interests in that property." *United States v.*

11  *Jacobsen*, 466 U.S. 109, 113 (1984). In the determination of whether a seizure's interference with

12  possessory interests violates the Fourth Amendment, "reasonableness is still the ultimate standard."

13  *Soldal*, 506 U.S. at 71. "A seizure is reasonable if it meets the 'careful balancing of governmental and

14  private interests' that *Soldal* requires." *Hroch v. City of Omaha*, 4 F.3d 693, 697 (8th Cir. 1993).

15       When a seizure occurs pursuant to valid law, making a showing of unreasonableness is a

16  "laborious task." *Soldal*, 506 U.S. at 71. For example, "the Constitution is not offended by the

17  warrantless abatement of a vehicle in accordance with a valid state law from a location where the

18  possessor has no reasonable expectation of privacy." *Tarantino v. Syputa*, 270 F. App'x 675, 677 (9th

19  Cir. 2008). The fact that a seizure is conducted in the context of a legitimate law enforcement or public

20  policy objective is not dispositive, however. *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1030 (9th Cir.

21  2012) ("A  seizure lawful at its inception can nevertheless violate the Fourth Amendment because its

22  manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's

23  prohibition on 'unreasonable seizures.") ("*Lavan I*"). In *Lavan*, nine homeless individuals alleged that

24  the City of Los Angeles violated their Fourth and Fourteenth Amendment rights by "seizing and

25  immediately destroying their unabandoned [sic] personal possessions, temporarily left on public

11

1   sidewalks while [they] attended to necessary tasks such as eating, showering, and using restrooms." *Id.*

2   at 1023-24. The district court found that Plaintiffs were likely to be able to show that this seizure was

3   unreasonable based on "at least three separate declarations and photographic evidence" showing that the

4   City was "in fact notified that the property belonged to [plaintiffs], and that when attempts to retrieve the

5   property were made, the City took it and destroyed it nevertheless." *Lavan v. City of Los Angeles*, 797 F.

6   Supp. 2d 1005, 1014 (C.D. Cal. 2011) ("*Lavan II*"). The Ninth Circuit upheld the preliminary injunction

7   order enjoining the city from engaging in similar behavior based on the district court's "correct"

8   conclusion that "the City's destruction of the property rendered the seizure unreasonable." *Lavan I,* 693

9   F.3d at 1030.

10      **2.      Whether the Access Regulation Violates Plaintiffs' Fourth Amendment Rights**

11          Plaintiffs argue that the Access Regulation violates the seizure clause of the Fourth Amendment

12   because it "effectively terminates" their "right to exclude others from their property." MPI at 11. The

13   government does not appear to dispute that the Access Regulation may cause a seizure. Opposition at

14   11.[5] Rather, it argues that Plaintiffs have not shown that such a seizure is unreasonable, given that the

15   state has "strong governmental interests at stake . . . to safeguard the rights of agricultural employees to

16   freedom of association, self-organization and collective bargaining." *Id.*

17          In their request for a preliminary injunction, Plaintiffs do not explain how "a careful balancing of

18   governmental and private interests" leads to the conclusion that the Access Regulation's previous or

19   future application to them is unreasonable. Rather they point to the Fourth Circuit's decision in *Presley*

20   *v. City of Charlottesville*, 464 F.3d 480 (4th Cir. 2006), as authority for their position that they present a

21   viable claim. Plaintiffs must go further to show that they are entitled to a preliminary injunction.

22   Elsewhere in their papers, Plaintiffs discuss how conditions around their worksites and related to their

23   _____

24   [5] The California Supreme Court's position on this topic, however, is that the Access Regulation "is not a deprivation of
'fundamental personal liberties' but a limited economic regulation of the use of real property imposed for the public welfare."

25   16 Cal. 3d at 409. Because the government does not dispute that the Access Regulation may create a seizure, and the state
court case is not precedential, the Court will assume without deciding that this is the case.

specific workforces make reliance on the access regulation unnecessary. MPI at 12. They also suggest that the Access Regulation presents them with operational challenges. *Id.* The latter suggestion is not based on any competent evidence and Plaintiffs do not elaborate on the extent to which such challenges would actually harm them. Plaintiffs' representatives testify that they fear they will lose "goodwill" because "it sends a message" that they treat their workers poorly.  Decl. of Dennis Parnagian, Doc. 4-2, ¶ 10; Fahner Decl. ¶ 14. Plaintiffs, however, do not provide any authority for the proposition that such a "loss of goodwill" is a cognizable form of injury that would support an unlawful seizure claim. Further, Plaintiffs' representatives do not provide any testimony, other than conclusory statements, as to any competitive disadvantages they expect to incur.

The government, on the flip side, rested its entire case on the premise that the Access Regulation is constitutional on its face. Opposition at 10-11. In doing so, they failed to explain why it is reasonable to apply the Access Regulation *to the Plaintiffs* in particular. The fact that Access Regulation is legal itself does not determine if it is constitutional as applied to Plaintiffs. *Miranda v. City of Cornelius*, 429 F.3d 858, 865 (9th Cir. 2005) ("The question in this Court upon review of a state-approved search or seizure is not whether the search (or seizure) was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment.") (quoting *Sibron v. New York*, 392 U.S. 40, 61 (1968))). Thus, the government provides this Court little basis for disputing Plaintiffs' as-applied claims.

Plaintiffs' strongest argument that they will suffer irreparable harm is based on the possibility that they will suffer a constitutional injury. The likelihood and extent to which such an injury will occur is therefore entwined with the merits of their legal argument. Thus, the present state of the record undercuts this court's ability to evaluate all four *Winter* factors. Further briefing is required for the Court to come to a reasoned decision.

## VII. CONCLUSION AND ORDER

For the reasons discussed above, the Court DENIES Plaintiffs' Motion for Preliminary Injunction, Doc. 4, as to their Fifth Amendment claim.

13

As to Plaintiffs' Fourth Amendment claim, the Court ORDERS supplemental briefing as follows: Each side is to submit a brief explaining whether "careful balancing of governmental and private interests" leads to the conclusion that the Access Regulation may reasonably be applied to Plaintiffs. Briefs are to be no longer than ten (10) pages in length, not including relevant declarations and attachments, and are due fourteen days after the date of this order.


IT IS SO ORDERED.

Dated:   __April 18, 2016__                    ___/s/ Lawrence J. O'Neill__
                                          UNITED STATES DISTRICT JUDGE

14