1

2

3            **UNITED STATES DISTRICT COURT**

4        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

5

6   | **CEDAR POINT NURSERY and FOWLER PACKING CO.,** | **1:16-cv-00185-LJO-BAM** |

7   Plaintiffs,                          **MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [Doc. 4]**

8        v.

9   **WILLIAM B. GOULD IV,** *et al.*,

10                    Defendants.

11

12

## I. INTRODUCTION

Plaintiffs Cedar Point Nursery and Fowler Packing Company ("Plaintiffs") allege that Cal. Code Regs. tit. 8, § 20900(e) (the "Access Regulation"), a regulation promulgated by California's Agricultural Labor Relations Board ("ALRB" or "the State") allowing union organizers access to worksites for limited periods of time, is unconstitutional as applied to them. Plaintiffs argue that the Access Regulation allows third parties to take their property without providing just compensation, in violation of the Fifth Amendment, and permits an unlawful seizure of their property rights, in violation of the Fourth Amendment.

## II. THE ACCESS REGULATION

In 1975, California enacted the Agricultural Labor Relations Act ("ALRA"). Cal. Lab. Code § 1140. The ALRA created the ALRB and vested its members with authority to make rules to carry out its policies. Cal. Lab. Code §§ 1141, 1144. The ALRB promulgated the Access Regulation in recognition that workers' abilities to exercise their organizational rights "depend[] in some measure on the ability of

1  employees to learn the advantages and disadvantages of organization from others." Cal. Code Regs. tit.

2  8, § 20900(b). The Access Regulation provides that "the rights of employees under [California] Labor

3  Code Section 1152" include "the right of access by union organizers to the premises of an agricultural

4  employer for the purpose of meeting and talking with employees and soliciting their support." *Id.* §

5  20900(e).

6       This right is subject to several constraints. For example, a labor organization must provide notice

7  to the ALRB and the employer of its intent to appear onsite. *Id.* § 20900(e)(1)(B). No organization may

8  appear for more than four thirty-day periods in any calendar year. *Id.* § 20900(e)(1)(A)-(B). Organizers

9  may enter an employer's property "for a total period of one hour before the start of work and one hour

10  after the completion of work" and for "a single period not to exceed one hour during the working day for

11  the purpose of meeting and talking with employees during their lunch period." *Id.* § 20900(e)(3). Access

12  is limited to a certain number of organizers (depending on the number of employees) and organizers are

13  not allowed to engage in "conduct disruptive of the employer's property or agricultural operations,

14  including injury to crops or machinery or interference with the process of boarding buses." *Id.* §

15  20900(e)(4). Organizers are only allowed to meet with employees in areas "employees congregate

16  before and after working" or "at such location or locations as the employees eat their lunch." *Id.* §

17  20900(e)(3). Organizers that violate these provisions may be barred from accessing employers'

18  properties for organizing purposes. *Id.* § 20900(e)(5).

19  ### III. <u>FACTUAL BACKGROUND</u>

20       Plaintiff Cedar Point Nursery ("Cedar Point") is located in Dorris, California. Compl. for

21  Declaratory and Injunctive Relief ("Compl."), Doc. 1, ¶ 8. Cedar Point employs more than 400 seasonal

22  employees, who are housed off-site. *Id.* ¶¶ 26-27. Cedar Point alleges that United Farm Workers

23  ("UFW") members entered their property at 5:00 A.M. on October 29, 2015, "under the guise of the

24  access regulation . . . without any prior notice of intent to access the property" and "disrupted work by

25  moving through the trim sheds with bullhorns, distracting and intimidating workers." *Id.* ¶¶ 6, 30.

2

1   Sometime after this event, UFW served notice of their intent to access pursuant to the Access

2   Regulation. *Id.* ¶ 32. Cedar Point lodged a complaint against the UFW with the ALRB regarding UFW's

3   failure to provide notice prior to the October 29 incident. *Id.* ¶ 34. The UFW has also filed a charge with

4   the ALRB against Cedar Point, alleging that Cedar Point has committed unfair labor practices. *Id.*

5        Plaintiff Fowler Packing Company ("Fowler") is a California corporation, headquartered in

6   Fresno, California. *Id.* ¶ 9. Fowler describes itself as "one of the largest shippers in the fresh produce

7   business." *Id.* Fowler's employees do not live on their property. *Id.* ¶ 37. The UFW brought charges

8   before the ALRB against Fowler, based on alleged violations of the Access Regulation, in July 2015. *Id.*

9   ¶ 38. It withdrew these charges in January of 2016. *Id.* ¶ 39. Fowler alleges that, "[a]bsent the

10   challenged regulation, Fowler would oppose union access and exercise its right to exclude trespassers

11   from its property." *Id.* ¶ 40.

12        Both companies allege they "have reason to believe that the access regulation will be applied

13   against them in the future" and "the only proper and possible remedy . . . is declaratory and injunctive

14   relief." *Id.* ¶ 57. They state that the Access Regulation should not apply to them because "such access is

15   unnecessary given the alternative means of communication available [to union organizers]." *Id.* ¶ 64.

16                        **IV. <u>PROCEDURAL HISTORY</u>**

17        Plaintiffs filed their complaint against individual members of the ALRB on February 10, 2016.

18   Compl. at 11. Plaintiffs argue that the Access Regulation amounts to both a "taking" in violation of the

19   Fifth Amendment of the Constitution, and an unlawful seizure of their private property in violation of

20   the Fourth Amendment. *Id.* ¶¶ 58, 64. Plaintiffs seek a declaratory judgment stating that the Access

21   Regulation is unconstitutional as applied to them and an order enjoining the ALRB from enforcing the

22   regulation against them. *Id.* at 10:16-19.

23        On February 16, 2016, Plaintiffs filed a motion for preliminary injunction seeking to enjoin the

24   ALRB from enforcing the Access Regulation on their properties. Mot. for Preliminary Injunction

25   ("MPI"), Doc. 4-1. The State filed an opposition on March 9, 2016. Mem. of P. & A. in Opp'n to Pls.'

Mot. for Prelim. Inj. ("Opposition"), Doc. 7. Plaintiffs filed their reply on March 16, 2016. Reply in Supp. of Pls.' Mot. for Prelim. Inj. ("Reply"), Doc 9. On April 18, 2016, this Court issued an order denying the motion to the extent that it was based on Plaintiffs' Fifth Amendment claims and requesting supplemental briefing on their Fourth Amendment claims. Mem. Decision and Order ("April 2016 Order"), Doc. 18. The Parties timely responded. Br. In Supp. of Mot. for Prelim. Inj. ("Pls.' Brief"), Doc. 14; Suppl. Br. in Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' Brief"), Doc. 15.[1]

## V. STANDARD OF DECISION

A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 552 U.S. 674, 128 (2008). As such, the Court may only grant such relief "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat'l Res. Def. Council, Inc*., 129 S. Ct. 365, 375 (2008). To prevail, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm absent a preliminary injunction; (3) that the balance of equities tips in the moving party's favor; and (4) that an injunction is in the public interest. *Id.* at 374. In considering the four factors, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id*. at 376 (quoting *Amoco Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987)); *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell–Jolly*, 572 F.3d 644, 651 (9th Cir. 2009). When the government is a party, the last two factors in the *Winter* analysis merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2013).

## VI. ANALYSIS

### A.   Scope of the Claims

As indicated in its previous Order, the Court perceives Plaintiffs' claims to be challenges to the Access Regulation as it may be applied to them. April 2016 Order at 3, n. 1. However, it is also important to note that Plaintiffs do not seek a review of past conduct. Compl. 10:18-19. Nor do they

---

[1] Also before the Court is Defendants' motion to dismiss, Doc. 11. This matter shall be addressed in a separate order.

1    seek to limit the scope of the Access Regulations to certain situations in the future. Rather, they want to

2    enjoin Defendants from enforcing the rule against them *in any way* in the future, based on the

3    characteristics of their operations. *Id.* 10:16-17. The wide breadth of the relief requested suggests that

4    the underlying challenge is facial. But, it stays within the framework of an as-applied challenge because

5    Plaintiffs state that they only seek relief that would apply to their "particular circumstances." *John Doe*

6    *No. 1 v. Reed*, 561 U.S. 186, 194 (2010).[2] Therefore, to succeed on the merits of their claim, Plaintiffs

7    must show that it would be unconstitutional to apply the Access Regulation to them. *McCullen v.*

8    *Coakley*, 134 S. Ct. 2518, 2534, n. 4 (2014).[3]

9    **B.     Likelihood of Success on the Merits**

10   **1.     Threshold Issue: Seizure/Meaningful Interference**

11   Whether access by organizers effects a Fourth Amendment seizure is a threshold issue. *Jensen v.*

12   *Cty. of Sonoma*, 444 F. App'x 156, 159 (9th Cir. 2011) (no Fourth Amendment violation because order

13   requiring property owners to schedule a home inspection did not effect a seizure). As discussed in the

14   Court's April 2016 Order, "a 'seizure' of property occurs when there is some meaningful interference

15   with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113

16   (1984). In its supplemental brief, the State argues that the Access Regulation does not effect a

17   "meaningful interference" with Plaintiffs' property rights because it only allows a limited number of

18   ─────────────────────

19   [2] The Court notes that Plaintiffs do not claim that their circumstances make them unique among agricultural employers. However, an order enjoining the ALRB from applying the Access Regulation would not automatically apply to other entities.

20   [3] Defendants' discussion of *Freeman v. City of Dallas*, 242 F.3d 642 (5th Cir. 2001), seems to suggest that Plaintiffs must show that the Access Regulation has been or will be applied to them in a manner that violates *some other constitutional right*

21   before the Fourth Amendment is triggered. Defs.' Br. at 4. In *Freeman*, the Fifth Circuit held that a municipality did not need a judicial warrant to demolish a building that had been condemned as a dangerous nuisance. 242 F.3d at 647, 654. In the context of nuisance cases, the Fifth Circuit held that "the Fourth Amendment reasonableness of a seizure and demolition of

22   nuisance property will ordinarily be established when the substantive and procedural safeguards inherent in state and municipal property standards ordinances have been fulfilled." *Id*. at 654 n.17. As the *Freeman* Court recognized, *id*. at 652, the Ninth Circuit has taken a different approach, and has held that a warrant is required to seize property in a nuisance

23   abatement action. *Conner v. City of Santa Ana*, 897 F.2d 1487, 1492 (9th Cir. 1990) ("The warrant requirement applied to the City . . . regardless of how 'reasonable' the warrantless search and seizure appeared in light of the pre-seizure process

24   afforded the [property owners]."). Thus, to the extent that Defendants argue that a seizure that comports with due process requirements is entitled to a presumption of reasonableness based on nuisance jurisprudence, this theory does not have a

25   viable basis in Ninth Circuit case law.

1   organizers access for short periods of time. Defs.' Brief at 4.[4] The Supreme Court has explained that

2   "[w]hile the concept of a 'seizure' of property is not much discussed in our cases, this definition follows

3   from our oft-repeated definition of the 'seizure' of a person within the meaning of the Fourth

4   Amendment-meaningful interference, however brief, with an individual's freedom of movement."

5   *Jacobsen*, 466 U.S. at 114 n. 5. Generally, Fourth Amendment property seizures involve the removal or

6   destruction or personal property. *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1030 (9th Cir. 2012)

7   (unreasonable to destroy "unabandoned" personal effects of plaintiffs temporarily left on sidewalk);

8   *Cochran v. Gilliam*, 656 F.3d 300, 308 (6th Cir. 2011) (removing personal effects from apartment

9   constituted a seizure); *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210 (3d Cir. 2001) ("[K]illing of a

10   person's dog by a law enforcement officer constitutes a seizure under the Fourth Amendment."); *Archer

11   v. Gipson*, 108 F. Supp. 3d 895, 909 (E.D. Cal. 2015) (warrantless seizure of construction materials to

12   abate nuisance was "per se unreasonable" unless exception to the warrant requirement applies). In these

13   cases, the complete displacement of possessory interests is undisputed. *See, e.g.*, *Lavan*, 693 F.3d at

14   1030. ("The district court was correct in concluding that even if the seizure of the property would have

15   been deemed reasonable had the City held it for return to its owner instead of immediately destroying it,

16   the City's destruction of the property rendered the seizure unreasonable.").

17        When an owner is not completely dispossessed of his property, but only suffers a trespass, it is

18   not necessarily the case that interference causes a seizure. As discussed in the Court's April 2016 Order,

19   the Fourth Circuit found that a "constant physical occupation" of a plaintiff's property (which resulted

20   from a city's advertisement of a hiking trail through her backyard) "certainly constitute[d] a 'meaningful

21   interference' with [her] possessory interests." *Presley v. City Of Charlottesville*, 464 F.3d 480, 487 (4th

22   Cir. 2006). Generally, however, "[t]he existence of a physical trespass is only marginally relevant to the

23   _____

24   [4] In its request for supplemental briefing, the Court asked the parties to expand on the reasonableness of the Access Regulation as applied to Plaintiffs. In their brief, Defendants also clarified an earlier position that the Court misread as a

25   concession on the threshold issue of whether a seizure occurred. Because Defendants timely raised this issue in their previous brief, the Court will consider the argument.

1    question of whether the Fourth Amendment has been violated . . . for an actual trespass is neither

2    necessary nor sufficient to establish a constitutional violation." *United States v. Karo*, 468 U.S. 705,

3    712-13 (1984). For example, in *Karo*, the Supreme Court considered whether "the installation of a

4    beeper in a container of chemicals with the consent of the original owner constitutes a search or seizure

5    within the meaning of the Fourth Amendment when the container is delivered to a buyer having no

6    knowledge of the presence of the beeper." *Id.* at 707. While acknowledging that placing the beeper in

7    the can may have been a "technical trespass on the space occupied by the beeper," the Court found that

8    no seizure occurred because "it cannot be said that anyone's possessory interest was interfered with in a

9    meaningful way." *Id.*

10   Plaintiffs argue that the Access Regulation's interference with their interests is substantial

11   because "it effectively terminates" their right to exclude others from their properties. MPI at 11.

12   However, Plaintiffs have not shown that the ALRB has applied or will apply the Access Regulation in a

13   manner that has restricted Plaintiffs' freedom to <u>use</u> their property. *Jacobsen*, 466 U.S. at 114, n. 5. Nor

14   do Plaintiffs show that the rule will subject them to a "constant physical occupation." *Presley*, 464 F.3d

15   at 487. In fact, Plaintiffs do not allege that the ALRB has used the Access Regulation to force them to

16   allow *any* organizers on their properties to date. This is because the one example Plaintiffs provide of

17   union organizers accessing their property is alleged to have occurred in *violation* of the Access

18   Regulation. Compl. ¶ 34 (describing that the Union's actions "violated the access regulation by taking

19   access to Cedar Point's property without providing proper notice."). In fact, Cedar Point admits that it

20   has filed a charge against the Union with the ALRB related to this event. *Id*. Plaintiffs cannot have it

21   both ways. If the 2015 event occurred in violation of the Access Regulation, conduct associated with it

22   cannot be viewed as compelling evidence that implementation of the law is unconstitutional.[5] Thus,

_____

24   [5] The constitutionality of the 2015 access event is not at issue in this case, as Plaintiffs have requested no relief related to this
     event. Additionally, because the ALRB has not yet issued its own decision regarding the event, the issue is likely not ripe for
25   review. *See Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 304 (1979) (Constitutionality of Arizona access
     regulation not justiciable until organizers could "assert an interest in seeking access to particular facilities as well as a

7

1   Plaintiffs have not at this time met their burden to show it is likely that the <u>Access Regulation</u> has

2   caused or will cause a "meaningful interference" with their possessory interests.[6]

3   **2.   Reasonableness of the Access Regulation**

4   Even if Plaintiffs were able to show that the Access Regulation effects a Fourth Amendment

5   seizure, they still must demonstrate that such a search would be unreasonable. When determining

6   whether an interference violates the Fourth Amendment, "reasonableness is still the ultimate standard."

7   *Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 71 (1992). Any analysis of reasonableness must involve a "careful

8   balancing of governmental and private interests." *Id.* at 71 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325,

9   341 (1985)). It is Plaintiff's burden to demonstrate likelihood of success. In their supplemental brief,

10  Plaintiffs put forth two new arguments that the interference with their property rights is unreasonable.

11  First, Plaintiffs argue that the Access Regulation threatens their ability to comply with health and safety

12  regulations. Pls.' Brief at 1-2. Second, they argue that the Access Regulation impairs productivity. *Id.* at

13  3. Plaintiffs also cite to additional evidence in support of their previously asserted position that the

14  Access Regulation harms them because it hurts their goodwill and reputation.

15  In support of their first argument, Plaintiffs point to the declaration of Fowler's human resources

16  director, Chris Rodriguez. *Id.* at 2. Rodriguez testified that Fowler has a "food defense policy" that

17  requires specialized training to protect their food products from contamination. Decl. of Chris Rodriguez

18  ("Rodriguez Decl."), Doc. 14-12, ¶ 7. He states that the Access Regulation

19  allows persons to come on to the property near sensitive products who

palpable basis for believing that access will be refused.").

[6] Further, it is not clear that California property law treats conduct authorized by the Access Regulation as a trespass, given the California Supreme Court's finding that the rule "is not a deprivation of 'fundamental personal liberties' but a limited economic regulation of the use of real property imposed for the public welfare." *Agric. Labor Relations Bd. v. Superior Court*, 16 Cal. 3d 392, 409 (1976); *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 217 n. 21 (1994) ("The right of employers to exclude union organizers from their private property emanates from state common law . . ."); *N.L.R.B. v. Calkins*, 187 F.3d 1080, 1088 (9th Cir. 1999) ("[S]tate property law is what creates the interest entitling employers to exclude organizers in the first instance. Where state law does not create such an interest, access may not be restricted consistent with Section 8(a)(1) [of the National Labor Relations Act].").

1
2
3
4
5
6
7

> have no reason to be trained in or to be aware of the protocols required by
> Fowler's food defense policy. Fowler's field workers typically congregate
> near open-faced tubs of grapes during their breaks and meal periods.
> Consequently, union representatives naturally position themselves in this
> sensitive zone to be able to speak with employees. A union representative
> could easily contaminate this zone if the representative had an unprotected
> open cut or wound, was not properly dressed with protective clothing, or
> had a viral condition, such as the common cold, influenza, mononucleosis,
> or hepatitis. Such contamination would pose a substantial risk to Fowler as
> a legal and business matter, and to its vendors and customers, as a safety
> matter. In contrast, these risks are minimized by Fowler's employees, who
> must use aprons to cover their street clothes when packing, and who are
> not allowed to work if they exhibit symptoms of infection.

8

*Id.* Rodriguez also states that the presence of union organizers who are non-compliant with their food

9

safety policies during an audit may jeopardize Fowler's ability meet audit standards. *Id.* at ¶ 8. Cedar

10

Point's human resources manager testified that:

11
12
13
14
15
16
17

> [d]uring harvest time, operations on Cedar Point's property, including
> within the trim sheds, are very fast-paced and involve a variety of heavy
> equipment, including tractors, excavators, forklifts, and heavy bins. For
> employee safety, Cedar Point is very strict about when and where
> employees may stand or walk on the property and in the trim sheds.
> Knowing these protocols can be a life-or-death matter. For example,
> during harvest time, heavy bins are placed on metal tracks within the trim
> sheds to facilitate the transport of plants from the coolers to the packing
> areas. If one does not pay attention to whether one is standing on these
> tracks, one could very easily be struck by a moving heavy plastic bin,
> which typically weighs 2,500 pounds. Similarly, if one does not know the
> areas where forklifts or other heavy equipment operate within the trim
> sheds, one could very easily be struck by the equipment.

18

Decl. of Rachel Halpenny ("Halpenny Decl."), Doc. 14-2, ¶ 6.

19

     The Court credits Plaintiffs' concern for the safety of their operations. However, Plaintiffs do not

20

provide a basis for finding that the ALRB has employed or will employ the Access Regulation in a

21

manner that would permit or encourage violations of food safety policies or require Plaintiffs to

22

jeopardize the health or safety of their employees, their property, or, for that matter, the union

23

organizers. Crucially, Plaintiffs do not claim that they have been prevented from requiring organizers to

24

comply with their protocols. Nor do they suggest that it would be impractical to require organizers to do

25

so. Plaintiffs posit that instructing organizers about their safety protocols may run afoul of the Access

1    Regulation's prohibition on employer interference with the activities of union organizers. Pls.' Brief at

2    2, n. 1. However, there is no evidence that the Access Regulation has been or would be applied in such a

3    manner. In fact, the Access Regulation *prohibits* organizers from engaging in "conduct disruptive of the

4    employer's property or agricultural operations." Cal. Code Regs. tit. 8, § 20900(e)(4). Because refusal to

5    comply with health and safety procedures would disrupt an employer's operations, the conduct of which

6    Plaintiff is concerned is prohibited, not required, by the Access Regulation.

7         Halpenny also described that when union protestors visited Cedar Point's facility in 2015, they

8    did so "in the early morning hours when the trim sheds and outside areas were dark," and "had no reason

9    to know about Cedar Point's safety protocols or the dangers of not knowing whether one is standing in a

10   safe area on the property." Halpenny Decl. ¶ 7. While the concerns about this event are reasonable, it is

11   not clear that they can be tied to implementation of the Access Regulation. Plaintiffs acknowledge that

12   the organizers did not comply with the Regulation, first because they failed to give notice, and second

13   because they engaged in disruptive activities. Compl. ¶ 30. In fact, two of Cedar Point's employees

14   testified that this event was a "protest" that was "particularly disruptive." Decl. of Matthew McEwen

15   ("McEwen Decl."), Doc. 14-3; ¶ 7; Decl. of Victor Garcia ("Garcia Decl."), Doc. 14-4, ¶ 7. Plaintiffs do

16   not claim that the ALRB sanctioned such behavior as protected by the Access Regulation. In fact,

17   Plaintiffs filed a complaint with the ALRB about the union's activities that is still pending. Compl. ¶ 34;

18   Decl. of Mike Fahner ("Fahner Decl."), Doc. 4-3, ¶ 13. Therefore, although this event is of obvious

19   practical concern to Plaintiffs, it is not persuasive evidence of conduct permitted by the Access

20   Regulation. Violations of the Access Regulation can result in the banning of any group for non-

21   compliance. Cal. Code Regs. tit. 8, § 20900(e)(5). This in no way makes the regulation unconstitutional.

22        Plaintiffs next argue that the Access Regulation threatens productivity because workers do not

23   generally eat when union organizers meet with them. Pls.' Br. at 3; *see also* Rodriguez Decl. ¶ 9.

24   Plaintiffs explain that this requires them to give the workers longer lunch breaks. *Id.* It is logical to

25   assume that longer lunch breaks may negatively affect productivity. However, given that Plaintiffs do

1    not provide any estimate of how much time is actually lost (or may be lost in the future) in relation to

2    these activities, the Court cannot determine how meaningful any such negative impact is relative to

3    Defendants' stated interests. Defendants provide testimony that the 2015 event resulted in a "significant

4    work slowdown." McEwen Decl. ¶ 7. For one crew, this meant that "an additional three hours were

5    required to complete trimming work." *Id.* For another crew, this meant that employees were "only able

6    to produce approximately 50% of what they could normally do." Garcia Decl. ¶ 7. As discussed above,

7    given that the 2015 event was "particularly disruptive," occurred without the required notice, and the

8    ALRB has not endorsed the event, the Court cannot consider productivity losses alleged to be associated

9    with the event to be persuasive evidence as to how the rule is actually implemented. Violating the rule is

10   not the same as implementing it.

11       Plaintiffs next assert that the Access Regulation is unreasonable because it will cause them to

12   lose goodwill insofar as its application sends a message that they do not treat their workers well. In its

13   April 2016 Order, the Court noted that Plaintiffs had not provided any authority for the proposition that

14   such a loss of goodwill is a cognizable form of injury that would support an unlawful seizure claim.

15   April 16 Order at 13. In supplemental briefing, Plaintiffs point to a Fifth Circuit case that recognized a

16   business could have a property interest in its reputation under Florida law. *Marrero v. City of Hialeah*,

17   625 F.2d 499, 514 (5th Cir. 1980) ("Florida has long extended its protection to the intangible interests of

18   a business."). California law also protects business goodwill as property. *WMX Techs., Inc. v. Miller*, 80

19   F.3d 1315, 1323 (9th Cir. 1996) (citing California Civil Code § 655), *on reh'g en banc*, 104 F.3d 1133

20   (9th Cir. 1997). Rodriguez states that Fowler's good will is impaired when organizers access the

21   property because "the perception among Fowler's employees is that the company must be a wrongdoer."

22   Rodriguez Decl. ¶ 10. He also states that a similar impression is left with Fowler's vendors and

23   customers, "making it less likely that they will continue to do business with Fowler." *Id.* Halpenny states

24   that, "since last year's protest, every labor contractor who has contacted me has asked whether Cedar

25   Point has resolved the issues with the union. These contractors are now concerned about whether to

11

contract with Cedar Point, a concern that was not present prior to the union protests." Halpenny Decl. ¶

9. As discussed above, Plaintiffs have not made clear that the mere presence of union organizers on their

property will cause them to lose goodwill, or whether the goodwill they alleged to have lost in the past

was due to the "particularly disruptive" nature of the event that occurred in 2015. In other words, it is

impossible at this point to determine whether the repercussions alleged by Plaintiff would have occurred

had the organizers complied with the Access Regulation.

In contrast, Defendants persuasively argue that the State's general interests in enforcing the

Access Regulation are significant. California has declared that is the

> policy of the state to encourage and protect the right of agricultural
> employees to full freedom of association, self-organization, and
> designation of representatives of their own choosing, to negotiate the
> terms and conditions of their employment, and to be free from the
> interference, restraint, or coercion of employers of labor, or their agents, in
> the designation of such representatives or in self-organization or in other
> concerted activities for the purpose of collective bargaining or other
> mutual aid or protection.

Cal. Lab. Code § 1140.2. The ALRB has found that workers' abilities to exercise these rights "depend[]

in some measure on the ability of employees to learn the advantages and disadvantages of organization

from others." Cal. Code Regs. tit. 8, § 20900(b). The Supreme Court has also recognized that "[t]he

right of self-organization depends in some measure on the ability of employees to learn the advantages

of self-organization from others." *Nat'l Labor Relations Bd. v. Babcock & Wilcox Co*., 351 U.S. 105,

113 (1956). The ALRB has found "that unions seeking to organize agricultural employees do not have

available alternative channels of effective communication." Cal. Code Regs. tit. 8, § 20900(c).

Therefore, to bring "certainty and a sense of fair play" to the "potentially volatile condition in the

agricultural fields of California," the ALRB has also found that the state's interests are "best served by

the adoption of rules on access which provide clarity and predictability to all parties." *Id.* § 20900(d).

"Relegation of the issues to case-by-case adjudication or the adoption of an overly general rule would

cause further uncertainty and instability and create delay in the final determination of elections." *Id.* The

1  California Supreme Court subsequently confirmed that this rule was within the ALRB's rulemaking

2  powers. *Agric. Labor Relations Bd. v. Superior Court* ("*ALRB v. SC*"), 16 Cal. 3d 392, 416 (1976).

3          The State also presents evidence that conditions supporting the necessity of worksite access at

4  the time of the rule's inception still exist today. Opposition at 13-14. For example, the State presents a

5  memorandum summarizing the testimony and minutes of three hearings the ALRB held in September of

6  2015. Req. for Judicial Notice, Ex. A ("ALRB Memo"), Doc. 8 at Ct. R. 4.[7] In these hearings, the ALRB

7  heard testimony that agricultural workers remain largely unaware of their labor rights because of a

8  number of communication barriers. *Id.* at Ct. R. 10-11.[8] First, reaching employees directly offsite is

9  difficult because of the long hours that agricultural employees work. *Id.* Second, many workers are not

10  literate in Spanish or English, and lack access to the internet because of the high cost of data plans and

11  computers. *Id.* at 13-14. Workers' lack of language and computer literacy means that online outreach

12  efforts have not been very successful. *Id.* at 14. Further, the ALRB heard testimony that agricultural

13  workers were fearful about exercising their rights and that face-to-face communication is important to

14  help them overcome these fears. *Id.* at 20.

15          Plaintiffs counter that their employees are accessible because they mostly speak Spanish or

16  English. McEwen Decl., ¶ 5; Garcia Decl., ¶ 5. Cedar Point also presents evidence that between 90%

17  and 100% of their employees possess cellular or smartphones. McEwen Decl. ¶ 5; Garcia Decl. ¶ 5.

18  Fowler represents that 50% of their employees use "a cellular or smart phone." Decl. of Scott. Sanders

19  ("Sanders Decl."), Doc. 14-5, ¶ 5. Plaintiffs also show that organizers utilize internet resources and have

20  a radio station. Decl. of Kevin Desormeaux, Doc. 14-6, Ex. A-E.

21

22  [7] A court may take judicial notice of "records and reports of administrative bodies." *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), abrogated on other grounds by *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991).

23  [8] Plaintiffs argue that the Court may not take judicial notice of the facts set forth in the ALRB Memo because they are

24  "legislative facts." Pls.' Br. at 5, n. 3. Plaintiffs' argument is misplaced. The Court takes judicial notice that the administrative hearings took place and that the Memo reflects these proceedings as summarizing part of the administrative record. Further, this Court has discretion to consider a broad range of evidence because "the rules of evidence do not strictly

25  apply to preliminary injunction proceedings." *Houdini Inc. v. Goody Baskets LLC*, 166 F. App'x 946, 947 (9th Cir. 2006).

1    That Plaintiffs' employees may have some access to social media does not negate the ALRB's

2    concerns that workers have sufficient access to the internet or the skills to find *and* understand the

3    relevant information. Nor does the fact that organizers use broadcast and social media mean that these

4    tools are sufficient. As discussed above, the Access Regulation is primarily concerned with information

5    delivery and education. Cal. Code Regs. tit. 8, § 20900(e). ("[T]he rights of employees under Labor

6    Code Section 1152 [] include the right of access by union organizers to the premises of an agricultural

7    employer *for the purpose of meeting and talking with employees and soliciting their support*.")

8    (emphasis added). Defendants have put forth evidence supporting their conclusion that worksite access

9    is necessary for organizers to be able to provide this information. In contrast, Plaintiffs have not

10   presented compelling evidence that their seasonal workers have reliable access to such information via

11   alternative sources that would negate the need for worksite access. Thus, they have not shown that it

12   would be unreasonable for the ALRB to allow organizers to access their property to provide such

13   information.

14   **C.    Irreparable Harm**

15       **1.    Constitutional Injuries**

16       Plaintiffs argue that they are suffering from a "deprivation of constitutional rights" which

17   "unquestionably constitutes irreparable injury." MPI at 12. This theory arises out of a First Amendment

18   case where public employees alleged that "they were discharged or threatened with discharge solely

19   because of their partisan political affiliation or nonaffiliation." *Elrod v. Burns*, 427 U.S. 347, 349 (1976).

20   Finding that "First Amendment interests were either threatened or in fact being impaired at the time

21   relief was sought," the Court concluded that such a loss, "for even minimal periods of time,

22   unquestionably constitutes irreparable injury." *Id*. at 373. The government argues that this line of case

23   law only extends to violations of "fundamental" constitutional rights. Opposition at 12. The cases the

24   government cites in support of this argument, however, are from out of circuit. *Id.* (citing *Vaqueria Tres

25   Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009), and *Ne. Florida Chapter of Ass'n of Gen.*

14

1   *Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285-86 (11th Cir. 1990)). There is no

2   indication that the Ninth Circuit requires a constitutional right to be "fundamental" in order to support a

3   conclusion that its violation would constitute an irreparable injury. Rather, it has held more generally

4   that "an alleged constitutional infringement will often alone constitute irreparable harm." *Associated*

5   *Gen. Contractors of Cal., Inc. v. Coalition for Economic Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991).

6   For example, it has recognized a violation of the equal protection clause as a type of constitutional

7   infringement that "will often alone constitute irreparable harm." *Goldie's Bookstore, Inc. v. Superior*

8   *Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984). Further, the Ninth Circuit has upheld a

9   decision in which a district court found irreparable injury on the basis of a Fourth Amendment violation.

10  *Lavan*, 693 F.3d at 1033. Thus, Plaintiffs may be able to show an irreparable injury if they can show that

11  activities authorized by the Access Regulation are unconstitutional.

12          While a Fourth Amendment violation may be a sufficient basis for finding irreparable harm, the

13  strength of this position is tied to the likelihood of success of their underlying claim. *Dex Media W., Inc.*

14  *v. City of Seattle*, 790 F. Supp. 2d 1276, 1289 (W.D. Wash. 2011) ("Because the court finds that

15  Plaintiffs have failed to establish that they are likely to succeed on the merits of their First Amendment

16  claim . . . the court cannot find that Plaintiffs have established that they are likely to suffer irreparable

17  First Amendment injury in the absence of a preliminary injunction."); *accord Nationwide Biweekly*

18  *Admin., Inc. v. Owen*, No. 14-CV-05166-LHK, 2015 WL 1254847, at *9 (N.D. Cal. Mar. 18, 2015). As

19  discussed above, Plaintiffs have not demonstrated that the Access Regulation is likely to cause a

20  constitutional injury. Therefore, they cannot show that irreparable harm based on such an injury is

21  likely.

22          **2.    Operational Injuries**

23          Plaintiffs also allege that the potential for them to lose goodwill and competitive advantage is

24  also likely to cause them irreparable harm. MPI at 12. They claim that "just the 'threatened loss' of

25  goodwill is undeniably an irreparable harm under Ninth Circuit precedent," citing *Stuhlbarg Int'l Sales*

1 *Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). MPI at 12. However, the *Stuhlbarg*

2 Court's reliance on the "possibility" that goodwill would be lost as sufficient showing of irreparable

3 harm was overruled by the Supreme Court in *Winter*: "[T]he Ninth Circuit's 'possibility' standard is too

4 lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate

5 that irreparable injury is likely in the absence of an injunction." 555 U.S. at 22. The Ninth Circuit has

6 since made clear that a plaintiff "must establish a likelihood of irreparable harm that is grounded in

7 evidence, not in conclusory or speculative allegations of harm." *Pom Wonderful LLC v. Hubbard*, 775

8 F.3d 1118, 1133 (9th Cir. 2014).

9       Plaintiffs argue that the Access Regulation "threatens to put Plaintiffs at a competitive

10 disadvantage relative to their unionized competitors" by "inciting protests on their property" and will

11 cause them to lose goodwill because "the regulation sends the message that Plaintiffs would treat own

12 workers poorly if it were not for union interference." MPI at12. Cedar Point's owner states that the

13 Access Regulation will cause Cedar Point to lose goodwill because it "sends a message that Cedar Point

14 would treat its workers poorly without union interference." Fahner Decl. ¶ 14. Similarly, Fowler's CEO

15 states that the access regulation will cause Cedar Point to lose goodwill because "it sends a message that

16 Fowler would treat its workers poorly without union interference." Decl. of Dennis Parnagian

17 ("Parnagian Decl."), Doc. 4-2, ¶ 10. Plaintiffs submitted additional evidence with their supplemental

18 briefing attesting to the fact that Cedar Point's employees were "visibly shaken and scared" in response

19 to the 2015 episode. Pls.' Br. at 4. Cedar Point's human resources director attested that "approximately

20 75" employees resigned in response to the event and that since that time, "every labor contractor who

21 has contacted me has asked whether Cedar Point has resolved issues with the union." Halpenny Decl. ¶¶

22 8-9. The Court credits Plaintiffs' frustration with the events alleged to have occurred in 2015, as well as

23 their alleged ramifications. If Plaintiffs were able to tie these allegations to the <u>lawful</u> implementation or

24 enforcement of the Access Regulation, then there might be a basis for finding harm. However, as

25 discussed above, Plaintiffs have not shown that the 2015 events were the result of lawfully

1    implementing or enforcing the Access Regulation. Rather, according to Plaintiffs, these events occurred

2    *in violation* of the Access Regulation. Fahner Decl. ¶ 13; Compl. ¶ 34. Plaintiffs do not present any

3    other objective evidence that substantiates their theory that the Access Regulation, when <u>lawfully</u>

4    implemented or enforced, is likely to cause Plaintiffs to lose goodwill or suffer a competitive

5    disadvantage. Thus, they have not shown that the Access Regulation is likely to cause them irreparable

6    harm.

7    **D.    <u>Balance of the Equities/Public Interest</u>**

8        Plaintiffs argue that the balance of the equities tips in their favor because they would suffer

9    "many injuries," such as the "loss of goodwill, a competitive disadvantage, and deprivation of their

10   constitutional rights." MPI at 12-13. As indicated above, Plaintiffs do not provide sufficient evidentiary

11   support for these assertions. In contrast, the government has shown that the state of California has a

12   specific interest in protecting the rights and safety of the agricultural workers under the ALRA and that

13   the Access Regulation is an integral part of this policy. *ALRB v. SC*, 16 Cal. 3d at 415.

14       Plaintiffs invoke the Supreme Court's decision in *Lechmere, Inc. v. N.L.R.B.*, 502 U.S. 527

15   (1992), to undermine the strength of the State's stated interests. MPI at 13. In *Lechmere*, the Supreme

16   Court considered whether section 7 of the National Labor Relations Act ("NLRA") permitted an

17   administrative law judge to require an employer to allow non-employee union organizers on to its

18   property. 502 U.S. at 531. Summarizing its previous holding in *Nat'l Labor Relations Bd. v. Babcock &*

19   *Wilcox Co.*, 351 U.S. 105, 109-110 (1956), the *Lechmere* Court explained that section 7 "simply does

20   not protect nonemployee union organizers except in the rare case where 'the inaccessibility of

21   employees makes ineffective the reasonable attempts by nonemployees to communicate with them

22   through the usual channels.'" *Id.* Plaintiffs argue that *Lechmere* requires this Court to find that the

23   Access Regulation is contrary to the public interest because they claim that their circumstances differ

24   from those that the Supreme Court recognized as making the employees inaccessible (*i.e.*, that their

25   employees speak Spanish or English, own cell phones and are not housed on their employer's property).

First, it must be noted that *Lechmere* and *Babcock* were based on the *scope of the NLRA* and did not present constitutional challenges. Therefore, the holdings in these cases do not control the issue of whether ALRA regulations are constitutional. But even if the factors identified in *Lechmere* and *Babcock* might be considered in an evaluation of the public interest, the outcome of that analysis would favor the State. As the California Supreme Court recognized in 1976, the ALRB reasonably found that employee inaccessibility "was the rule rather than the exception in California agriculture" because

> . . . many farmworkers are migrants; they arrive in town in time for the local harvest, live in motels, labor camps, or with friends or relatives, then move on when the crop is in. Obviously home visits, mailings, or telephone calls are impossible in such circumstances. According to the record, even those farmworkers who are relatively sedentary often live in widely spread settlements, thus making personal contact at home impractical because it is both time-consuming and expensive.
>
> Nor is pamphleting or personal contact on public property adjacent to the employer's premises a reasonable alternative in the present context, on several grounds. To begin with, many ranches have no such public areas at all: the witnesses explained that the cultivated fields begin at the property line, and across that line is either an open highway or the fields of another grower. Secondly, the typical industrial scene of a steady stream of workers walking through the factory gates to and from the company parking lot or nearby public transportation rarely if ever occurs in a rural setting. Instead, the evidence showed that labor contractors frequently transport farmworkers by private bus from camp to field or from ranch to ranch, driving directly onto the premises before unloading; in such circumstances, pamphleting or personal contact is again impossible. . .
>
> Finally it was also shown that many farmworkers are illiterate, unable to read even in one of the foregoing languages; in such circumstances, of course, printed messages in handbills, mailings, or local newspapers are equally incomprehensible.

*ALRB v. SC*, 16 Cal. 3d at 414-15. The government presents evidence that these conditions persist today. ALRB Memo at Ct. R. 10. Thus, the fact that Plaintiffs' employees do not meet certain metrics of isolation does not undermine the State's position that these employees are inaccessible to organizers.

Finally, Plaintiffs also submit declarations of their executives that working conditions at their properties are excellent and that their employees have not expressed an interest in organizing. Fahner Decl. ¶ 8, Parnagian Decl. ¶ 6. That is beside the point. The purpose of the Access Regulation is to

provide employees with the *knowledge* of their rights. It has nothing to do with employees' decisions as to what, if anything, to do with those rights. This purpose exists independent of the actual conditions on site. As discussed above, Plaintiffs provide no evidence that their workers have reliable access to information about their organizational rights. For these reasons, the Court finds that the balance of the equities favors Defendants and that denial of Plaintiffs' request is in the public interest. *Drakes Bay Oyster Co.*, 747 F.3d at 1092.

## VII. <u>CONCLUSION AND ORDER</u>

For the reasons discussed above, the Court finds that each of the *Winter* factors favors Defendants with respect to Plaintiffs' Fourth Amendment claims. The Court previously denied Plaintiffs' motion as to their Fifth Amendment claims. It now DENIES Plaintiffs' motion for preliminary injunction, Doc. 4, in its entirety.

IT IS SO ORDERED.

Dated:   **May 26, 2016**                    **/s/ Lawrence J. O'Neill**
                                      UNITED STATES CHIEF DISTRICT JUDGE